UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 23-15280-JGR |
| GALLUS DETOX SERVICES, INC. | ) | Chapter 11 |
| EIN: 88-2490456 | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| GALLUS DETOX DENVER, LLC | ) | Case No. 23-15283-JGR |
| EIN: 84-3421544 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| GALLUS DETOX SCOTTSDALE, LLC | ) | Case No. 23-15284-JGR |
| EIN: 47-2515577 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| GALLUS DETOX DALLAS, PLLC, | ) | Case No. 23-15285-JGR |
| EIN: 87-2068937 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

## THIRD AMENDED JOINT PLAN OF REORGANIZATION DATED FEBRUARY 12, 2024

The Debtors, Gallus Detox Services, Inc. ("GDS"), Gallus Detox Denver, LLC ("Denver"), Gallus Detox Scottsdale, LLC ("Scottsdale"), and Gallus Detox Dallas, PLLC ("Dallas" and together with GDS, Denver, and Scottsdale, the "Debtors"), Debtors and Debtors-in-Possession in this Chapter 11 case, set forth their Amended Joint Plan of Reorganization Dated February 12, 2024 as follows:

### ARTICLE I.
### INTRODUCTION

1.1 -   This document constitutes the Plan of Reorganization for the Debtors.  This document is designed to provide all creditors and parties in interest with sufficient information with which to make an informed vote as to the acceptance or rejection of the Debtors' Plan.

1

1.2 -   Any terms which are set forth in this document and defined in the Bankruptcy Code shall have the meaning attributed to them as set forth in Article II herein.

1.3 -   Pursuant to the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" under the Plan are entitled to vote to accept or reject the Plan.  Classes of Claims and Interests that are not impaired are not entitled to vote and are deemed to have accepted the Plan. Voting on the Plan shall be pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules, and a Class shall have accepted the Plan if the Plan is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class actually voting. Each holder of an Allowed Claim in Classes 2 through 13 as to GDS, Classes DE2 through DE8 as to Denver, Classes S2 through S8 as to Scottsdale, and Classes DA2 through DA 8 as to Dallas shall be entitled to vote to accept or reject the Plan.

1.4 -   Regardless of creditor votes, if the Plan meets all of the applicable requirements of Section 1129(a) of the Bankruptcy Code, other than subsections (8), (10), and (15), the Court may confirm the Plan if it does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.

1.5 -   As discussed more fully below, the Debtors firmly believes that the Plan represents the best alternative for providing the maximum value for creditors.  The Plan provides creditors with a distribution on their Claims in an amount greater than any other potential known option available to the Debtor.

1.6 -   THIS PLAN AND THE DISCLOSURES CONTAINED HEREIN HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION.  THE COMMISSION HAS SIMILARLY NOT REVIEWED THE ACCURACY OR ADEQUACY OF THIS PLAN.

## ARTICLE II.
### DEFINITIONS

2.1 -   "Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(2) of the Bankruptcy Code, including (a) actual, necessary costs and expenses, incurred after the Petition Date, of preserving any Debtor's Estate and operating its business, including wages, salaries, or commissions for services rendered after the Petition Date, (b) Professional Fees, and (c) all fees and charges assessed against the Estate under chapter 123 of

2

title 28, United States Code; *provided*, *however*, that post-Petition Date liabilities incurred or expenses arising in the ordinary course of the Debtor's business, including, but not limited to, trade vendor, employee wage and benefit, and state and local property, sales, and use taxes shall not constitute Administrative Claims for which a proof of Administrative Claim shall be required to be filed.

2.2 -   "<u>Administrative Claims Bar Date</u>" means the deadline for filing Administrative Claims, including Professional Fee Claims, as set forth in Paragraph 12.8.

2.3 -   "<u>Allowed</u>" means with respect to Claims: (a) any Claim, proof of which is timely filed by the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court, a Proof of Claim is not or shall not be required to be filed); (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein and to the maximum extent provided by applicable law, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor, as applicable. For the avoidance of doubt, to the maximum extent provided by applicable law and except as provided herein or otherwise agreed, no Entity may File a Proof of Claim after the Claims Bar Date without further order of the Bankruptcy Court. "Allow" and "Allowing" shall have correlative meanings.

2.4 -   "<u>Assets</u>" means any and all of either GDS, Denver, Scottsdale, or Dallas's real or personal property of any nature, including, without limitation, any leasehold improvements, privileges, rights, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, cash, deposit accounts, reserves, deposits,

3

contractual rights, intellectual property rights, claims, causes of action, any other general intangibles of any of the Debtors, and the property of their respective Estate under section 541 of the Bankruptcy Code.

2.5 - "Assumed Contracts" means all executory contracts and unexpired leases assumed by the Debtors under section 365 of the Bankruptcy Code pursuant to an order of the Bankruptcy Court entered prior to or on the Effective Date.

2.6 - "Avoidance Actions" means the Debtors' causes of action for any avoidance or recovery action under sections 502, 506, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfers, whether or not litigation has been commenced with respect to such causes of action as of the Effective Date.

2.7 - "Bankruptcy Code" means title 11 of the United States Code, as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing, to the extent such amendments, modifications, or replacements are applicable to the Chapter 11 Cases.

2.8 - "Bankruptcy Court" means the United States Bankruptcy Court for the District of Colorado, or such other court as may properly exercise jurisdiction over the Chapter 11 Cases.

2.9 - "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code and the Official Bankruptcy Forms, the Federal Rules of Civil Procedure, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, all as now in effect or hereafter amended, and as applicable to the Chapter 11 Cases.

2.10 - "Business Day" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in Denver, Colorado.

2.11 - "Cash" means cash and cash equivalents, including, without limitation, wire transfers, bank deposits, checks and legal tender of the United States.

2.12 - "Causes of Action" means any and all of the Estates' and the Debtors' actions, Claims, demands, rights, defenses, counterclaims, suits, causes of action, liabilities, obligations, debts, judgments, remedies, damages, recoupments, cross claims, counterclaims, third-party claims, indemnity claims, contribution claims, and any other claim, whether known or unknown,

4

foreseen or unforeseen, direct or indirect, derivative, choate or inchoate, in law, equity, or otherwise, including all Avoidance Actions, and any and all other claims or rights of any value whatsoever, at law or in equity, against any Creditor or other third party, including any and all claims against any Insiders, members, officers, directors, managers or employees of the Debtors; *provided*, *however*, that, when used in the Plan, the term "Causes of Action" does not include any Claim, obligation, suit, judgment, damages, right, remedy, cause of action, charge, cost, debt, indebtedness, or liabilities released or waived pursuant to Paragraph 10.5 of the Plan or by order of the Bankruptcy Court, nor does the term "Causes of Action" include any appeals pending under applicable State Law for the refund of severance taxes.  When used in the Plan, the term "Causes of Action" shall also specifically include any claim, demand, right, and cause of action that may only be asserted by a Person other than the Debtor (including the Holder of a Claim or Interest) on a derivative or other basis.  A Cause of Action shall not under any circumstances be waived as a result of the failure of the Debtors to describe such Cause of Action with specificity in the Plan. Except as expressly provided herein, nothing in the Plan operates as a release of any of the Causes of Action.

2.13 -  "Chapter 11 Cases" means, together, the Debtors' Chapter 11 cases, pending in the Bankruptcy Court under Case Nos. 23-15280-JGR (GDS), 23-15283-JGR (Denver), 23-15284-JGR (Scottsdale), and 23-15285-JGR (Dallas), jointly administered under Case No. 23-15280-JGR.

2.14 -  "Claim" means a "claim" against any Debtor, as defined in section 101(5) of the Bankruptcy Code and as supplemented by section 102(2) of the Bankruptcy Code, whether or not asserted, or reduced to judgment, whether known or unknown, liquidated or unliquidated, fixed, contingent, non-contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether arising before, on, or after the Petition Date.

2.15 -  "Claims Bar Date" means January 23, 2024 or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court to File such Claims.

2.16 -  "Claims Objection Bar Date" means, for each Claim, the later of (a) 120 Days after the Effective Date of the Plan and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

2.17 -  "Class" means one of the classes of Claims or Interests listed in Article IV of this Plan.

5

2.18 - "Collateral" means any property or interest in property of any Debtor's Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or other applicable law.

2.19 - "Combined Net Revenue" means the combined revenue from GDS, Dallas, Scottsdale, and Denver after payment of expenses for all of the Debtors, including payment of any amounts owed on account of secured debt payments.

2.20 - "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court.

2.21 - "Confirmation Date" means the date that the Bankruptcy Court enters a Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

2.22 - "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider confirmation of this Plan pursuant to sections 1129 and 1191 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

2.23 - "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan under sections 1129 and 1191 of the Bankruptcy Code.

2.24 - "Creditor" means a creditor, within the meaning of section 101(10) of the Bankruptcy Code, of any of the Debtors.

2.25 - "Debtors" means the Debtors who are proposing this Plan, GDS, Denver, Scottsdale, and Dallas.

2.26 - "Disallowed Claim" means a Claim, or any portion thereof, that (a) has been disallowed by a Final Order, or (b) is not Scheduled or is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a bar date has been established but no proof of claim has been filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, or otherwise deemed timely filed under applicable law.

2.27 - "Disputed Claim" means a Claim, or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, including, but not limited to, Claims (a) (i) that have not been Scheduled by any Debtor, but as to which a timely proof of claim has been filed or (ii) have been Scheduled at zero or as contingent, unliquidated, or disputed, but as to which a timely proof of claim in a liquidated amount has been filed and (b) as to which any Debtor, any Reorganized

6

Debtor, or any other party-in-interest has interposed a timely objection or request for estimation, or has sought to subordinate or otherwise limit recovery, in accordance with the Bankruptcy Code and the Bankruptcy Rules, or which is otherwise disputed by any Debtor, any Reorganized Debtor, or other party-in-interest in accordance with applicable law, which objection, request for estimation, action to limit recovery, or dispute has not been withdrawn or determined by a Final Order. In the event that any part of a Claim is disputed, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distributions under this Plan unless and until a Final Order has been entered allowing such Claim.

2.28 - "Distributions" means the properties or interests in property to be paid or distributed under this Plan to the holders of Allowed Claims.

2.29 - "Effective Date" means the date that all conditions to consummation of this Plan set forth in Paragraph 12.6.

2.30 - "Entity" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

2.31 - "Estates" means the estates of the Debtors created by section 541 of the Bankruptcy Code on the Petition Date.

2.32 - "Exculpated Party" means GDS, Denver, Scottsdale, and Dallas and their respective officers, directors, employees, partners, advisors, attorneys, financial advisors, accountants, and other professionals.

2.33 - "Executory Contract" means every unexpired Lease and every other contract that is subject to being assumed or rejected by the Debtors under 11 U.S.C. § 365, pursuant to the Plan or pursuant to a separate motion.

2.34 - Expense Reserve shall mean the amount set aside by the Debtors from their revenue prior to payment of creditors to cover any cash shortfalls, cost overruns, or unanticipated expenses

2.35 - "Final Decree" means the decree or other order of the Bankruptcy Court closing the Chapter 11 Case, as contemplated by section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

2.36 - "Final Order" means an order, ruling, or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived, or, in the event that an appeal,

writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court of other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous Bankruptcy Rule or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

2.37 -  "General Unsecured Claim" means any Claim that is not (a) entitled to priority under section 507(a) of the Bankruptcy Code or subordinated pursuant to section 510(b) of the Bankruptcy Code, or (b) a Secured Claim, Priority Tax Claim, or Other Priority Claim.

2.38 -  "Holder" means an Entity holding a Claim or Interest (as the case may be), and with respect to a Distribution under the Plan, an Entity holding the beneficial interest in a Claim or Interest as of the Distribution Date

2.39 -  "Impaired" means, when used with reference to a Claim or Interest, a Claim or Interest (as the case may be) that is impaired within the meaning of section 1124 of the Bankruptcy Code.

2.40 -  "Insider" means (i) an "insider," as defined in Section 101(31) of the Bankruptcy Code, and (ii) an "affiliate," as defined in Section 101(2) of the Bankruptcy Code.

2.41 -  "Interest" shall mean any member interest, preferred, common, or otherwise, or any other instrument evidencing any ownership interest in the Debtors and any option, warrant or right of any nature, contractual or otherwise, to acquire an ownership interest in the Debtors.

2.42 -  "Lease" means any lease agreement between any Debtor and another Entity.

2.43 -  "Lien" means any charge against or interest in property to secure payment or performance of a claim, debt, or obligation.

2.44 -  "New Common Stock" means any new shares of common stock issued in Reorganized GDS pursuant to Paragraph 12.11 of the Plan.

2.45 -  "New Preferred Stock" means any new shares of preferred stock issued in Reorganized GDS pursuant to Paragraph 12.11 of the Plan.

2.46 -  "Other Priority Claim" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code, other than an Administrative Claim, a Priority Wage Claim, or a Priority

8

Tax Claim.

2.47 -   "Person" means a "person" as defined in section 101(41) of the Bankruptcy Code.

2.48 -   "Petition Date" means November 14, 2023, the date on which the Debtors filed their respective voluntary petitions commencing the Chapter 11 Cases.

2.49 -   "Plan" means this joint plan under Chapter 11 of the Bankruptcy Code, together with all exhibits and schedules hereto, as it has been or may be amended, modified, or supplemented from time to time in accordance with sections 1127 and 1193 of the Bankruptcy Code.

2.50 -   "Priority Tax Claim" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

2.51 -   "Priority Wage Claim" means a Claim that is entitled to priority under Section 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

2.52 -   "Professional" means any professional employed in the Chapter 11 Cases pursuant to section 327 of the Bankruptcy Code or otherwise, and the professionals seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

2.53 -   "Professional Fee Claim" means a Claim of a Professional for compensation for services rendered, and/or reimbursement of costs and expenses incurred, after the Petition Date and prior to and including the Confirmation Date.

2.54 -   "Proof of Claim" means a proof of claim pursuant to section 501 of the Bankruptcy Code and/or any order of the Bankruptcy Court, together with supporting documents.

2.55 -   "Reorganized GDS, Reorganized Denver, Reorganized Scottsdale, Reorganized Dallas or Reorganized Debtors" means the respective Debtors, or collectively the Debtors, as reorganized pursuant to and under the Plan on or after the Effective Date.

2.56 -   "Schedules" means the schedules of assets and liabilities, the list of Holders of Interests, and the statement of financial affairs filed by the Debtors in the Chapter 11 Cases under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists, and statements have been or may be supplemented or amended from time to time in accordance with Bankruptcy Rule 1009.

2.57 -   "Secured Claim" means (a) a Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected and enforceable under applicable law or

by reason of a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) a Claim that is Allowed as a Secured Claim under this Plan.

2.58 -   "Unimpaired Claim" means a Claim that is not Impaired under this Plan.

## ARTICLE III.
## HISTORY, EVENTS LEADING TO BANKRUPTCY, AND POST-PETITION CHANGES TO OPERATIONS

GDS is a Delaware corporation with its principal place of business in Denver, Colorado. GDS is engaged in business as the agent and manager of detoxification clinics located in Littleton, Colorado, Scottsdale, Arizona, and Dallas, Texas.  Pre-petition, GDS was also the agent and manager of clinics in San Antonio, Texas and Las Vegas, Nevada, both of which locations closed pre-petition, and a location in Houston, Texas, which closed post-petition.  Denver is a Colorado limited liability company that owns and operates the Littleton, Colorado detoxification clinic. Scottsdale is an Arizona limited liability company that owns and operates a detoxification clinic in Scottsdale, Arizona.  Denver and Scottsdale are wholly owned by Dr. Patrick Gallus, however, both clinics are managed in all respects by GDS pursuant to Management Services Agreements. Dallas is similarly managed in all respects by GDS, but the Texas professional limited liability company is wholly owned by Dr. Ronald Sierzenski. .

Scottsdale was originally formed in 2011 under the name Prescott Medical Executive Detox in Prescott, Arizona, by Dr. Patrick Gallus.  At the time, Dr. Gallus saw a growing need in the market to provide medical detoxification services in order to enable those suffering from substantial addiction to alcohol and drugs – such as prescribed opioids, benzodiazepines and illicit drugs – to physically withdraw from the substance in a safe, comfortable, medically supervised manner before progressing to the next step in the individual's addiction treatment.  The next stage of treatment is generally behavioral therapy, which can be provided in an in-patient setting (commonly referred to as "rehab") or in an outpatient therapy setting. Although Scottsdale only provided medical detoxification services, part of those services does entail preliminary behavioral therapy focused on getting patients to go to the next stage of treatment.  In 2015, the company moved from Prescott to Scottsdale and renamed to Gallus Detox Scottsdale.  At the time of the transition, the clinic was maintained as a small, six-bed inpatient facility where patients generally

10

stayed between 4 and 15 nights. The demand for such a facility proved to be substantial, and over the next few years, the clinic would see between 200 and 300 patients per year.

In 2019, SCB Global Healthcare Services, LLC saw the investment potential in Gallus Detox Scottsdale and formed GDS with the intention of expanding the Gallus brand and opening additional locations. GDS was formed in 2019 and began managing the business and financial affairs of Scottsdale shortly thereafter. Through GDS, numerous additional locations were opened, all focusing on patients who were typically individuals with private insurance or who would pay out of pocket for treatment. GDS converted to a Delaware C-Corporation in May 2022.

After taking over management of Scottsdale, GDS then opened clinics in Denver, Dallas, San Antonio, and Las Vegas, with plans to continue to expand the network. With each clinic opened, the clinic was wholly owned by a doctor to ensure compliance with applicable Corporate Practice of Medicine statutes, but managed in all business and administrative respects by GDS. The locations selected for the new clinics were intended to capitalize on the target market, namely those patients using private insurance and/or paying out of pocket. Denver was completed in May 2020 after a three month delay from the COVID-19 pandemic and was profitable within the first three months after opening, enabling the continued expansion of the Gallus network. As the network continued to grow into other markets, GDS raised over $14 million in investment capital and expanded its corporate infrastructure to support its growth vision.

GDS signed leases for locations in early 2021 for locations in San Antonio, Dallas, and Las Vegas. The clinics were intended to open in late 2021, however continued construction delays throughout 2021 prevented the clinics from opening until Spring 2022. By 2022, GDS had already spent over a year expending funds for additional staff and rent without any additional revenue from the clinics. The new clinics were also slow to ramp up in operations, causing further losses to GDS even after the clinics were open.

Throughout 2023, GDS began the internal process of restructuring its operations. GDS moved forward with opening the Houston clinic to which it had initially committed in 2022, and the Houston clinic was opened in November 2023 with the anticipation that the Houston location would provide additional revenue after the clinic opened. GDS also elected to close the San Antonio location in January 2023, and the Las Vegas clinic in August 2023, as both clinics remained unprofitable after the clinics were opened.

While the internal restructuring process was effective in bringing the costs for operations

11

more in line with the size of the business, the Debtors remained heavily burdened by large debt payments that caused further financial strain on the Debtors.  As a result, the Debtors filed their voluntary petitions for relief pursuant to Chapter 11, Subchapter V on November 14, 2023.

Post-petition, the Debtors have continued their restructuring efforts in order to become profitable and fund a Plan.  The Debtors closed the Houston clinic in December 2023 as the clinic was proving to be unsustainable for the Debtors' operations.  The Debtors have continued to reduce their overall staff size in order to reduce overhead expenses, and are working to develop new streams of revenue, including preparing to launch an outpatient behavioral service referred to as an "Intensive Outpatient Program" or "IOP" that will operate in harmony with the detox clinics. As the Debtors continue to restructure their operations, the Debtors anticipate that new revenue will be generated, and the Debtors will continue to grow.  The Debtors have also explored the possibility of a sale of either one of the clinics or the Debtors' operations as a whole.  While the Debtors have consulted with business brokers regarding the possibility of the sale, the Debtors have not received any offers at this time and are continuing to pursue their reorganization efforts.

**ARTICLE IV.**
**PLAN OVERVIEW AND CLASSIFICATION OF CLAIMS AND INTERESTS**

*Gallus Detox Services, Inc.*

| CLASS | STATUS | TREATMENT |
|---|---|---|
| Class 1 -  Allowed Claims Pursuant to 11 U.S.C. § 507(a)(4) and (a)(5) – Wage Claims | Unimpaired | Paid in full on the Effective Date of the Plan.  GDS does not anticipate that any Class 1 Claims exist. |
| Class 2 – Allowed Secured Claim held by AKF, Inc. d/b/a FundKite | Impaired | Treated in accordance with the Stipulation |
| Class 3 – Allowed Secured Claim held by Reliance Platinum, LLC d/b/a MYNT Advance | Impaired | Treated in accordance with the Stipulation |
| Class 4 – Allowed Secured Claim held by Lionheart Funding, LLC | Impaired | Treated in accordance with the Stipulation |
| Class 5 – Allowed Secured Claim held by CloudFund | Impaired | Allowed in the amount of $250,000 with no further interest to accrue and paid in equal monthly installments over a five (5) year period beginning on the one year anniversary of the |

| | | Effective Date of the Plan. |
|---|---|---|
| Class 6 – Allowed Secured Claim held by G&G Funding | Impaired | Allowed in the amount of $30,000 with no further interest to accrue and paid in equal monthly installments over a five (5) year period beginning on the one year anniversary of the Effective Date of the Plan. |
| Class 7 – Allowed Secured Claim held by Allen Fata | Impaired | Allowed in the principal amount owed on the Petition Date with a conversion of accrued but unpaid interest to equity. The Class 7 Claim shall maintain all liens that existed as of the Petition Date and shall continue to accrue interest at a rate of 12% per annum but no payment shall be due and payable until the five (5) year anniversary of the Effective Date of the Plan. |
| Class 8 – Allowed Secured Pre-Petition Claim held by Walter van Woudenberg | Impaired | Allowed in the principal amount owed on the Petition Date with a conversion of accrued but unpaid interest to equity. The Class 8 Claim shall maintain all liens that existed as of the Petition Date and shall continue to accrue interest at a rate of 12% per annum but no payment shall be due and payable until the five (5) year anniversary of the Effective Date of the Plan. |
| Class 9 – Allowed Secured Claims held by Post-Petition Lenders | Impaired | Allowed in the principal amount authorized to be extended to the Debtors by the Court with a conversion of accrued but unpaid debt to equity.  The Class 9 Claim shall maintain all liens that are authorized by the Court and continue to accrue interest at a rate of 12% per annum but no payment shall be due and payable until the five (5) year anniversary of the Effective Date of the Plan. |
| Class 10 – Allowed Cure Claims held by Landlords | Impaired | Paid in full over 9 months following the Effective Date of the Plan |
| Class 11 – Allowed Unsecured Claims of Trade Creditors Against GDS | Impaired | Shall receive 75% of the Combined Net Revenue over a period of 3 years. |

13

| Class 12 – Allowed Unsecured Claims of Insider Note Holders Against GDS | Impaired | Converted to a combination of New Preferred Shares and New Common Stock in full satisfaction of their claims.  Class 12 Interest Holders shall have the option to be treated as a Class 11 Claimant. |
| Class 13 – Holders of Preferred Stock in GDS | Impaired | Terminated as of the Effective Date of the Plan |
| Class 14 – Holders of Common Stock in GDS | Impaired | Terminated as of the Effective Date of the Plan |

### *Gallus Detox Denver, LLC*

| CLASS | STATUS | TREATMENT |
|---|---|---|
| Class DE1 -  Allowed Claims Pursuant to 11 U.S.C. § 507(a)(4) and (a)(5) – Wage Claims | Unimpaired | Paid in full on the Effective Date of the Plan.  Denver does not anticipate that any Class DE1 Claims exist. |
| Class DE2 – Allowed Secured Claim held by AKF, Inc. d/b/a FundKite | Impaired | Treated in accordance with the Stipulation attached as Exhibit F. |
| Class DE3 – Allowed Secured Claim held by Reliance Platinum, LLC d/b/a MYNT Advance | Impaired | Treated in accordance with the Stipulation attached as Exhibit G. |
| Class DE4 – Allowed Secured Claim held by Lionheart Funding, LLC | Impaired | Treated in accordance with the Stipulation attached as Exhibit H. |
| Class DE5 – Allowed Secured Claim held by CloudFund | Impaired | See GDS Class 5 |
| Class DE6 – Allowed Secured Claim held by G&G Funding | Impaired | See GDS Class 6 |
| Class DE7 – Allowed Secured Claims held by Post-Petition Lenders | Impaired | See GDS Class 9 |
| Class DE8 – Allowed General Unsecured Claims against Denver | Impaired | See GDS Class 11 |
| Class DE9 – Interests in Denver | Unimpaired | Maintained by the pre-petition Interest Holder |

### *Gallus Detox Scottsdale, LLC*

| CLASS | STATUS | TREATMENT |
|---|---|---|
| Class S1 -  Allowed Claims Pursuant to 11 U.S.C. § 507(a)(4) and (a)(5) – Wage Claims | Unimpaired | Paid in full on the Effective Date of the Plan.   Scottsdale does not anticipate that any Class S1 Claims |

| | | exist. |
|---|---|---|
| Class S2 – Allowed Secured Claim held by AKF, Inc. d/b/a FundKite | Impaired | Treated in accordance with the Stipulation |
| Class S3 – Allowed Secured Claim held by Reliance Platinum, LLC d/b/a MYNT Advance | Impaired | Treated in accordance with the Stipulation |
| Class S4 – Allowed Secured Claim held by Lionheart Funding, LLC | Impaired | Treated in accordance with the Stipulation |
| Class S5 – Allowed Secured Claim held by CloudFund | Impaired | See GDS Class 5 |
| Class S6 – Allowed Secured Claim held by G&G Funding | Impaired | See GDS Class 6 |
| Class S7 – Allowed Secured Claims held by Post-Petition Lenders | Impaired | See GDS Class 9 |
| Class S8 – Allowed General Unsecured Claims against Scottsdale | Impaired | See GDS Class 11 |
| Class S9 – Interests in Scottsdale | Unimpaired | Maintained by the pre-petition Interest Holder |

### *Gallus Detox Dallas, PLLC*

| CLASS | STATUS | TREATMENT |
|---|---|---|
| Class DA1 - Allowed Claims Pursuant to 11 U.S.C. § 507(a)(4) and (a)(5) – Wage Claims | Unimpaired | Paid in full on the Effective Date of the Plan. Dallas does not anticipate that any Class DA1 Claims exist. |
| Class DA2 – Allowed Secured Claim held by AKF, Inc. d/b/a FundKite | Impaired | Treated in accordance with the Stipulation |
| Class DA3 – Allowed Secured Claim held by Reliance Platinum, LLC d/b/a MYNT Advance | Impaired | Treated in accordance with the Stipulation |
| Class DA4 – Allowed Secured Claim held by Lionheart Funding, LLC | Impaired | Treated in accordance with the Stipulation |
| Class DA5 – Allowed Secured Claim held by CloudFund | Impaired | See GDS Class 5 |
| Class DA6 – Allowed Secured Claim held by G&G Funding | Impaired | See GDS Class 6 |
| Class DA7 – Allowed Secured Claims held by Post-Petition Lenders | Impaired | See GDS Class 9 |
| Class DA8 – Allowed General Unsecured Claims against Dallas | Impaired | See GDS Class 11 |

| Class DA9 – Interests in Dallas | Unimpaired | Maintained by the pre-petition Interest Holder |
|---|---|---|

## ARTICLE V.
## DESCRIPTION OF ASSETS

*Gallus Detox Services, Inc.*

The values of GDS's assets, owned on the Petition Date unless otherwise noted, are set forth in the following chart:

| Asset | Estimated Value |
|---|---|
| Office Furniture | $87,535.00 |
| Office Artwork | $50,593.00 |
| Technology Equipment | $25,573.00 |
| Azure Software License | $7,688.00 |
| Lease Deposits | $354,733.44 |
| Management Contracts with Denver, Dallas, and Scottsdale | Unknown |
| Gallusdetox.com | Unknown |
| Funds in DIP Account (As of May 31, 2024) | $2,025 |
| **Total** | **$528,147.44** |

The asset values set forth above are the book value as of the Petition Date unless otherwise noted. GDS's physical assets are generally comprised of office furniture, artwork, and technology equipment that would receive less than 10% of the book value in the event of liquidation, particularly given the large influx of used office furniture on the market following the COVID-19 pandemic.

GDS has also scheduled a number of deposits to landlords with whom it entered into leases for the various clinics it either opened, or was intending to open. The deposits will likely be set off against any unpaid rent by the landlords to whom they were provided. While GDS is investigating whether any of the deposits may be recoverable, GDS anticipates that a majority will be subject to setoff, and therefore have minimal value to the estates. GDS reserves the right to pursue collection or return of deposits as necessary and appropriate under applicable State and Federal Law and applicable contracts.

16

GDS has also listed a number of payments made in the 90 days prior to filing. GDS will investigate whether there are any claims arising under Chapter 5 with respect to such payments that could be recovered for the benefit of creditors. In evaluating whether to bring such claims, GDS will generally evaluate whether any defenses exist and the likelihood of recovery. All claims will be preserved for the benefit of creditors and any net funds recovered after attorney fees and expenses will be administered in accordance with the Plan. At this time, GDS does not anticipate pursuing any avoidance actions, as GDS believes there are valid defenses to all avoidance actions that could be pursued.

### Gallus Detox Denver, LLC

The values of Denver's assets, owned on the Petition Date unless otherwise noted, are set forth in the following chart:

| Asset | Estimated Value |
|---|---|
| Bank of America (as of May 31, 2024) | $17,086.00 |
| Prepaid Expenses | $74,458.00 |
| Accounts Receivable, Less than 90 Days (as of May 31, 2024) | $269,318.89 |
| Accounts Receivable, Over 90 Days | $356,996 |
| Inventory and Supplies | $160,587.00 |
| Medications and Supplies | De Minimis |
| **Total** | **$666,872.89** |

The value of the tangible assets is based on book value as of the Petition Date unless otherwise noted. Denver's physical assets are generally comprised of inventory and medical supplies that will have minimal value in a liquidation. Denver also has an additional inventory of medications and supplies that cannot be resold, and would have to be destroyed.

Denver's primary asset is its receivables. The receivables over 90 days old are subject to significant reduction and significantly less likely to be collected. The receivables less than 90 days old are significantly more collectible but will still be subject to the reimbursement claims of patients for insurance reimbursements that would reduce the overall value of the collectible receivables. The receivables may also be subject to reduction based on approvals from insurance

17

companies.

Denver has also listed a number of payments made in the 90 days prior to filing. Denver will investigate whether there are any claims arising under Chapter 5 with respect to such payments that could be recovered for the benefit of creditors. In evaluating whether to bring such claims, Denver will generally evaluate whether any defenses exist and the likelihood of recovery. All claims will be preserved for the benefit of creditors and any net funds recovered after payment of attorney fees will be administered in accordance with the Plan. At this time, Denver does not anticipate pursuing any avoidance actions, as Denver believes there are valid defenses to all avoidance actions that could be pursued.

### Gallus Detox Scottsdale, LLC

The values of Scottsdale's assets, owned on the Petition Date unless otherwise noted, are set forth in the following chart:

| Asset | Estimated Value |
|---|---|
| Bank of America (as of May 31, 2024) | $1,861.00 |
| Prepaid Expenses | $77,947.00 |
| Accounts Receivable, Less than 90 Days (as of May 31, 2024) | $263,367.00 |
| Accounts Receivable, Over 90 Days | $365,177 |
| Inventory and Supplies | $53,026.00 |
| Medications and Supplies | De Minimis |
| **Total** | **$761,378.00** |

The asset values set forth above are the book value as of the Petition Date unless otherwise noted. Scottsdale's physical assets are generally comprised of inventory and medical supplies that will have minimal value in a liquidation. Scottsdale also has an additional inventory of medications and supplies that cannot be resold, and would have to be destroyed.

Scottsdale's primary asset in its receivables. The receivables over 90 days old are subject to significant reduction and significantly less likely to be collected. The receivables less than 90 days old are significantly more collectible but will still be subject to the reimbursement claims of patients for insurance reimbursements that would reduce the overall value of the collectible

18

receivables.  The receivables may also be subject to reduction based on approvals from insurance companies.

Scottsdale has also listed a number of payments made in the 90 days prior to filing. Scottsdale will investigate whether there are any claims arising under Chapter 5 with respect to such payments that could be recovered for the benefit of creditors.  In evaluating whether to bring such claims, Scottsdale will generally evaluate whether any defenses exist and the likelihood of recovery.  All claims will be preserved for the benefit of creditors and any net funds recovered after payment of attorney fees and expenses will be administered in accordance with the Plan.  At this time, Scottsdale does not anticipate pursuing any avoidance actions, as Scottsdale believes there are valid defenses to all avoidance actions that could be pursued.

***Gallus Detox Dallas, PLLC***

The values of Dallas's assets, owned on the Petition Date unless otherwise noted, are set forth in the following chart:

| Asset | Estimated Value |
| --- | --- |
| Bank of America (as of May 31, 2024) | $2,979.00 |
| Prepaid Expenses | $55,164.00 |
| Accounts Receivable, Less than 90 Days (as of May 31, 2024) | $434,877.00 |
| Accounts Receivable, Over 90 Days | $249,040 |
| Inventory and Supplies | $336,819.00 |
| Medications and Supplies | De Minimis |
| **Total** | **$1,078,879.00** |

The asset values set forth above are as of the Petition Date unless otherwise noted.  The value of the tangible assets is based on book value unless otherwise noted.  Dallas's physical assets are generally comprised of inventory and medical supplies, including installed improvements, that will have minimal value in a liquidation.  Dallas also has an additional inventory of medications and supplies that cannot be resold, and would have to be destroyed.

Dallas's primary asset in its receivables.  The receivables over 90 days old are subject to significant reduction and significantly less likely to be collected.  The receivables less than 90 days

19

old are significantly more collectible but will still be subject to the reimbursement claims of patients for insurance reimbursements that would reduce the overall value of the collectible receivables. The receivables may also be subject to reduction based on approvals from insurance companies.

Dallas has also listed a number of payments made in the 90 days prior to filing. Dallas will investigate whether there are any claims arising under Chapter 5 with respect to such payments that could be recovered for the benefit of creditors. In evaluating whether to bring such claims, Scottsdale will generally evaluate whether any defenses exist and the likelihood of recovery. All claims will be preserved for the benefit of creditors and any net funds recovered after payment of attorney fees and expenses will be administered in accordance with the Plan. At this time, Dallas does not anticipate pursuing any avoidance actions, as Dallas believes there are valid defenses to all avoidance actions that could be pursued.

### ARTICLE VI.
### CLAIMS AND INTERESTS

**A. UNCLASSIFIED PRIORITY CLAIMS**

Claims which are more particularly defined under Section 507(a)(1), 507(a)(2) or 507(a)(8) of the Bankruptcy Code are not classified and will be as set forth below. These claims consist of administrative expenses incurred during the course of the Chapter 11 case, claims incurred in an involuntary case (which are not applicable) and certain priority tax claims.

**B. ADMINISTRATIVE CLAIMS**

The Debtors retained Kutner Brinen Dickey Riley, P.C. ("KBDR") as their bankruptcy counsel. The Debtors provided KBDR with retainers in the amount of $35,255 as to GDS, and $6,000 each as to Denver, Scottsdale, and Denver. The Debtors estimate that the total legal fees for KBDR through Plan confirmation for all cases is anticipated to be approximately $78,000, assuming moderate litigation over contested matters, including confirmation. The total amount owed to KBDR after application of the retainer is anticipated to be approximately $25,000 across all four cases. If there is extensive litigation and discovery with respect to the Plan could increase by another $20,000 through confirmation of the Plan.

The Subchapter V Trustee, Joli Lofstedt, also has an administrative expense for services provided during the course of the Debtor's bankruptcy case. Ms. Lofstedt's fees estimated to be

approximately $12,000 through confirmation of a Plan.   In the event of a nonconsensual confirmation of the Plan, Ms. Lofstedt will continue to receive compensation at her standard hourly rate for her services in connection with administering the Plan.

In addition to the Administrative Claims set forth above, the Patient Care Ombudsman appointed in the Debtors' cases, Eric Huebscher is anticipated to have an administrative expense claim for his fees and expenses in connection with providing services in the Debtors' cases.  Mr. Huebscher's claim is anticipated to be approximately $18,000 through confirmation of the Plan after payment of the fees approved under his first fee application which is expected to occur on September 10, 2024.

In addition to the Administrative Claims for professionals, the Debtor also anticipates administrative expense claims for Capitol Center Properties and F2920m Property Management. The administrative expense claim for Capitol Center Properties and the administrative claim of F290m Property Management will be treated in accordance with the respective stipulations at Docket Nos. 320 and 319.

Administrative claims will be paid over one (1) year following the later of the Effective Date of the Plan or allowance of the Administrative Expense Claim, or as otherwise agreed by the Debtors and the respective claim holder.  In the event of a sale of the Debtors' assets and/or operations, either prior to or after confirmation, all unpaid administrative expense claims shall be paid in full upon closing.  Beginning on the fifteenth day of first full month after the occurrence of either the Effective Date of the Plan or allowance of the Administrative Expense Claim, the Debtors shall remit payment in an amount equal to one-twelfth of the Administrative Expense Claim, and shall continue to remit such payments on the fifteenth of each month thereafter until the respective Administrative Claim is paid in full.  Notwithstanding anything to the contrary, funds from the Expense Reserve may be used to fund payments on account of Administrative Claims to the extent any new investment funds, loan proceeds, or revenue do not allow the Debtors to otherwise fund payments on account of the Administrative Claims.

For the avoidance of a doubt, any open invoices for post-petition goods or services delivered that remain unpaid as of the Effective Date and are not past due in accordance with the terms of such invoices shall be paid in the ordinary course of business in accordance with such terms without further need for application to the Court.  For the further avoidance of a doubt, all past-due post-petition invoices of PharMerica will be cured on the Effective Date of the Plan.

**C.  TAX CLAIMS**

The Debtors do not believe that any Tax Claims exist.  The Internal Revenue Service ("IRS") filed Proof of Claim No. 4-1 asserting a priority claim in the amount of $200 based on unfiled returns for tax year 2022.  The Debtors have since filed the 2022 returns, and no taxes are owed based on the Debtors' returns.  The Debtors further do not believe that any amount will be owed to the Colorado Department of Revenue, the State of Texas, or the State of Arizona, and no such taxing authorities have filed claims in the Debtors' respective cases.

For the avoidance of a doubt, any priority claim asserted by the IRS or any other taxing authority will be paid in full no later than five (5) years following the Petition Date, and all returns shall be timely filed on a post-petition and post-confirmation basis.  Failure to timely file tax returns shall constitute an event of default, and shall be treated as set forth in paragraph 12.15 below.

**ARTICLE VII.**
**CLASSIFIED CLAIMS**

7.1 -  **CLASSES 1, DE1, S1, and DA1.  Priority Wage Claims.**  Allowed Class 1, DE1, S1, and DA1  Priority Claims shall be paid in full on the Effective Date, unless the holder of a Class 1 claim agrees to an alternative treatment.  The Class 1 claims for certain pre-petition wages and employee Claims are more particularly described in Sections 507(a)(4) and 507(a)(5) of the Code. On August 1, 2023, the Court entered an *Order Authorizing (A) Payment of Prepetition Employee Wages and Salaries; and (B) Payment of All Costs and Expenses Incident to the Foregoing Payments* (Docket No. 23).  As a result, the Debtors do not anticipate that any Class 1, DE1, S1, or DA1 claims exist.

7.2 -  **CLASSES 2, DE2, S2, and DA2.  AKF, Inc. d/b/a FundKite ("FundKite").**  The Class 2, DE2, S2, and DA2 Secured Claim consist of the Allowed Secured Claim of AKF, Inc. d/b/a FundKite.  The FundKite Claim shall be treated and paid in accordance with the Stipulation with FundKite Resolving Objections to Use of Cash Collateral filed at Docket No. 142 and approved by the Court on January 17, 2024 (Docket No. 146), and further attached hereto as Exhibit F.  In the event of a sale the Debtors' assets and/or operations, the FundKite Claim shall receive a pro rata distribution of any receivables collected through the earlier of: 1) the date of closing on the sale; or 2) the date on which the FundKite Claim is paid in full.

7.3 - **CLASSES 3, DE3, S3, and DA3.   Reliance Platinum, LLC d/b/a MYNT Advance ("MYNT").**   The Class 3, DE3, S3, and DA3 Secured Claim consist of the Allowed Secured Claim of MYNT.  The MYNT Claim shall be treated and paid in accordance with the Stipulation with MYNT Resolving Objections to Use of Cash Collateral at Docket No. 143 and approved by the Court on January 17, 2024 (Docket No. 147), and further attached hereto as Exhibit G.  In the event of a sale the Debtors' assets and/or operations, the MYNT Claim shall receive a pro rata distribution of any receivables collected through the earlier of: 1) the date of closing on the sale; or 2) the date on which the MYNT Claim is paid in full.

7.4 - **CLASSES 4, DE4, S4, and DA4.   Lionheart Funding, LLC ("Lionheart").**   The Class 4, DE4, S4, and DA4 Secured Claim consist of the Allowed Secured Claim of Lionheart. The Lionheart Claim shall be treated and paid in accordance with the Stipulation with Lionheart Resolving Objections to Use of Cash Collateral at Docket No. 144 and approved by the Court on January 17, 2024 (Docket No. 148), and further attached hereto as Exhibit H.  In the event of a sale the Debtors' assets and/or operations, the Lionheart Claim shall receive a pro rata distribution of any receivables collected through the earlier of: 1) the date of closing on the sale; or 2) the date on which the Lionheart Claim is paid in full.

7.5 - **CLASSES 5, DE5, S5, and DA5.   CloudFund.**   Classes 5, DE5, S5, and DA5 are comprised of the Secured Claim of CloudFund, which Claim is secured by a fourth position lien on the Debtors' receivables.  The CloudFund Claim is impaired by the Plan.  The Class 5, DE5, S5, and DA5 Claim will be treated and paid as followed:

      a.      The CloudFund Claim shall be allowed in the amount of: (i) $250,000, which amount shall constitute the principal amount owed with fully amortized interest through the date of Confirmation of the Plan; or (ii) if CloudFund objects, in an amount to be determined by the Court on or before the Confirmation Date; or (iii) an amount agreed upon by the Debtors and CloudFund on or before the Confirmation Date.  Any remaining amounted owed to CloudFund shall be treated as a Class 11 General Unsecured Claim pursuant to 11 U.S.C. § 506;

      b.      CloudFund will retain all liens that secured its Claim as of the Petition Date. For the avoidance of a doubt, such liens shall attach solely to the receivables of the Debtors and shall not extend to any other assets;

      c.      The CloudFund Claim will not accrue any additional interest and will be paid in equal monthly installments over a five (5) year term following the one-year anniversary of the Effective Date of the Plan. The first payment on account of the CloudFund Claim will be due on the 15th day of the first full month after the one-year anniversary of the Effective Date and will continue on the 15th date of each month thereafter. The monthly payment due on account of the CloudFund Claim will be $4,166.67.

      d.      In the event of a sale of the Debtor's assets and/or operations, the CloudFund Claim shall receive all remaining receivables up to the amount of $250,000 received by the Debtor after payment in full of the FundKite Claim, MYNT Claim, and Lionheart Claim through the date of the closing on the sale.

7.6 - **CLASSES 6, DE6, S6, and DA6. G&G Funding ("G&G").** Classes 6, DE6, S6, and DA6 are comprised of the Secured Claim of G&G Funding, which Claim is secured by a fifth position lien on the Debtors' receivables. The G&G Claim is impaired by the Plan. The Class 6, DE6, S6, and DA6 Claim will be treated and paid as followed:

      a.      The G&G Claim shall be allowed in the amount of: (i) $30,000, which amount shall constitute the principal amount owed with fully amortized interest through the date of Confirmation of the Plan; or (ii) if G&G objects, in an amount to be determined by the Court on or before the Confirmation Date; or (iii) an amount agreed upon by the Debtors and G&G on or before the Confirmation Date. Any remaining amounted owed to G&G shall be treated as a Class 11 General Unsecured Claim pursuant to 11 U.S.C. § 506;

      b.      G&G will retain all liens that secured its Claim as of the Petition Date. For the avoidance of a doubt, such liens shall attach solely to the receivables of the Debtors and shall not extend to any other assets;

      c.      The G&G Claim will not accrue any additional interest and will be paid in equal monthly installments over a five (5) year term following the one-year anniversary of the Effective Date of the Plan. The first payment on account of the G&G Claim will be due on the 15th day of the first full month after the one-year anniversary of the Effective Date and will continue on the 15th date of each month thereafter. The monthly payment due on account of the G&G Claim will be $500.

24

d.      In the event of a sale of the Debtor's assets and/or operations, the G&G Claim shall receive all remaining receivables up to the amount of $30,000 received by the Debtor after payment in full of the FundKite Claim, MYNT Claim, Lionheart Claim, and CloudFund Claim through the date of the closing on the sale.

7.7 -   **CLASS 7. Allen Fata.**  The Class 7 Secured Claim consists of the Allowed Secured Claim held by Allen Fata on account of his pre-petition secured loan to GDS and secured by the tangible assets of GDS.  The Class 7 Claim is impaired by the Plan.  The Class 7 Claim will be treated and paid as follows:

a.      The Class 7 Claim shall be allowed in the principal amount owed on the Petition Date of the Plan, and the Class 7 Claim shall continue to accrue interest at the contractual rate of twelve percent (12%) per annum;

b.      The Class 7 Claim shall retain all liens securing the Claim as of the Petition Date;

c.      No payment shall be due on account of the Class 7 Claim until the five (5) year anniversary of the Effective Date of the Plan, at which time all outstanding interest and principal amounts shall become due and payable;

d.      On the Effective Date of the Plan, any accrued but unpaid interest due on account of the Class 7 Claim shall be exchanged for 2.01% of the New Common Stock to be issued in accordance with this Plan; and

e.      The total amount due to the Class 7 Claimant on the maturity date is anticipated to be approximately $176,000.

f.      In the event of a sale of the Debtor's assets and/or operations, unless otherwise assumed by a buyer, the Class 7 Claim shall be paid in full on closing of the sale together with all accrued interest through such date.

7.8 -   **CLASS 8. Walter van Woudenberg.**  The Class 8 Secured Claim consists of the Allowed Secured Claim held by Walter van Woudenberg on account of his pre-petition secured loan to GDS and secured by the tangible assets of GDS.  The Class 8 Claim is impaired by the Plan.  The Class 8 Claim will be treated and paid as follows:

a.      The Class 8 Claim shall be allowed in the principal amount owed on the Petition Date of the Plan, and the Class 8 Claim shall continue to accrue interest at the contractual rate of twelve percent (12%) per annum;

25

b.      The Class 8 Claim shall retain all liens securing the Claim as of the Petition Date;

c.      No payment shall be due on account of the Class 8 Claim until the five (5) year anniversary of the Effective Date of the Plan, at which time all outstanding interest and principal amounts shall become due and payable;

d.      On the Effective Date of the Plan, any accrued but unpaid interest due on account of the Class 8 Claim shall be exchanged for 3% of the New Common Stock to be issued in accordance with this Plan; and

e.      The total amount due to the Class 8 Claimant on the maturity date is anticipated to be approximately $440,000.

f.      In the event of a sale of the Debtor's assets and/or operations, unless otherwise assumed by a buyer, the Class 8 Claim shall be paid in full on closing of the sale together with all accrued interest through such date.

7.9 -    **CLASSES 9, DE7, S7, DA7. Secured Claims of Post-Petition Lenders.**  Classes 9, DE7, S7, and DA7 are comprised of the Secured Claims of the Post-Petition Lenders.  The Debtors filed Motions for Authority to Incur Debt on a Secured Basis and Approve Secured Promissory Notes on December 12, 2023 and December 13, 2023 (Docket Nos. 75 and 89) which were granted by the Court and approved on January 10, 2024 (Docket No. 127 and 128), authorizing the Debtor to enter into secured loans with the following parties:

| Lender | Loan Amount (the "Loans") |
|---|---|
| 2 Street Investments, LLC | $50,000 |
| Stanhope Reed Rigby Advisory, LLC | $15,000 |
| Michael A. Dixon | $1,680 |
| Walter van Woudenberg | $533,320[1] |
| Mitchell Milias | $200,000 |
| Warren Olsen | $260,000 |
| Russell Matthews | $20,000 |

---

[1] May increase by an additional $500,000

The Class 9, DE7, S7, and DA7 Claims ("DIP Loan Claims") are impaired by the Plan. The DIP Loan Claims shall be treated and paid as follows:

      a.     The DIP Loan Claims shall be allowed in the principal amount extended to the Debtors in accordance with the Orders authorizing the Debtor to incur such debt, and shall continue to accrue interest at the contractual rate of twelve percent (12%) per annum;

      b.     The DIP Loan Claims shall continue to retain such liens as those granted under the applicable loan documents;

      c.     No payment shall be due on account of the DIP Loan Claims until the five (5) year anniversary of the Effective Date of the Plan, at which time all outstanding interest and principal amounts shall become due and payable;

      d.     On the Effective Date of the Plan, in exchange for the extended maturity date of the Notes and in exchange for any accrued but unpaid interest, the DIP Loan Claims shall receive a pro rata distribution of New Common Stock in the following anticipated percentages:

| Lender | New Common Stock (percentage)[2] |
|---|---|
| 2 Street Investments, LLC | 1.01% |
| Stanhope Reed Rigby Advisory, LLC | 0.3% |
| Michael A. Dixon | 0.03% |
| Walter van Woudenberg | 37% |
| Mitchell Milias | 12.5% |
| Warren Olsen & Russ Matthews | 6.65% |
| **Total** | 57.49% |

      e.     In the event of a sale of the Debtor's assets and/or operations, unless otherwise assumed by a buyer, the DIP Loan Claims shall be paid in full on closing of the sale together with all accrued interest through such date.

      f.     In addition to the treatment set forth above, Mr. van Woudenberg, as the lead investor/lender shall be entitled to additional protections which were included in the

---

[2] Contemplates additional DIP lending

Debtors' Motion seeking approval of the post-petition loan and approved by the Bankruptcy Court, including:

    i.    Mr. van Woudenberg shall have the right and ability to appoint one (1) member to the Board of Directors for Gallus Detox Services;

    ii.    The Debtors shall provide regular reporting to Mr. van Woudenberg including view-only access to bank accounts, daily occupancy reports, weekly cash flow statements, and monthly financial statements;

    iii.    Mr. van Woudenberg shall have the ability to review and approve any budgets proposed by the Debtors, but shall not have the ability to alter and amend any payments authorized or required by the Bankruptcy Court, prior agreements reached with creditors, or any payment terms provided under any duly confirmed Plan of Reorganization;

    iv.    Mr. van Woudenberg shall have the ability to review and approve any compensation paid to any Chief Operating Officer or Chief Executive Officer employed by the Debtor; and

    v.    Mr. van Woudenberg shall have the ability to effectuate a change in control, including controlling any sale, reorganization, or restructuring process, subject to seeking approval of such change on motion to the Bankruptcy Court with appropriate notice.

Mr. van Woudenberg may continue to serve in an advisory capacity, and has been provided with such protections as the lead post-petition lender and most significant post-petition lender as additional incentive to providing the post-petition loan. Mr. van Woudenberg does not hold an officer role with respect to the Debtors currently, nor is his receipt of one contemplated under this Plan.

7.10 - **CLASS 10. Allowed Cure Claim Held by Landlords**. Class 10 consists allowed claims of the pre-petition Landlords of GDS asserting that a cure is due for GDS to assume a lease pursuant to Paragraph 8.1 below. GDS anticipates the following Cure Claims will be due on the Effective Date of the Plan:

| Location | Landlord | Cure Amount |
|---|---|---|
| Denver | AWW Estes MOB Owner | $45,000 |
| Scottsdale | KAW Property | $40,000 |

| Dallas | EBD BEMC Mansfield | $162,713.71 (cure due over six (6) months) |

The Class 10 Claims shall be paid in equal monthly installments over a nine (9) month period, commencing on the fifteenth (15th) day of the first full month following the Effective Date of the Plan and continuing on the fifteenth (15th) day of each month thereafter until the Cure Claims are paid in full unless otherwise agreed to in connection with a motion to assume, such as in the case of EBD BEMC Mansfield.  The aggregate monthly payment on account of the Cure Claims is anticipated to be approximately $27,523.75.

In the event of a sale of the Debtors' assets and/or operations, unless otherwise assumed by a buyer, the Class 10 Claims shall be paid in full on closing of the sale together with all accrued interest through such date.

**7.11 - CLASSES 11, DE8, S8, and DA8. Allowed General Unsecured Claims of Trade Creditors**. Classes 11, DE8, S8, and DA8 ("Trade Creditor Class") are comprised of the Allowed General Unsecured Claims of Trade Creditors holding unsecured claims against the Debtors.  All Trade Creditors holdings claims against any of the Debtors shall receive the same treatment, regardless of the Debtor against whom the claim is held.  The Trade Creditor Class are treated equally, as GDS is the primary creditor as to all Trade Creditor Claims, and was generally the contracting party with all Trade Creditors and shall be paid by GDS and with payments guaranteed by all Debtors in accordance with Section 12.3.1.  The Trade Creditor Class shall be treated and paid as follows:

a. The Trade Creditor Class shall receive a pro-rata distribution equal to seventy-five percent (75%) of the Debtors' Combined Net Revenue calculated on a quarterly basis for a three (3) year period commencing on the first day of the first calendar quarter following the date on which the Class 10 Landlord Cure Claims and Administrative Claims are paid in full ("Trade Creditor Term");

b. Commencing on the twentieth day of the first month in the second calendar quarter following the commencement of the Trade Creditor Term and continuing on the twentieth day of the first month of each quarter thereafter, the Debtors shall set aside an amount equal to (100%) of the prior quarter's Combined Net Revenue with twenty-five

percent (25%) going to the Expense Reserve and 75% going to Class 11 Creditors ("Class 11 Funds"). By way of example, if the Plan is confirmed in November 2024, and Administrative Expense Claims and Class 10 Claims are paid in full, the Trade Creditor Term shall commence in April 2025, and the first calculation of the set aside shall occur on July 20, 2025 based on the Combined Net Revenue generated from April 2025 through June 2025;

c.      Commencing on the 30th day of the first month in the second calendar quarter following the commencement of the Trade Creditor Term and continuing on the 30th day of the first month of each calendar quarter during the Creditor Term thereafter, GDS or the Subchapter V Trustee shall make a pro rata distribution of the Class 11 Funds to the Holders of allowed Class 11 Claims;

d.      Based on the Debtors' projections, attached hereto as Exhibit C, the Debtors estimate that Trade Creditor Claims will receive approximately 42.27% on account of their claims. Upon request by any party in interest, the Debtors shall provide a quarterly financial statement, including amounts disbursed to creditors in accordance with the Plan;

e.      In addition to the amounts set forth herein and notwithstanding anything to the contrary, on the three-year anniversary of the commencement of the Trade Creditor Term, the Trade Creditor Class shall receive pro rata distribution of any amount in the Expense Reserve in excess of $250,000. For illustrative purposes, if the amount in the Expense Reserve is $300,000 on the three-year anniversary of the commencement of the Trade Creditor Term, the Debtors shall make an additional distribution in the amount of $50,000 to the Trade Creditor Class;

f.      Notwithstanding anything to the contrary, the Debtors shall be entitled to retire the entire obligations to the Trade Creditor Class at any time during or prior to the first two years of the Trade Creditor Term, including through a sale of the Debtors' assets and/or operations, by making a single pro rata distribution of $525,000, less any amounts previously disbursed to the Class 11 Trade Creditors. The amount of the lump sum payment would allow Class 11 Creditor to receive approximately 22.9% on account of their claims, which amount is approximately 20% less (or $430,000 less by dollar number) less than the amount they are anticipated to receive through the duration of the Trade Creditor Term, but is greater than the amount of disposable net combined revenue anticipated to be

30

generated by the Debtors in the first three (3) years of the Debtors' operations under the Plan which is anticipated to be $80,990 largely as a result of the projected losses in the first year of the Plan. The early payment also removes potential uncertainty of fluctuations in payments based on future operations. ; and

g.      In addition to the amounts set forth above, the Trade Creditor Class shall receive fifty percent (50%) of the amounts recovered for claims arising under Chapter 5 after payment of attorney fees, cost of litigation, and cost of recovery. The Debtors have investigated all payments made in the ninety (90) days prior to filing and transfers to insiders, and do not believe that any Chapter 5 claims exist or have valid defenses to such claims. As a result, the Debtors do not anticipate pursuing any Chapter 5 claims but will continue to investigate any claims for the benefit of creditors.

h.      Distributions to Trade Creditor Claims may be decreased based on any elections made by Class 12 Creditors to be treated as a Class 11 Claimant based on a recalculation of the pro rata distributions.

7.12 - **CLASS 12**. **Allowed Unsecured Claims of Holders of Insider and/or Convertible Notes.** Class 12 is comprised of claims of Insiders and/or the Holders of pre-petition convertible promissory notes and are more specifically identified on Exhibit B. Class 12 is impaired by this Plan. Class 12 shall be treated as follows:

a.      The holders of Class 12 Claims shall be allowed in the amount owed on the Petition Date;

b.      On the Effective Date of the Plan, Class 12 Claimants will receive a pro rata distribution of New Preferred Stock issued under the Plan and a pro rata distribution of 17.5% of the total New Common Stock issued under the Plan in full satisfaction of their Class 12 Claim; and

c.      Class 12 Claimants shall be entitled to elect to be treated as a Class 11 Trade Creditor. Such election must be made at the time of voting to accept or reject the Plan of Reorganization. **If a Class 12 Claimant does not make such an election, either by not submitting a ballot or not affirmatively making an election on any ballot submitted, they will be treated as set forth in Paragraph 7.12(b). If a Class 12 Claimant makes an election to be treated as a Class 11 Creditor, it shall forgo any rights it may have**

31

**to the equity provided to Class 12 and the amount of such electing Claim shall be removed from the calculation of the pro rata equity distribution to Class 12 Creditors.**

7.13 -   **CLASS 13**. **Preferred Shareholders of GDS.** Class 13 is comprised of the holders of preferred shares existing as of the Petition Date in GDS.  Class 13 is impaired by the Plan.  On the Effective Date of the Plan, all existing Class 13 Preferred Shares will be terminated.

7.14 -   **CLASS 14**. **Holders of Common Stock of GDS.** Class 14 is comprised of the holders of commons stock existing as of the Petition Date in GDS.  Class 14 is impaired by the Plan.  On the Effective Date of the Plan, all existing Class 14 Commons Stock will be terminated.

7.15 -   **CLASS DE9**. **Interests in Denver.** Class DE9 includes Interests in Denver held by the pre-confirmation Interest Holders.  Class DE9 is unimpaired by this Plan.   On the Effective Date of the Plan, Class DE9 shall retain its Interests in Denver, subject to the terms of the Plan.

7.16 -   **CLASS S9**. **Interests in Scottsdale.**  Class S9 includes Interests in Scottsdale held by the pre-confirmation Interest Holders.  Class S9 is unimpaired by this Plan.   On the Effective Date of the Plan, Class S9 shall retain its Interests in Scottsdale subject to the terms of the Plan.

7.17 -   **CLASS DA9**. **Interests in Dallas.** Class DA9 includes Interests in Dallas held by the pre-confirmation Interest Holders.  Class DA9 is unimpaired by this Plan.   On the Effective Date of the Plan, Class DA9 shall retain its Interests in Dallas, subject to the terms of the Plan.

**ARTICLE VIII.**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

8.1 -    The Debtors assume, the following executory contracts and unexpired leases as of the Effective Date:

    a.  All contracts and leases previously assumed or for which a motion to assume is pending;

    b.  All leases and contracts that are not specifically rejected, including insurance contracts and open customer contracts;

    c.  Wadsworth Medical Office Building Lease by and Between GDS and CHP Wadsworth MOB, LLC and any amendments thereto;

    d.   Office Lease between GDS and KAW Property Holdings;

    e.  Lease between EBD BEMC Mansfield, LLC and GDS; and

32

      f.   All Management and Services Contracts as between the Debtors.

8.2 -   The Debtors will be conclusively deemed to have rejected all executory contracts and unexpired leases for which a motion to reject has been granted or is pending as of the Effective Date.   For the avoidance of a doubt, to the extent not rejected as of the Effective Date of the Plan, any and all contracts between the Debtors and any Landlord for which a Motion to Assume is not pending shall be deemed to be rejected as of the Effective Date.   A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than **45** days after the date of the order confirming this Plan.

## ARTICLE IX.
## FEASIBILITY OF THE PLAN

The Debtors' Plan is feasible based upon the Debtors' prepared projections, attached hereto as Exhibit C, which reflect a reasonable prediction of the Debtors' operations during the term of the Plan.   The Debtors will need an additional $750,000 in post-petition financing to effectuate the Plan, which is anticipated to come from Walter van Woudenberg in accordance with the Letter of Commitment, or may be advanced by existing DIP lenders or new investors to the extent they elect to participate with Mr. van Woudenberg.

The Debtors believe their plan is feasible based on: (i) the adequacy of the enhanced capital structure after additional capital is infused into the business as discussed below; (ii) the earning power of the business; (iii) the ability of management and the fact that existing management is committed to seeing the business through to profitability; and (iv) the size of the marketplace that the business operates in and demand for services.

(ii) Earnings Power of The Business

The Debtors' ongoing operating and financial model is predicated upon remaining within the Substance Use Disorder ("SUD") industry in which it already operates and adding additional services focused on the same type of patients that it already treats.   Going forward, the Debtors will derive revenues from providing the following two types of services to patients suffering from addiction issues:

      (a)   In-patient medical detoxification services (the Debtors' existing business); and

      (b)   Out-patient Behavioral Services (added services).

The Debtors' financial projections were derived using a very granular approach to estimate each of: revenues for the two service lines, the direct costs of delivering each of the service lines, and the corporate overhead required to run the overall business. These are discussed as follows:

**REVENUES FROM IN-PATIENT DETOX SERVICES**

The projections for this service line were formulated by using actual operating results from prior years, modified for more recent results in each of the three operating clinics (Dallas, Denver, and Scottsdale).  The Debtors have historically been paid (either private pay or by private insurance on an out-of-network basis) with a per diem rate.  These nightly rates can vary substantially depending on the insurance payer and also for private payers based on the availability of beds in a clinic (similar to a hotel, a clinic may discount rates if occupancy is low). Therefore a clinic's revenue is based on the number of patients times the average length of stay ("ALOS") times the average reimbursement rate.  Historical revenues and the Debtors' projections for the two most seasoned clinics (Scottsdale and Denver) are as follows:

| | Actual Results | | | Projected |
|---|---|---|---|---|
| | 2022 | 2023 | 6 Mos 2024 | 2025 |
| **DENVER** | | | | |
| # patients | 298 | 267 | 100 | 227 |
| ALOS | 4.02 | 4.22 | 5.34 | 5.50 |
| Patient Nights | 1,199 | 1,126 | 534 | 1,250 |
| Avg. Nightly Reimbursement | $2,130 | $ 1,866 | $ 1,809 | $ 1,850 |
| Total Revenues | $2,553,426 | $ 2,100,723 | $ 966,000 | $ 2,312,500 |
| | | | | |
| **SCOTTSDALE** | | | | |
| # patients | 285 | 281 | 123 | 264 |
| ALOS | 4.00 | 4.58 | 4.72 | 5.50 |
| Patient Nights | 1,139 | 1,287 | 580 | 1,450 |
| Avg. Nightly Reimbursement | $ 2,201 | $ 1,789 | $ 1,852 | $ 1,750 |
| Total Revenues | $ 2,507,068 | $ 2,302,299 | $ 1,074,000 | $ 2,537,500 |

For the Dallas clinic, which has not been in operation as long as the other two clinics and has underperformed such that it has not been able to generate sufficient revenues to cover its direct operating costs, the Debtors instituted a significant change in February 2024 as that clinic became an in-network provider with Blue Cross Blue Shield of Texas ("BCBS"). Although in-network reimbursement rates are generally significantly lower than out-of -network reimbursement rates, patients usually prefer going to in-network providers as the co-pays and deductibles may be significantly less of a cost to the patient than an out-of-network provider. The Dallas clinic can

profitably accept these lower rates as its capacity at 10 licensed beds is greater than the other 2 clinics which are 7 bed facilities, especially with the addition of out-patient behavioral services as discussed herein. Revenue results and projections for medical detox for Dallas are as follows:

| | Actual Results | | | Projected |
|---|---|---|---|---|
| | 2022 (clinic opened in May) | 2023 | 6 Mos 2024 | 2025 |
| # patients | 102 | 165 | 101 | 282 |
| ALOS | 4.40 | 4.83 | 5.67 | 5.50 |
| Patient Nights | 449 | 797 | 573 | 1,550 |
| Avg. Nightly Reimbursement | $ 1,656 | $ 1,563 | $ 1,084 | $ 1,100 |
| Total Revenues | $ 743,357 | $ 1,246,048 | $ 621,000 | $ 1,705,000 |

It should be noted that the number of patients seen by the Dallas clinic increased from 82 for the first six months of 2023 to 101 for the corresponding period in 2024 with bed nights increasing from 402 to 573, a 43% increase. Even with this significant increase, occupancy for the Dallas clinic was still only 32% for the first half of 2024, so the Debtors believe that there will be significant increases as the market for these services recognizes that the clinic is an in-network provider.

For the Denver and Scottsdale clinics, although patient nights decreased approximately 5% for the first six months of 2024 verse the corresponding period in 2023, this was against a backdrop of: the Company's filing for reorganization, the closing of other Gallus clinics in Houston, San Antonio and Las Vegas, significant headcount reduction related to the closing of these clinics and the right-sizing of corporate infrastructure, other turnover from these significant changes, and negative chatter in the marketplace from competitors and others that Gallus would close all clinics and cease operations. Against these significant headwinds, overall patient nights for the 3 operating clinics actually increased for the first 6 months of 2024 versus 2023 with the Dallas demonstrating the most significant increase.

36

**REVENUES FROM OUTPATIENT SERVICES ("IOP")**

The projections for revenues from providing IOP services in each of Dallas, Denver and Scottsdale are based on the following assumptions:

- IOP services are part of a normal progression of care for people who seek treatment for SUD. For people with severe addictions, in-patient medical detox is indicated as the first course of treatment, but for addiction treatment to be ultimately successful patients must also receive behavioral treatment either through an in-patient setting (commonly referred to as "rehab") or on an out-patient basis. After receiving this treatment, many patients move on to support groups such as A.A. or N.A. and/or receive individual therapy.

- IOP as a recognized course of treatment is designed as "group therapy" in which groups of up to 12-16 patients meet on a regular basis to work on behavioral issues related to substance abuse. An industry standard course of care is to meet 3 times a week for 3 hour sessions for a period of 10 to 12 weeks (30 to 36 sessions).

- Insurance companies have recognized the validity of IOP and other out-patient services in treating SUD and almost all health insurance policies cover some form of reimbursement for out-patient behavioral services.

- Many, if not most SUD providers provide a continuum of care for patients so the Debtors will not be unique in providing in-patient medical detox and IOP. In fact, this will move them more in-line with the industry norm for business models.

While the Debtors have not historically provided IOP services, several members of the senior leadership team and other key employees have extensive experience with providing these services. Sara Kaylor, the Executive Clinical Director for the Debtors has 14 years in the SUD industry with the majority of that experience in providing out-patient behavioral services. In addition, Annie Humphreys, the Clinical Director for the Denver Clinic has 13 years of experience with IOP and other out-patient behavioral services. Ms. Kaylor (with Ms. Humphreys' assistance) built the curriculum for the Debtors' IOP services. In addition, Brayden Younghusband, the Debtors' Head of Admissions and Business Development has extensive experience with providing IOP services. All of the admissions representatives and business development directors have significant experience in the provision of IOP services.

It should be noted that the Debtors received their license to provide IOP services in the State of Colorado on August 30, 2024 and will be applying for its license in the State of Texas the week of September 2nd and expect to receive the Texas license by October 15th. The Debtors will apply for the IOP license in Arizona in the Fall of 2024. The Debtors anticipate that the IOP services will provide revenues almost immediately, as the Debtors are using their existing infrastructure as a marketing base.

Patients will be acquired for the IOP services from 4 basic channels – (i) patients who come to the Debtors for in-patient medical detox; (ii) patients who are "alumni" and have been previously treated in a Gallus medical detox clinic; (iii) direct marketing – similar to the in-patient medical detox services patients for IOP services are acquired through direct marketing, which in the SUD industry is done primarily through digital marketing and in which the Debtors have extensive experience in with marketing through the digital space, including both search engine optimization and paid advertising; and (iv) referrals from the same professional providers - such as primary care physicians, interventionists, hospitals and others - that the Debtors already call on to obtain patients for the in-patient medical detox business.

. On average, each clinic generates about 20 to 25 patients a month, with about half of these patients moving on to outpatient therapy. The Debtors financial model assumes that of these patients going to outpatient, the Debtors can convert 20% of them to utilize the IOP services. Addiction can be a lifetime struggle and patients often relapse or need additional help and go to IOP. Gallus has treated thousands of patients over its lifetime who are potential IOP patients and will continue to market these beneficial services to such patients through existing corporate infrastructure.

For its financial model, the Debtors used a blended reimbursement rate of $300 per patient, per session. In determining this rate, the Debtors used information from several sources, including: key Debtor employees with IOP experience, an informal competitor survey and, most importantly, from the Debtors' independent third party insurance billing vendor that maintains an extensive database of what IOP providers are receiving. While there is a wide range of rates depending on the insurance provider, our billing provider believes that a blended rate of $300 to be very reasonable.

38

As can be seen from the model, the ramp of the IOP in each of the 3 existing markets is modest in terms of number of patients acquired each month and also accounts for reasonable attrition. Therefore, the Debtors believe that their revenue projections for the IOP services to be reasonable and attainable.

## COSTS FOR THE BUSINESS

The costs of the business are detailed in the financial model but can be broadly categorized as:

(i)   Direct Costs of providing Medical Detox Services

(ii)  Direct Costs of providing IOP Services

(iii) Corporate Costs related to Business Development (sales and marketing, including the admissions function) and General Administration (organizational management, finance and accounting, regulatory and risk management)

## DIRECT COSTS OF PROVIDING MEDICAL DETOX SERVICES

These costs are the direct costs for running each of the 3 clinics and the assumptions in the financial model are based on historical actuals. The major cost categories for a clinic are: 1) Labor (nurses, therapists, technicians and part-time consulting physicians; and 2) Rent and other facility costs such as furniture and equipment, and patient amenities (medicines, food, laundry and other misc.)

The Debtor believes it is operating the clinics in a financially prudent manner, while understanding that patient care and treatment is paramount to not only maintaining all required licenses and accreditations, but is also core to the Debtors competitiveness in the marketplace.

## DIRECT COSTS OF PROVIDING IOP SERVICES

The direct costs of providing IOP services are also detailed in the financial model and consist of: 1) Labor (therapists and assistants); 2) Rent and other facility costs; and 3) General administrative and Marketing.

- Labor – the Debtors already employ on a full-time basis two senior therapists as required for the provision of medical detox services. These therapists, who have extensive experience and expertise in providing IOP services in addition to the therapy provided with medical detox services will oversee the provision of IOP services, including the hiring of

part-time, hourly paid therapists to run the group IOP sessions. Therapist assistants will help with administrative functions related to IOP services.

- Rent and facility costs – very different from the inpatient medical detox services which require in-patient 24/7 facilities built to certain regulatory requirements and also requiring specialized medical equipment, the physical plant required to provide IOP services is very basic. IOP services only require a meeting room large enough to comfortably accommodate up to 16 people with a small adjacent room for private meeting and to perform administrative functions. Consequently, the rent for IOP space is very modest compared to medical detox facilities. Based on preliminary market research, the cost for a space to provide IOP services in Scottsdale will be similar to Denver. In Dallas, because the existing medical detox facility has the physical plant to accommodate a meeting of up to 16 people, IOP services will be provided at that facility and there will be no additional facility costs.

- General administrative – one of the primary costs here are patient amenities and again, different from the provision of medical detox services where patients are living at the facility during the course of treatment, patient amenities are de minimis and consist of providing drinks (water, coffee and soda) and snacks appropriate for a 3 hour meeting.

- Marketing – the Debtor already has marketing resources in place that will be used for the marketing of IOP services, so the additional cost will be de minimis.

Therefore, the direct costs of providing IOP services are substantially lower than the costs of providing medical detox services both on an absolute basis and as a percentage of revenues derived from providing each of those services.

**CORPORATE COSTS RELATED TO OPERATING THE BUSINESS**

Since the addition of IOP services to the provision of in-patient medical detox services is an extension of services within the same industry and to the same target population (patients suffering from substance use disorder commonly referred to as addiction who need help and have the means to pay for these services either through private, non-governmental insurance and/or personal means (private pay), the Debtors already have the necessary corporate infrastructure in

place including existing management and other key employees with extensive experience in providing IOP services.

All existing systems used in providing medical detox services can be utilized in providing IOP services, including patient record-keeping, billing and regulatory compliance. The Debtors' existing third party insurance billing vendor has extensive experience with billing and collections for IOP services. It should also be noted that the perceived business risks of providing IOP services in addition to medical detox services are recognized as minimal such that the Debtors total insurance costs (medical malpractice, general liability, D&O, etc.) will only increase nominally.

The Debtors projections demonstrate operating losses for the first 6 months of the Plan, and negative cash flow for the first 10 months of the Plan where the Debtors have the highest burden for debt repayment as a result of the cure payments on account of the Landlord Claims, the administrative expenses, and the continued payments on the FundKite, MYNT, and Lionheart Claims. As these claims are paid in full, it will reduce the cash burden on the Debtor, and the Debtor is anticipated to have positive cash flow by the middle of 2025. The Debtors anticipate raising an additional $750,000 through either equity infusions or additional lending from DIP Lenders to cover the cash shortfalls. After the first year, the Debtors projections evidence that the Debtors will generate sufficient revenue to meet its obligations under the Plan. As described above, the Debtors have used their best efforts to prepare accurate projections based on actual pre and post filing historical operating results for the revenues and expenses for providing medical detox services and market and operating data for the anticipated provision of IOP services that were obtained from reliable sources as discussed above. The Debtors' actual income will fluctuate based on actual sales and changes in the market.

The Debtors, therefore, submit that the financial and operating plans which were built on a granular level based on both pre- and post- filing actual historic results combined with industry assumptions obtained from knowledgeable and experienced sources demonstrates that the business can achieve sufficient earnings power to meet its obligations under the Plan. In addition, the Debtors have the management team in place with sufficient experience and expertise to provide the proposed services of both in-patient medical detox services and IOP services. This leadership team is committed to the success of the Debtors and the Debtors believe will remain in place for the foreseeable future. As a result, the Debtors have submitted the Plan in good faith and anticipate that its Plan is feasible, not speculative, and that they will be able to make all required payments

41

under the Plan.

**Compliance with Corporate Practice of Medicine and Conflict of Interest Issues**

The Debtors operate in three states – Colorado, Arizona, and Texas – that have statutory provisions that prohibit corporations from engaging in the practice of medicine. To address these issues while ensuring that Denver, Scottsdale, and Dallas all had a cohesive management group in place to reduce costs and maximize efficiency, the Services consulted with legal counsel in setting up the practices at the time of either opening the practices or acquiring a practice. The Debtors' corporate formation was assisted by David Kendall at Bold Legal. Mr. Kendall is the founder of Bold Legal with approximately 30 years of experience in corporate and business law, including specializations in corporate formation and complex credit transactions as well as mergers and acquisitions. He has worked with businesses ranging from early stage start-ups through Fortune 100 companies, and has significant experience working with all types of business, including businesses in the Healthcare Services industry subject to Corporate Practice of Medicine statutes in various States. .

Based on Mr. Kendall's advice, the Debtors set up the Management Agreements to ensure compliance with the applicable corporate practice of medicine statutes in Colorado, Arizona, and Texas. All of the Management Agreements and the fee structures comply with the applicable statutes, and the Debtors remain in compliance with the Management Agreements and the corporate practice of medicine statutes. Pre-petition, these agreements were also reviewed by a large and prominent law firm specializing in health care medicine, which firm similarly determined that the Debtors were in compliance with applicable corporate practice of medicine statutes.

Mr. Kendall has also reviewed certain concerns related to a potential conflict of interest based on Dr. Sierzenski's involvement as the Chief Medical Officer for Services and his involvement as a DIP Lender and prospective investor through his related entity, 2 Street Investments, LLC. Based on a review of applicable State and Federal Law, Dr. Sierzenski's position as Chief Medical Officer and his involvement as a DIP Lender, creditor, and minority shareholder do not violate any corporate practice of medical statutes, nor is it a prohibited conflict of interest.

## ARTICLE X.
## LIQUIDATION ANALYSIS

The principal alternative to a Debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code.  Chapter 7 requires the liquidation of the Debtors' assets by one more Trustees who are appointed by the United States Trustee's office.  In a Chapter 7 case, the Chapter 7 Trustee would take over control of the Debtors; assets.  The assets would be liquidated and the proceeds distributed to creditors in the order of their priorities.

The Debtors' assets are generally subject to liens, and in a conversion to a case under Chapter 7, the secured creditors would seek relief from stay in order to foreclose on the various assets of the Debtors.  Because there is no remaining equity for creditors, there would be no assets for a Chapter 7 Trustee to administer.  As a result, in a Chapter 7, unsecured creditors would likely receive nothing.

## ARTICLE XI.
## TAX CONSEQUENCE

The Debtors are not providing tax advice to creditors or interest holders.  **U.S. Treasury Regulations require you to be informed that, to the extent this section includes any tax advice, it is not intended or written by the Debtor or its counsel to be used, and cannot be used, for the purpose of avoiding federal tax penalties.**  Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation.  Generally, unsecured creditors should have no tax impact as a result of Plan confirmation.  The recovery of each creditor is payment on account of a debt and generally not taxable, unless the creditor wrote off the debt against income in a prior year in which case income may have to be recognized.  Interest holders may have very complicated tax effects as a result of Plan confirmation.

## ARTICLE XII.
## IMPLEMENTATION OF THE PLAN

12.1 -  **Continued Existence.**  Unless otherwise provided in the Plan, each Debtor shall, as Reorganized Debtors, continue to exist after the Effective Date of the Plan with the same corporate powers as existed prior to Plan confirmation pursuant to the laws of the respective jurisdiction of organization of each Debtor entity.

12.2 -  **Operation of Business**.  The Debtors shall be empowered to take such action as may be necessary to perform their obligations under this Plan.

12.3 -  **Effectuating the Plan.**  On the Effective Date of the Plan, GDS and its respective Board of Directors and officers shall be appointed as the agents of each Debtor pursuant to applicable contracts and applicable law of the state of incorporation for each of the Debtors, pursuant to 11 U.S.C.§1142(b) for the purpose of carrying out the terms of the Plan, and taking all actions deemed necessary or convenient to consummating the terms of the Plan.

12.3.1 - **Payment Guaranty.**  GDS shall be responsible for disbursing all payments to creditors in accordance with this Plan if confirmed pursuant to 11 U.S.C. § 1191(a), or remitting all payments under the Plan to the Subchapter V Trustee in the event of a nonconsensual confirmation under 11 U.S.C. § 1191(b).  Notwithstanding anything to the contrary, all Debtors, including GDS, Dallas, Denver, and Scottsdale shall guaranty all payments that become due and owing under the Plan, and in the event of a default under the Plan, creditors may pursue their remedies against any and all of the Debtors, and each shall have joint and several liability for such Plan obligations.

12.4 - **Compensation to Insiders.**  GDS's current CEO and COO, Warren Olsen and Russel Matthews, respectively, have agreed to waive their existing priority claims and compensation until January 2025 in exchange for each receiving 8.25% of the New Common Stock issued under the Plan.  Beginning after January 2025, Mr. Olsen and Mr. Matthews will each receive a monthly salary of $7,500 per month until December 2025, and then will each receive an annual salary in the amount of $120,000, payable monthly.  The Chief Medical Officer will be entitled to receive 3.5% of the New Common Stock issued under the Plan.  Insiders providing services to the Debtors will also be entitled to receive employee benefits, including insurance and any retirement plans offered by the Debtors.

In addition to the amounts set forth above, the Debtors shall continue to service the SBA loans indirectly assumed when Scottsdale was purchased from Patrick Gallus.  The payments remain in the name of Dr. Gallus and not the Debtors, and payments on account of such loans is reflected in the Debtors' projections as SBA payments.  There are two existing loans that remain to be serviced with the SBA with monthly payments of $1,100 and $1,730 respectively, resulting in total payments made by the Debtors on behalf of Dr. Gallus in the amount of $2,830.00 per month.

12.5 - **Expense Reserve.**  On the Effective Date of the Plan, the Debtors shall establish a segregated account for the Expense Reserve into which 25% of the Debtors' Combined Net

Revenue shall be deposited in accordance with Paragraph 7.11.  The Expense Reserve may be used for any cash shortfalls, expense and cost overruns, unanticipated expenses, or other expenses the Debtors deems reasonable and necessary to ongoing business operations but, subject to Sections VI(b) and 7.11(e), shall not be used to pay general unsecured creditors.  The Debtors shall be entitled to continue contributing to the Expense Reserve in accordance with Section 7.11.

12.6 -  **Effective Date.**  The Plan will become effective on the date the Bankruptcy Court enters its Order confirming the Plan and said Order becomes final and non-appealable (the "Effective Date").

12.7 -  **Discharge of Patient Care Ombudsman.**  On the Effective Date of the Plan, the Patient Care Ombudsman shall be discharged from any obligation to provide any further services to the Debtors or in connection with this case, subject to the filing of a final application for allowance and payment of fees and expenses.

12.8 -  **Disputed Claims.**  Any Debtor may file an objection to any claim no later than 45 days following the Effective Date.  In the event of one or more Debtors filing an Objection to allowance of a Claim, distributions on account of such Claim shall be held in a segregated account (the "Withheld Funds") until such time as the Objection to the Claim is settled or adjudicated through entry of a final Order.  After either entry of a final order allowing such Claim or settlement of the Claim Objection resulting in an allowed Claim, distributions to such Claimant shall begin with the next pro rata distribution of Class 11 Funds and shall be calculated from the beginning of the Trade Creditor Term, with such disbursements first from the Withheld Funds.  In the event that a partial or complete disallowance of such Claim occurs resulting in a surplus of Withheld Funds, such Withheld Funds will be combined with the Class 11 Funds and distributed to Class 11 creditors on the next disbursement date in accordance with the Plan.  Each Debtor shall have standing to commence, prosecute, and settle claim objections, and avoidance actions without need for Court approval.

12.9 -  **Administrative Expense Bar Date.**  Any creditor seeking allowance and payment of an administrative expense priority claim must do so no later than 45 days following the Effective Date of the Plan.

12.10 -  **Exemption from Transfer Taxes.**  Pursuant to Section 1146(c) of the Code, the issuance, transfer, or exchange of notes or equity securities under the Plan by any Debtor, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of

any lease or the making or delivery of any deed or instrument of transfer under, in furtherance of, or in connection with the Plan or the Agreements shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

12.11 -　　　　**Independent Plans.**　This Plan is a joint Plan for GDS, Denver, Scottsdale, and Dallas.　Notwithstanding the joint Plan, it is a requirement or condition precedent that the Plans be confirmed for all Debtors in order for the Plan to be confirmed and become effective for one Debtor.　The Plan does not provide for substantive consolidation of the Debtors and all Debtors will remain separate legal entities.　Nothing contained herein shall be construed as a substantive consolidation of the Debtors.

12.12 -　　　　**Issuance of New Interests in GDS.**　On the Effective Date of the Plan or within thirty days thereafter, GDS shall issue new stock interests in GDS as set forth in the Plan. On the Effective Date of the Plan, GDS shall be authorized and approved to effectuate the following:

a. Authorize the issuance of up to $5,000,000 in New Preferred Stock with a 12% annual accrual of interest as determined upon the occurrence of a subsequent liquidation event, to be distributed in accordance with the terms of this Plan.

b. Authorize the issuance of 100,000 shares of New Common Stock to be issued in accordance with the terms of this Plan;

c. Amend and restate any applicable corporate documents as necessary to effectuate the term of this provision and this Plan.

Upon confirmation of the Plan, GDS shall be authorized to create and issue such new stock certificates and other documents and take such actions as may be necessary to effectuate the terms of the Plan and ensure that recipients of shares under this Plan are the holders and record owners of such shares.

12.13 -　　　　**Fractional Shares.**　No fractional shares with respect to New Preferred Stock or New Common Stock shall be issued.　In the event a fractional share would be issued, the amount shall be rounded down to the next lower whole number.

12.14 -　　　　**Final Decree.**　The Debtors will request entry of a final decree within 180 days of the Effective Date or as otherwise provided in the Bankruptcy Code.

12.15 -　　　　**Discharge.** If the Debtors' Plan is confirmed under § 1191(a), on the effective date of the Plan, the Debtor will be discharged from any debt that arose before

confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:

(i) imposed by this Plan; or

(ii) to the extent provided in § 1141(d)(6).

If the Debtors' Plan is confirmed through a nonconsensual confirmation under § 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Code, and the creditors' rights in the event of default may be greater. The Debtors will not be discharged from any debt:

(i) on which the last payment is due after the first 3 years of the plan, or as otherwise provided in § 1192; or

(ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

A discharge granted following a nonconsensual confirmation under 11 U.S.C. § 1191(b) may be granted after the first three (3) years of payments under the Plan, but such discharge will not discharge any continuing obligations under the Plan, nor serve as a discharge of any debts that have been amortized and paid over a longer period of time.

12.16 -        **Contractual Relationship and Default.**  The Plan, upon confirmation, constitutes a new contractual relationship by and between the Debtors and their creditors.  In the event of a default by the Debtors under the Plan, including failure to timely file and pay any post-petition taxes, creditors shall be entitled to enforce all rights and remedies against the Debtors for breach of contract, the Plan.  Any secured creditor claiming a breach of the Plan by any Debtor will be able to enforce all of their rights and remedies including acceleration, foreclosure of their deed of trust, security agreement, lien, or mortgage pursuant to the terms of such document.  Any creditor claiming a breach by any Debtor must provide written notice to the applicable Debtor and counsel for the Debtor of the claimed default, the notice must provide the applicable Debtor a ten (10) day period within which to cure the claimed default, unless a longer period is specified elsewhere in the Plan.  Upon the Debtors' failure to cure the default within such ten-day period, the creditor may proceed to exercise their rights and remedies under applicable State and Federal Law, including seeking to enforce the terms of the Plan or conversion of the Debtors' case to a case under Chapter 7.

In the event the Debtors' Plan is confirmed through a non-consensual confirmation under 11 U.S.C. § 1191(b), creditors may have greater rights in the event of default, as debts are not discharged until the completion of all payments due within the first three years of the Plan, and creditors may be able to pursue the full amount of their claims immediately in the event of a default under the Plan if confirmed pursuant to 11 U.S.C. § 1191(b).

12.17 - **Exculpation**. **Except as set forth in this Plan, neither the Debtors, nor any of their agents, representatives, attorneys, accountants or advisors shall have or incur any liability in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming the Plan, or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with the restructuring of the Debtors pursuant to the Plan during the pendency of the Debtors' Chapter 11 Cases and through the date of confirmation of the Plan; provided that the foregoing shall have no effect on the liability for a breach of the Plan or any other document, instrument, or agreement executed and delivered in connection with the Plan, or that otherwise results from any act or omission that is determined in a Final Order to have constituted gross negligence, bad faith, or willful misconduct; provided further that nothing in this Plan shall limit the liability of any retained attorney in violation of Rule 1.8(h)(1) of the Colorado Rules of Professional Conduct. For the avoidance of a doubt, there shall be no liability limitation for the Debtors and their Insiders, for their actions or omissions occurring before the Petition Date, *or after the Confirmation Date*, or their actions or omissions after the Petition Date that are not official actions made in good faith or not made in connection with the Chapter 11 cases, nor shall it release the Debtor from any obligations arising under contracts entered into on a post-petition basis.**

12.18 - **Executory Contracts and Unexpired Leases.** All executory contracts and unexpired leases which were entered into by the Debtors pre-petition, and not assumed by order of the Bankruptcy Court, are assumed as of the Effective Date of the Plan.

12.19 - **Revestment.** The entry of an Order confirming this Plan shall revest in the Debtor all property of the estate free and clear of all liens except those specifically set forth in the Plan. In the event the Plan is not confirmed by consent but rather is confirmed pursuant to 11

U.S.C. § 1191(b), the Debtors' property shall revest in the Debtors upon the earliest of the Debtors receiving its discharge.

12.20 -       **Retention of Jurisdiction**.  Notwithstanding confirmation of the Plan, the Court shall retain jurisdiction for the following purposes:

a.      Determination of the allowability of claims upon objection to such claims by the Debtors-in-Possession or by any other party in interest;

b.      Determination of the request for payment of claims entitled to priority under 11 U.S.C. Section 507(a)(1), including compensation of the parties entitled thereto;

c.      Resolution of any disputes regarding interpretation of the Plan;

d.      Implementation of the provisions of the Plan and entry of orders in aid of consummation of the Plan, including without limitation, appropriate orders to protect the revested Debtors from action by creditors;

e.      Modification of the Plan pursuant to 11 U.S.C. §1193;

f.      Adjudication of any causes of action, including avoiding powers actions, brought by the Debtors-in-Possession, by the representative of the estate or by a Trustee appointed pursuant to the Code;

g.      Adjudication of any cause of action brought by the Debtors-in-Possession, by a representative of the estate, or by a Trustee appointed pursuant to the Code, or the revested Debtors exercising rights and powers as provided in 11 U.S.C. §542-549.  This section shall not be construed to limit any other power or right which the Debtor may possess under any section of the Code; and

h.      Entry of a final decree.

12.21 -  **Satisfaction of Claims.**  Except as otherwise required by or provided in this Plan, the Debtors shall receive a discharge on the confirmation date pursuant to Section 1141(d). Confirmation of the Plan shall constitute a modification of any note or obligation for which specification and treatment is provided under the Plan as set forth in the Plan.  Any obligation or note, previously in default, so modified, shall be cured as modified as of the Confirmation Date. This provision shall be operable regardless of whether the Plan provides for any obligation to be evidenced by a rewritten loan or security document following confirmation of the Plan.

12.22 -   **Headings**.  The headings used in the Plan are for convenience of reference only and shall not limit or in any manner affect the meaning or interpretation of the Plan

12.23 -   **Notices.**  All notices, requests, demands, or other communications required or permitted in this Plan must be given in writing to the party(ies) to be notified.  All communications will be deemed delivered when received at the following addresses:

    a.    Gallus Detox Services, Inc.
        c/o Warren Olsen
        7200 E. Hampden Ave., Suite 106
        Denver. CO 80223

        With a copy to:
        Keri L. Riley, Esq.
        Kutner Brinen Dickey Riley, P.C.
        1660 Lincoln St., Suite 1720
        Denver, CO 80264
        Email:klr@kutnerlaw.com

    b.    To an allowed claimant, at the addresses set forth in the allowed Proof of Claim, if filed, otherwise, at the address set forth for the claimant in the Debtors' Schedules filed with the Court.

    c.    To the IRS, by fax to the attention of Troy Blair at (855) 716-0613, or to the attention of Sal Rivera at (855) 276-0907.

12.24 -   **Unclaimed Payments**.  If a person or entity entitled to receive a payment or distribution pursuant to this Plan, exclusive of the IRS, fails to negotiate a check, accept a distribution or leave a forwarding address in the event notice cannot be provided as set forth in paragraph 18, within one (1) year of the Effective Date of the Plan, the person or entity is deemed to have released and abandoned any right to payment or distribution under the Plan.

12.25 -   **Subchapter V Trustee and Plan Payments**.  If this Plan is confirmed pursuant to 11 U.S.C. § 1191(a), the Trustee's services shall be terminated at such time as the Plan has been substantially consummated.  If the Plan is confirmed pursuant to 11 U.S.C. § 1191(b), the Trustee shall continue to serve as Trustee, shall accept Plan payments from the Debtor and convey said payments as provided herein, and may pursue a default claim in the event of a default under the Plan.  As set forth above, the Trustee shall be entitled to reasonable compensation in accordance with 11 U.S.C. § 330 for continued services and expenses provided as the Subchapter V Trustee under the Plan.  The Trustee's compensation must be approved by the Court based on an hourly

rate calculation of the services provided. In order to ensure funds are available to compensate the Trustee, the Trustee may deduct and hold up to 5% from the Class 11 Funds prior to calculating disbursements to creditors until the amount of her compensation is approved by the Court.  The Debtors shall pay any shortfall of the Trustee's allowed post-Effective Date fees and expenses after the application of the 5% holdback within thirty (30) days after entry of an Order allowing such fees and expenses.

12.26 - **Substantial Consummation**.  Pursuant to 11 U.S.C. § 1183(c)(2), within fourteen (14) days after the Plan has been substantially consummated, the Debtors shall file a notice of the same with the Court, and serve the Subchapter V trustee, the United States trustee, and all parties in interest.

**ARTICLE XIII.**
**<u>CONFIRMATION REQUEST</u>**

The Debtors, as proponents of the Plan, requests confirmation of the Plan pursuant to 11 U.S.C. §1191(a).  The Court may confirm the Plan pursuant to § 1191(b) if it does not discriminate unfairly and is fair and equitable with respect to each class of Claims or Interests that is impaired under, and has not accepted, the Plan.

DATED:  October 8, 2024     **GALLUS DETOX SERVICES, INC.**

By: <u>s/  Warren Olsen</u>
       Warren Olsen, CEO

DATED:  October 8, 2024     **GALLUS DETOX DENVER, LLC**

By: <u>s/  Warren Olsen</u>
       Warren Olsen, as Agent

DATED:  October 8, 2024     **GALLUS DETOX SCOTTSDALE, LLC**

By: <u>s/ Warren Olsen</u>
       Warren Olsen, as Agent

DATED:  October 8, 2024     **GALLUS DETOX DALLAS, PLLC**

By: <u>s/  Warren Olsen</u>
       Warren Olsen, as Agent

APPROVED AS TO FORM:

*s/ Keri L. Riley*
Keri L. Riley, #47605
Kutner Brinen Dickey Riley, P.C.
1660 Lincoln St., Suite 1720
Denver, CO 80264
Telephone:  303- 832-2400
Email: klr@kutnerlaw.com

ATTORNEYS FOR DEBTORS

## **EXHIBITS TO PLAN OF REORGANIZATION**

- Exhibit A – List of General Unsecured Trade Creditors of GDS and Unsecured Creditors of Dallas, Scottsdale, and Dallas
- Exhibit B – List of Unsecured Claims Held by Holders of Insider and/or Convertible Notes
- Exhibit C – Projections
- Exhibit D – Fully Diluted Capitalization Table Assuming Full Conversion of Class 12 to Equity
- Exhibit E – Stipulation with AKF, Inc. d/b/a FundKite Resolving Objections to Use Cash Collateral
- Exhibit F – Stipulation with Reliance Platinum, LLC d/b/a MYNT Advance Resolving Objections to Use of Cash Collateral
- Exhibit G – Stipulation with Lionheart Funding, LLC Resolving Objections to Use of Cash Collateral
- Exhibit H – Liquidation Analysis

Exhibit A

| Name | Amount of Claim on Schedule F | Proof of Claim | for Trade Creditor Class Analysis | Notes |
|---|---|---|---|---|
| Zalkind, Simon | $ 11,000.00 | | $ 11,000.00 | Art Vendor |
| WorkBright | $ 604.64 | | $ 604.64 | HR Software |
| Weiss, Douglas | $ 986.30 | | $ 986.30 | |
| WebServ | $ 28,000.00 | $30,500 (Proof of Claim No. 1) | $ 30,500.00 | Digital Marketing |
| WC Construction | $ 112,378.76 | $113,137.93 (Proof of Claim No. 7) | $ 113,137.93 | General Contractor |
| Trusted Provider Network | $ 1,000.00 | | $ 1,000.00 | |
| Technolink of the Rockies | $ 358.85 | | $ 358.85 | Technology/Communications Vendor |
| Stericycle | $ 3,044.27 | | $ - | Scheduled as Contingent and Unliquidated |
| Stericycle | $ 193.91 | | $ - | Scheduled as Contingent and Unliquidated |
| Stericycle | $ 391.58 | | $ - | Scheduled as Contingent and Unliquidated |
| Stericycle | $ 1,351.75 | | $ - | Scheduled as Contingent and Unliquidated |
| Start your Recovery | $ 155.00 | | $ 155.00 | Digital Marketing |
| Southwest Calibration | $ 9,815.00 | | $ - | Scheduled as Contingent and Unliquidated |
| Sopris Capital | $ 4,293.36 | | $ 4,293.36 | |
| Sampson, Glenn | $ 665.00 | | $ - | Scheduled as Contingent and Unliquidated |
| Salary.com | $ 4,454.43 | | $ 4,454.43 | HR Software |
| Roadrunner Oxygen Service | $ 85.18 | | $ 85.18 | Medical Services/Supplies |
| Richey May | $ 28,860.00 | $28,860.00 (Proof of Claim No. 8-1) | $ 28,860.00 | Accounting Services |
| Republic Parking | $ 11,236.50 | | $ 11,236.50 | |
| Relias | $ 26,270.50 | | $ 26,270.50 | |
| Reliabill | $ 61,645.69 | | $ 61,645.69 | Former 3rd Party Insurance Collector |
| Pro Construct | $ 373,627.52 | | $ 373,627.52 | General Contractor |
| PRN Uniforms | $ 340.47 | | $ - | Scheduled as Contingent and Unliquidated |
| Pharmerica | $ 15,445.46 | $35,030.13 (Proof of Claim No. 10-1) | $ 35,030.13 | Includes all amounts owed by all clinics |
| PayrHealth | $ 24,000.00 | | $ 24,000.00 | Insurance Contractor |
| Parks Coffee | $ 247.02 | | $ 247.02 | General Services |
| Omnicell | $ 1,644.00 | | $ - | Scheduled as Contingent and Unliquidated |
| Omnicell | $ 5,079.97 | | $ - | Scheduled as Contingent and Unliquidated |
| Omnicell | $ 1,644.00 | | $ - | Scheduled as Contingent and Unliquidated |
| Omnicell | $ 3,096.00 | | $ - | Scheduled as Contingent and Unliquidated |
| Omnicell | $ 5,079.97 | | $ - | Scheduled as Contingent and Unliquidated |
| Office Scapes | $ 17,837.26 | | $ 17,837.26 | Furniture Vendor |
| Oak Ridge, LLC | $ 52,326.96 | | $ 52,326.96 | Landlord (Minneapolis future location) |
| NaturZone | $ 300.00 | | $ - | Scheduled as Contingent and Unliquidated |
| Mussalli Law | $ 15,739.75 | | $ 15,739.75 | Legal Fees |
| Meltwater | $ 1,650.00 | | $ 1,650.00 | PR/Marketing |
| Medline | $ 377.94 | | $ 377.94 | Scheduled as Contingent and Unliquidated |
| Medely | $ 17,291.84 | $19,616.14 (Scottsdale Proof of Claim No. 1-1) | $ 17,291.84 | |
| Medely | $ 4,605.62 | $5,299.33 (Denver Proof of Claim No. 1-1) | $ 4,605.62 | |
| McKesson | $ 4,420.93 | $5,971.82 (Proof of Claim No. 15-1) | $ 5,971.82 | Includes all amounts owed by all clinics |
| Maricopa County Treasurer | $ 2,466.98 | | $ 2,466.98 | |

| | | | | |
|---|---|---|---|---|
| Manchester Mills | $ 2,778.82 | | $ - | Scheduled as Contingent and Unliquidated |
| Lumen | $ 307.51 | | $ - | Scheduled as Contingent and Unliquidated |
| Lochness | $ 1,487.12 | | $ - | Scheduled as Contingent and Unliquidated |
| Lindsey Jannach | $ 1,200.00 | | $ - | Scheduled as Contingent and Unliquidated |
| Liaison Home Automation | $ 6,229.92 | | $ 6,229.92 | Technology/Communications Vendor |
| LegitScript | $ - | | $ - | |
| LabCorp. | $ 11,941.57 | | $ 11,941.57 | Medical Service/Supplies |
| Kipu Systems | $ 10,173.55 | | $ 10,173.55 | |
| KAW Property Holdings | $ 23,742.40 | | $ 23,742.40 | Landlord (Scottsdale) |
| JJ Home Repairs and More | $ 5,392.30 | | $ 5,392.30 | Scheduled as Contingent and Unliquidated |
| Iron Mountain | $ - | | $ - | General Services |
| IPFS Corporation | $ 14,002.58 | | $ 14,002.58 | Insurance |
| Innovative Career Consulting | $ 4,500.00 | | $ 4,500.00 | Staffing |
| Inmar Rx Solutions, Inc. | $ 294.20 | | $ - | Scheduled as Contingent and Unliquidated |
| IMA | $ 2,819.11 | | $ 2,819.11 | Insurance Broker |
| Higher Ground Landscaping | $ 200.00 | | $ - | Scheduled as Contingent and Unliquidated |
| High Touch Technologies | $ 8,612.20 | $8,387.20 (Proof of Claim No. 3-1) | $ 8,387.20 | IT Consultant |
| Herrmann, Laura | $ 7,200.00 | | $ 7,200.00 | Contract Business Development |
| Health Temps | $ 35,520.01 | | $ - | Scheduled as Contingent and Unliquidated |
| Gnani Billakanti MD | $ 1,000.00 | | $ 1,000.00 | Consulting Physician |
| Fusion 92 | $ - | | $ - | Digital Marketing |
| Flowater | $ 136.02 | | $ - | Scheduled as Contingent and Unliquidated |
| F2920M Property Management | $ 195,395.21 | $115,257.13 (Proof of Claim No. 14) | $ 115,257.13 | Landlord (Houston) |
| Emerus/BHS SA Hausman | $ 97,280.43 | $283,814.23 (Proof of Claim No. 12-2) | $ 283,814.23 | Landlord (San Antonio) |
| Edward Bozaan | $ 18,750.00 | | $ 18,750.00 | Director (Board Fee) |
| EBD BEMC Mansfield | $ 133,744.48 | $162,713.71 (Proof of Claim No. 11-1) | $ 162,713.71 | Landlord (Dallas) |
| DE Craig Ranch, LLC | $ 117,336.45 | $286,422.67 (Proof of Claim No. 13-2) | $ 286,422.67 | Landlord (Las Vegas) |
| Comcast | $ - | | $ - | |
| Collaborate MD | $ - | | $ - | Insurance Billing Software |
| CLIA Laboratory Program | $ 180.00 | | $ - | Scheduled as Contingent and Unliquidated |
| Clark County Assessor | $ 3,228.64 | | $ - | Scheduled as Contingent and Unliquidated |
| Century Link | $ - | $30.21 (Scottsdale Proof of Claim No. 2) | $ 30.21 | Scheduled as Contingent and Unliquidated |
| CBS Technologies | $ 199.25 | | $ 199.25 | Scheduled as Contingent and Unliquidated |
| Cardinal Health | $ 75.29 | | $ 75.29 | Scheduled as Contingent and Unliquidated |
| Capitol Services | $ 2,600.00 | | $ 2,600.00 | Registered Agent |
| Capitol Center | $ 82,506.45 | $103,465.58 (Proof of Claim No. 9-1) | $ 103,465.58 | Landlord - potentially subject to setoff |
| California Franchise Tax Board | $ 1,615.00 | | $ 1,615.00 | |
| C Squared | $ 69,259.13 | | $ 69,259.13 | IT Consultant |
| Buxton | $ 30,000.00 | | $ 30,000.00 | Technology/Data |
| Brian Shear, MD | $ - | | $ - | Scheduled as Contingent and Unliquidated |
| Bold Legal | $ 11,005.00 | | $ 11,005.00 | Legal Services |
| Bigam, Lyra | $ 25,441.78 | | $ 25,441.78 | |
| Bank of America | $ 7,111.96 | | $ 7,111.96 | Credit Card |
| Bank of America | $ 16,698.20 | | $ 16,698.20 | Credit Card |
| Bank of America | $ 11,466.30 | | $ 11,466.30 | Credit Card |
| Bank of America | $ - | | $ - | Credit Card |

| | | | | |
|---|---|---|---|---|
| Bank of America | $ 8,741.21 | | $ 8,741.21 | Credit Card |
| Bank of America | $ 24,970.34 | | $ 24,970.34 | Credit Card |
| Bank of America | $ 20,694.51 | | $ 20,694.51 | Credit Card |
| Balch and Bingham | $ 8,011.06 | | $ 8,011.06 | Legal Services |
| Bach Diagnostics | $ 5,780.00 | | $ - | Scheduled as Contingent and Unliquidated |
| AT&T | $ 1,591.31 | | $ 1,591.31 | Technology/Communications Vendor |
| Architectural Resources | $ 80,250.00 | | $ 80,250.00 | Architect |
| Angela Walcher, MD | $ - | | $ - | Scheduled as Contingent and Unliquidated |
| Alston Bird | $ 11,120.00 | | $ 11,120.00 | Legal Services |
| Airtec Gases | $ 357.41 | | $ - | Scheduled as Contingent and Unliquidated |
| Airgas | $ 2,624.86 | | $ 2,624.86 | Scheduled as Contingent and Unliquidated |
| ADT | $ 37.00 | | $ 37.00 | Security Services |
| Ad Resources | $ 563.69 | | $ 563.69 | Marketing Vendor |
| ACC Business | $ 612.80 | | $ 612.80 | Technology/Communications Vendor |
| AC Merchandising | $ 5,000.00 | | $ 5,000.00 | Digital Marketing |
| WorkPlace Elements | $ - | $17,837.26 (Proof of Claim No. 6-1) | $ 17,837.26 | |
| Medely, Inc. | | $1,214.71 (Proof of Claim No. 2-1) | $ 1,214.71 | |
| Lyra Bigam | | $25,000 (Proof of Claim No. 18-1) | $ 25,000.00 | |
| | | | **$ 2,295,344.04** | |

Exhibit B

| Type of Note | Creditor | Claim Amount |
|---|---|---:|
| *Insider Note* | Warren J Olsen | 1,495,863.02 |
| *Insider Note* | SCB Global Capital Management, LLC | 237,268.49 |
| *Insider Note* | Russell Matthews | 223,261.99 |
| *Insider Note* | Walter van Woudenberg | 1,017,671.24 |
| *Insider Note and Convertible Note* | Pacific Financial Association, Inc. | 640,982.35 |
| *Insider Note* | Patrick Gallus | 347,601.11 |
| *Insider Note* | Jon Maxwell Silverman | 60,295.89 |
| *Convert* | Yellow Lab Properties | 50,673.98 |
| *Convert* | Stanhope Reed Rigby LLC | 38,986.01 |
| *Convert* | Sara Montgomery | 30,880.67 |
| *Convert* | Whitney Knier | 14,183.51 |
| *Convert* | Michael A Dixon | 4,252.56 |
| | | **4,161,920.81** |

Exhibit C

Gallus Reorg
Monthly Budget

| | days in yr >> | 366 | 366 | 366 | 366 | 366 | 366 |
|---|---|---|---|---|---|---|---|
| | days in mo >> | 31 | 31 | 30 | 31 | 30 | 31 |
| | | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 |

**CURRENT BUSINESS OPERATIONS: IN-PATIENT MEDICAL DETOX SERVICES ("IP Detox")**

**Gross Cash In: IP Detox**

| | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 |
|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | 150,000 | 250,000 | 205,350 | 205,350 | 205,350 | 205,350 |
| Gallus Detox Denver, LLC | 160,000 | 180,000 | 177,600 | 177,600 | 177,600 | 177,600 |
| Gallus Detox Dallas, PLLC | 118,000 | 140,000 | 118,800 | 118,800 | 118,800 | 118,800 |
| **Total Gross Cash In: IP Detox** | **428,000** | **570,000** | **501,750** | **501,750** | **501,750** | **501,750** |

**Cash Out: IP Detox**

| | | | | | | |
|---|---|---|---|---|---|---|
| Total Cash Out - IP Detox: Gallus Detox Scottsdale, LLC | (133,500) | (133,500) | (133,500) | (133,500) | (133,500) | (133,500) |
| Total Cash Out - IP Detox: Gallus Detox Denver, LLC | (136,000) | (136,000) | (136,000) | (136,000) | (136,000) | (136,000) |
| Total Cash Out - IP Detox: Gallus Detox Dalllas, PLLC | (141,500) | (141,500) | (141,500) | (141,500) | (141,500) | (141,500) |

**Gross Cash In/(Out):  IP Detox**

| | | | | | | |
|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | 16,500 | 116,500 | 71,850 | 71,850 | 71,850 | 71,850 |
| Gallus Detox Denver, LLC | 24,000 | 44,000 | 41,600 | 41,600 | 41,600 | 41,600 |
| Gallus Detox Dallas, PLLC | (23,500) | (1,500) | (22,700) | (22,700) | (22,700) | (22,700) |
| **Total Gross Cash In/(Out): IP Detox** | **17,000** | **159,000** | **90,750** | **90,750** | **90,750** | **90,750** |

**Deductions to Gross Cash In: IP Detox**

| | | | | | | |
|---|---|---|---|---|---|---|
| Credit Card Processing Fees | (5,082) | (5,082) | (4,918) | (5,082) | (4,918) | (5,082) |
| Insurance Billing Fees | (12,705) | (12,705) | (12,295) | (12,705) | (12,295) | (12,705) |
| **Net Cash In/(Out) Before Corporate Overhead: IP Detox** | **(787)** | **141,213** | **73,537** | **72,963** | **73,537** | **72,963** |

**ADDED BUSINESS OPERATIONS: INTENSIVE OUTPATIENT SERVICES ("IOP")**

**Gross Cash In: IOP**

| | | | | | | |
|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | - | - | - | - | - | - |
| Gallus Detox Denver, LLC | - | - | 6,698 | 13,395 | 20,093 | 26,791 |
| Gallus Detox Dallas, PLLC | - | - | - | 4,000 | 12,000 | 20,093 |
| **Total Gross Cash In: IOP** | **-** | **-** | **6,698** | **17,395** | **32,093** | **46,884** |

**Cash Out: IOP**

| | | | | | | |
|---|---|---|---|---|---|---|
| Total IOP Cash Out: Gallus Detox Scottsdale, LLC | - | - | - | - | (2,000) | (2,000) |
| Total IOP Cash Out: Gallus Detox Denver, LLC | (2,000) | (2,000) | (8,750) | (8,750) | (8,750) | (8,750) |
| Total IOP Cash Out: Gallus Detox Dallas, PLLC | - | - | - | (9,250) | (9,250) | (9,250) |

**Gross Cash In/(Out):  IOP**

| | | | | | | |
|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | - | - | - | - | (2,000) | (2,000) |
| Gallus Detox Denver, LLC | (2,000) | (2,000) | (2,052) | 4,645 | 11,343 | 18,041 |
| Gallus Detox Dallas, PLLC | - | - | - | (5,250) | 2,750 | 10,843 |
| **Total Gross Cash In/(Out): IOP** | **(2,000)** | **(2,000)** | **(2,052)** | **(605)** | **12,093** | **26,884** |

**Deductions to Gross Cash In: IOP**

| | | | | | | |
|---|---|---|---|---|---|---|
| Credit Card Processing Fees | - | - | (66) | (172) | (318) | (464) |
| Insurance Billing Fees | - | - | (155) | (402) | (741) | (1,083) |
| **Net Cash In/(Out) Before Corporate Overhead: IOP** | **(2,000)** | **(2,000)** | **(2,273)** | **(1,179)** | **11,034** | **25,337** |

| | | | | | | |
|---|---|---|---|---|---|---|
| **TOTAL NET CASH IN/(OUT) BEFORE CORPORATE OVERHEAD: IP DETOX + IOP** | **(2,787)** | **139,213** | **71,264** | **71,784** | **84,571** | **98,300** |

Gallus Reorg
Monthly Budget

| | days in yr >> | 366 | 366 | 366 | 366 | 366 | 366 |
|---|---|---|---|---|---|---|---|
| | days in mo >> | 31 | 31 | 30 | 31 | 30 | 31 |
| | | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 |

**CASH OUT: CORPORATE OVERHEAD**

| | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 |
|---|---|---|---|---|---|---|
| Total Labor | (95,877) | (83,528) | (71,179) | (79,513) | (79,513) | (79,513) |
| | | | | | | |
| Marketing (Non-Labor) | | | | | | |
| Digital Marketing | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) |
| Business Development Expenses | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) |
| Total Marketing (Non-Labor) | (16,500) | (16,500) | (16,500) | (16,500) | (16,500) | (16,500) |
| | | | | | | |
| General & Administrative | | | | | | |
| Accounting | (4,000) | (4,000) | - | - | - | - |
| 3rd Party IT Support | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) |
| Professional Services | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) |
| Insurance | (16,000) | (16,000) | (16,000) | (16,000) | (16,000) | (16,000) |
| Communications & Technology | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) |
| Subscriptions | (1,250) | (1,250) | (1,250) | (1,250) | (1,250) | (1,250) |
| Assumed SBA Loans | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) |
| Chief Medical Officer Contract | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| Other G&A | (4,000) | (4,000) | (4,000) | (4,000) | (4,000) | (4,000) |
| Total General & Administrative | (48,750) | (48,750) | (44,750) | (44,750) | (44,750) | (44,750) |
| | | | | | | |
| **Total Cash Out: Corporate Overhead** | **(161,127)** | **(148,778)** | **(132,429)** | **(140,763)** | **(140,763)** | **(140,763)** |
| | | | | | | |
| **Cash Available from Ongoing Operations** | **(163,914)** | **(9,565)** | **(61,165)** | **(68,978)** | **(56,192)** | **(42,463)** |
| | | | | | | |
| Cash Out: Payments to Secured Creditors | (20,534) | (20,534) | (20,534) | (20,534) | (20,534) | (20,534) |
| | | | | | | |
| **Cash Available after payments to secured creditors** | **(184,448)** | **(30,099)** | **(81,699)** | **(89,512)** | **(76,726)** | **(62,997)** |

**CASH OUT: CASH NEEDS FOR ORDERED PAYMENTS AND CAPITAL EXPENDITURES**

| | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 |
|---|---|---|---|---|---|---|
| Catch up Rent Payments | | | | | | |
| Gallus Detox Scottsdale, LLC | | | | | (4,444) | (4,444) |
| Gallus Detox Denver, LLC | | | | | (5,000) | (5,000) |
| Gallus Detox Dallas, PLLC | | | | | (18,079) | (18,079) |
| | | | | | | |
| Court Ordered Payments to F2920M Property Management (Houston landlord) | | | | | | |
| | | | | | | |
| Capital Expenditures: Ongoing Operations | | | | | | |
| Capital Expenditures: Scottsdale clinic Move in 2026 | | | | | | |
| | | | | | | |
| Chapter 11 Administrative Fees | | | | | | |
| Medical Ombudsman | | | (18,000) | - | - | - |
| Subchapter V Trustee | | | | | (625) | (625) |
| Debtor's Legal Counsel | | | | | (1,667) | (1,667) |
| | | | | | | |
| **Total Cash Out: Other** | **-** | **-** | **(18,000)** | **-** | **(29,815)** | **(29,815)** |
| | | | | | | |
| **DISPOSABLE MONTHLY INCOME** | **(184,448)** | **(30,099)** | **(99,699)** | **(89,512)** | **(106,541)** | **(92,812)** |

Gallus Reorg
Monthly Budget

| | days in yr >> | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 |
| | days in mo >> | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 |
| | | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |

**CURRENT BUSINESS OPERATIONS: IN-PATIENT MEDICAL DETOX SERVICES ("IP Detox")**

**Gross Cash In: IP Detox**

| | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | 215,514 | 194,658 | 215,514 | 208,562 | 215,514 | 208,562 | 215,514 | 215,514 | 208,562 | 215,514 | 208,562 | 215,514 |
| Gallus Detox Denver, LLC | 196,404 | 177,397 | 196,404 | 190,068 | 196,404 | 190,068 | 196,404 | 196,404 | 190,068 | 196,404 | 190,068 | 196,404 |
| Gallus Detox Dallas, PLLC | 144,808 | 130,795 | 144,808 | 140,137 | 144,808 | 140,137 | 144,808 | 144,808 | 140,137 | 144,808 | 140,137 | 144,808 |
| **Total Gross Cash In: IP Detox** | **556,726** | **502,849** | **556,726** | **538,767** | **556,726** | **538,767** | **556,726** | **556,726** | **538,767** | **556,726** | **538,767** | **556,726** |

**Cash Out: IP Detox**

| | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cash Out - IP Detox: Gallus Detox Scottsdale, LLC | (137,665) | (137,665) | (137,665) | (137,665) | (137,665) | (137,665) | (137,665) | (137,665) | (137,665) | (137,665) | (137,665) | (137,665) |
| Total Cash Out - IP Detox: Gallus Detox Denver, LLC | (140,080) | (140,080) | (140,080) | (140,080) | (140,080) | (140,080) | (140,080) | (140,080) | (140,080) | (140,080) | (140,080) | (140,080) |
| Total Cash Out - IP Detox: Gallus Detox Dalllas, PLLC | (145,745) | (145,745) | (145,745) | (145,745) | (145,745) | (145,745) | (145,745) | (145,745) | (145,745) | (145,745) | (145,745) | (145,745) |

**Gross Cash In/(Out):  IP Detox**

| | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | 77,849 | 56,993 | 77,849 | 70,897 | 77,849 | 70,897 | 77,849 | 77,849 | 70,897 | 77,849 | 70,897 | 77,849 |
| Gallus Detox Denver, LLC | 56,324 | 37,317 | 56,324 | 49,988 | 56,324 | 49,988 | 56,324 | 56,324 | 49,988 | 56,324 | 49,988 | 56,324 |
| Gallus Detox Dallas, PLLC | (937) | (14,950) | (937) | (5,608) | (937) | (5,608) | (937) | (937) | (5,608) | (937) | (5,608) | (937) |
| **Total Gross Cash In/(Out): IP Detox** | **133,236** | **79,359** | **133,236** | **115,277** | **133,236** | **115,277** | **133,236** | **133,236** | **115,277** | **133,236** | **115,277** | **133,236** |

**Deductions to Gross Cash In: IP Detox**

| | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credit Card Processing Fees | (5,512) | (4,978) | (5,512) | (5,334) | (5,512) | (5,334) | (5,512) | (5,512) | (5,334) | (5,512) | (5,334) | (5,512) |
| Insurance Billing Fees | (12,860) | (11,616) | (12,860) | (12,446) | (12,860) | (12,446) | (12,860) | (12,860) | (12,446) | (12,860) | (12,446) | (12,860) |
| **Net Cash In/(Out) Before Corporate Overhead: IP Detox** | **114,864** | **62,765** | **114,864** | **97,498** | **114,864** | **97,498** | **114,864** | **114,864** | **97,498** | **114,864** | **97,498** | **114,864** |

**ADDED BUSINESS OPERATIONS: INTENSIVE OUTPATIENT SERVICES ("IOP")**

**Gross Cash In: IOP**

| | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | 6,698 | 13,395 | 20,093 | 26,791 | 35,000 | 38,000 | 41,000 | 43,000 | 48,333 | 48,333 | 48,333 | 48,333 |
| Gallus Detox Denver, LLC | 35,000 | 38,000 | 41,000 | 43,000 | 48,333 | 48,333 | 48,333 | 48,333 | 48,333 | 48,333 | 48,333 | 48,333 |
| Gallus Detox Dallas, PLLC | 30,000 | 38,000 | 46,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 |
| **Total Gross Cash In: IOP** | **71,698** | **89,395** | **107,093** | **124,791** | **138,333** | **141,333** | **144,333** | **146,333** | **151,667** | **151,667** | **151,667** | **151,667** |

**Cash Out: IOP**

| | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total IOP Cash Out: Gallus Detox Scottsdale, LLC | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) |
| Total IOP Cash Out: Gallus Detox Denver, LLC | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) |
| Total IOP Cash Out: Gallus Detox Dallas, PLLC | (9,250) | (9,250) | (9,250) | (9,250) | (9,250) | (9,250) | (9,250) | (9,250) | (9,250) | (9,250) | (9,250) | (9,250) |

**Gross Cash In/(Out): IOP**

| | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | (4,552) | 2,145 | 8,843 | 15,541 | 23,750 | 26,750 | 29,750 | 31,750 | 37,083 | 37,083 | 37,083 | 37,083 |
| Gallus Detox Denver, LLC | 23,750 | 26,750 | 29,750 | 31,750 | 37,083 | 37,083 | 37,083 | 37,083 | 37,083 | 37,083 | 37,083 | 37,083 |
| Gallus Detox Dallas, PLLC | 20,750 | 28,750 | 36,750 | 45,750 | 45,750 | 45,750 | 45,750 | 45,750 | 45,750 | 45,750 | 45,750 | 45,750 |
| **Total Gross Cash In/(Out): IOP** | **39,948** | **57,645** | **75,343** | **93,041** | **106,583** | **109,583** | **112,583** | **114,583** | **119,917** | **119,917** | **119,917** | **119,917** |

**Deductions to Gross Cash In: IOP**

| | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credit Card Processing Fees | (710) | (885) | (1,060) | (1,235) | (1,370) | (1,399) | (1,429) | (1,449) | (1,502) | (1,502) | (1,502) | (1,502) |
| Insurance Billing Fees | (1,656) | (2,065) | (2,474) | (2,883) | (3,196) | (3,265) | (3,334) | (3,380) | (3,504) | (3,504) | (3,504) | (3,504) |
| **Net Cash In/(Out) Before Corporate Overhead: IOP** | **37,582** | **54,695** | **71,809** | **88,923** | **102,018** | **104,919** | **107,820** | **109,754** | **114,912** | **114,912** | **114,912** | **114,912** |
| **TOTAL NET CASH IN/(OUT) BEFORE CORPORATE OVERHEAD: IP DETOX + IOP** | **152,446** | **117,460** | **186,673** | **186,421** | **216,882** | **202,417** | **222,684** | **224,618** | **212,409** | **229,776** | **212,409** | **229,776** |

Gallus Reorg
Monthly Budget

| | days in yr >> | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | days in mo >> | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 |
| | | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
| **CASH OUT: CORPORATE OVERHEAD** | | | | | | | | | | | | | |
| Total Labor | | (96,597) | (96,597) | (96,597) | (96,597) | (96,597) | (96,597) | (96,597) | (96,597) | (96,597) | (96,597) | (96,597) | (96,597) |
| | | | | | | | | | | | | | |
| Marketing (Non-Labor) | | | | | | | | | | | | | |
| Digital Marketing | | (15,450) | (15,450) | (15,450) | (15,450) | (15,450) | (15,450) | (15,450) | (15,450) | (15,450) | (15,450) | (15,450) | (15,450) |
| Business Development Expenses | | (1,545) | (1,545) | (1,545) | (1,545) | (1,545) | (1,545) | (1,545) | (1,545) | (1,545) | (1,545) | (1,545) | (1,545) |
| Total Marketing (Non-Labor) | | (16,995) | (16,995) | (16,995) | (16,995) | (16,995) | (16,995) | (16,995) | (16,995) | (16,995) | (16,995) | (16,995) | (16,995) |
| | | | | | | | | | | | | | |
| General & Administrative | | | | | | | | | | | | | |
| Accounting | | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) |
| 3rd Party IT Support | | (6,180) | (6,180) | (6,180) | (6,180) | (6,180) | (6,180) | (6,180) | (6,180) | (6,180) | (6,180) | (6,180) | (6,180) |
| Professional Services | | (2,575) | (2,575) | (2,575) | (2,575) | (2,575) | (2,575) | (2,575) | (2,575) | (2,575) | (2,575) | (2,575) | (2,575) |
| Insurance | | (16,480) | (16,480) | (16,480) | (16,480) | (16,480) | (16,480) | (16,480) | (16,480) | (16,480) | (16,480) | (16,480) | (16,480) |
| Communications & Technology | | (2,060) | (2,060) | (2,060) | (2,060) | (2,060) | (2,060) | (2,060) | (2,060) | (2,060) | (2,060) | (2,060) | (2,060) |
| Subscriptions | | (1,288) | (1,288) | (1,288) | (1,288) | (1,288) | (1,288) | (1,288) | (1,288) | (1,288) | (1,288) | (1,288) | (1,288) |
| Assumed SBA Loans | | (3,090) | (3,090) | (3,090) | (3,090) | (3,090) | (3,090) | (3,090) | (3,090) | (3,090) | (3,090) | (3,090) | (3,090) |
| Chief Medical Officer Contract | | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| Other G&A | | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) | (4,120) |
| Total General & Administrative | | (49,913) | (49,913) | (49,913) | (49,913) | (49,913) | (49,913) | (49,913) | (49,913) | (49,913) | (49,913) | (49,913) | (49,913) |
| | | | | | | | | | | | | | |
| **Total Cash Out: Corporate Overhead** | | **(163,504)** | **(163,504)** | **(163,504)** | **(163,504)** | **(163,504)** | **(163,504)** | **(163,504)** | **(163,504)** | **(163,504)** | **(163,504)** | **(163,504)** | **(163,504)** |
| | | | | | | | | | | | | | |
| **Cash Available from Ongoing Operations** | | **(11,058)** | **(46,044)** | **23,169** | **22,916** | **53,378** | **38,913** | **59,180** | **61,114** | **48,905** | **66,271** | **48,905** | **66,271** |
| | | | | | | | | | | | | | |
| Cash Out: Payments to Secured Creditors | | (25,534) | (25,534) | (25,534) | (25,534) | (25,534) | (25,534) | (25,534) | (25,534) | (25,534) | (30,201) | (30,201) | (30,201) |
| | | | | | | | | | | | | | |
| **Cash Available after payments to secured creditors** | | **(36,592)** | **(71,578)** | **(2,365)** | **(2,618)** | **27,844** | **13,379** | **33,646** | **35,580** | **23,371** | **36,070** | **18,704** | **36,070** |
| | | | | | | | | | | | | | |
| **CASH OUT: CASH NEEDS FOR ORDERED PAYMENTS AND CAPITAL EXPENDITURES** | | | | | | | | | | | | | |
| Catch up Rent Payments | | | | | | | | | | | | | |
| Gallus Detox Scottsdale, LLC | | (4,444) | (4,444) | (4,444) | (4,444) | (4,444) | (4,444) | (4,444) | | | | | |
| Gallus Detox Denver, LLC | | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | | | | | |
| Gallus Detox Dallas, PLLC | | (18,079) | (18,079) | (18,079) | (18,079) | (18,079) | (18,079) | (18,079) | | | | | |
| | | | | | | | | | | | | | |
| Court Ordered Payments to F2920M Property Management (Houston landlord) | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Capital Expenditures: Ongoing Operations | | | | (12,500) | | | (12,500) | | | (12,500) | | | (12,500) |
| Capital Expenditures: Scottsdale clinic Move in 2026 | | | | | | | | | | | (25,000) | | |
| | | | | | | | | | | | | | |
| Chapter 11 Administrative Fees | | | | | | | | | | | | | |
| Medical Ombudsman | | - | - | - | - | - | - | - | - | | | | |
| Subchapter V Trustee | | (625) | (625) | (625) | (625) | (625) | (625) | (625) | (625) | (625) | (625) | | |
| Debtor's Legal Counsel | | (1,667) | (1,667) | (1,667) | (1,667) | (1,667) | (1,667) | (1,667) | (1,667) | (1,667) | (1,667) | | |
| | | | | | | | | | | | | | |
| **Total Cash Out: Other** | | **(29,815)** | **(29,815)** | **(42,315)** | **(29,815)** | **(29,815)** | **(42,315)** | **(29,815)** | **(2,292)** | **(14,792)** | **(27,292)** | **-** | **(12,500)** |
| | | | | | | | | | | | | | |
| **DISPOSABLE MONTHLY INCOME** | | **(66,408)** | **(101,394)** | **(44,681)** | **(32,433)** | **(1,971)** | **(28,937)** | **3,831** | **33,288** | **8,579** | **8,779** | **18,704** | **23,570** |

Gallus Reorg
Monthly Budget

| | days in yr >> | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | days in mo >> | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 |
| | | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |

**CURRENT BUSINESS OPERATIONS: IN-PATIENT MEDICAL DETOX SERVICES ("IP Detox")**

**Gross Cash In: IP Detox**

| | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | 221,671 | 200,219 | 221,671 | 214,521 | 221,671 | 214,521 | 221,671 | 221,671 | 214,521 | 221,671 | 214,521 | 221,671 |
| Gallus Detox Denver, LLC | 201,712 | 182,192 | 201,712 | 195,205 | 201,712 | 195,205 | 201,712 | 201,712 | 195,205 | 201,712 | 195,205 | 201,712 |
| Gallus Detox Dallas, PLLC | 149,479 | 135,014 | 149,479 | 144,658 | 149,479 | 144,658 | 149,479 | 149,479 | 144,658 | 149,479 | 144,658 | 149,479 |
| **Total Gross Cash In: IP Detox** | **572,863** | **517,425** | **572,863** | **554,384** | **572,863** | **554,384** | **572,863** | **572,863** | **554,384** | **572,863** | **554,384** | **572,863** |

**Cash Out: IP Detox**

| | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cash Out - IP Detox: Gallus Detox Scottsdale, LLC | (141,795) | (141,795) | (141,795) | (141,795) | (141,795) | (141,795) | (141,795) | (141,795) | (141,795) | (141,795) | (141,795) | (141,795) |
| Total Cash Out - IP Detox: Gallus Detox Denver, LLC | (144,282) | (144,282) | (144,282) | (144,282) | (144,282) | (144,282) | (144,282) | (144,282) | (144,282) | (144,282) | (144,282) | (144,282) |
| Total Cash Out - IP Detox: Gallus Detox Dalllas, PLLC | (150,117) | (150,117) | (150,117) | (150,117) | (150,117) | (150,117) | (150,117) | (150,117) | (150,117) | (150,117) | (150,117) | (150,117) |

**Gross Cash In/(Out):  IP Detox**

| | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | 79,876 | 58,424 | 79,876 | 72,726 | 79,876 | 72,726 | 79,876 | 79,876 | 72,726 | 79,876 | 72,726 | 79,876 |
| Gallus Detox Denver, LLC | 57,430 | 37,909 | 57,430 | 50,923 | 57,430 | 50,923 | 57,430 | 57,430 | 50,923 | 57,430 | 50,923 | 57,430 |
| Gallus Detox Dallas, PLLC | (638) | (15,104) | (638) | (5,460) | (638) | (5,460) | (638) | (638) | (5,460) | (638) | (5,460) | (638) |
| **Total Gross Cash In/(Out): IP Detox** | **136,668** | **81,230** | **136,668** | **118,189** | **136,668** | **118,189** | **136,668** | **136,668** | **118,189** | **136,668** | **118,189** | **136,668** |

**Deductions to Gross Cash In: IP Detox**

| | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credit Card Processing Fees | (5,671) | (5,123) | (5,671) | (5,488) | (5,671) | (5,488) | (5,671) | (5,671) | (5,488) | (5,671) | (5,488) | (5,671) |
| Insurance Billing Fees | (13,233) | (11,953) | (13,233) | (12,806) | (13,233) | (12,806) | (13,233) | (13,233) | (12,806) | (13,233) | (12,806) | (13,233) |
| **Net Cash In/(Out) Before Corporate Overhead: IP Detox** | **117,764** | **64,155** | **117,764** | **99,894** | **117,764** | **99,894** | **117,764** | **117,764** | **99,894** | **117,764** | **99,894** | **117,764** |

**ADDED BUSINESS OPERATIONS: INTENSIVE OUTPATIENT SERVICES ("IOP")**

**Gross Cash In: IOP**

| | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Gallus Detox Denver, LLC | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Gallus Detox Dallas, PLLC | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 |
| **Total Gross Cash In: IOP** | **160,000** | **160,000** | **160,000** | **160,000** | **160,000** | **160,000** | **160,000** | **160,000** | **160,000** | **160,000** | **160,000** | **160,000** |

**Cash Out: IOP**

| | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total IOP Cash Out: Gallus Detox Scottsdale, LLC | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) |
| Total IOP Cash Out: Gallus Detox Denver, LLC | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) | (11,588) |
| Total IOP Cash Out: Gallus Detox Dallas, PLLC | (9,528) | (9,528) | (9,528) | (9,528) | (9,528) | (9,528) | (9,528) | (9,528) | (9,528) | (9,528) | (9,528) | (9,528) |

**Gross Cash In/(Out): IOP**

| | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 |
| Gallus Detox Denver, LLC | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 | 38,413 |
| Gallus Detox Dallas, PLLC | 50,473 | 50,473 | 50,473 | 50,473 | 50,473 | 50,473 | 50,473 | 50,473 | 50,473 | 50,473 | 50,473 | 50,473 |
| **Total Gross Cash In/(Out): IOP** | **127,298** | **127,298** | **127,298** | **127,298** | **127,298** | **127,298** | **127,298** | **127,298** | **127,298** | **127,298** | **127,298** | **127,298** |

**Deductions to Gross Cash In: IOP**

| | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credit Card Processing Fees | (1,584) | (1,584) | (1,584) | (1,584) | (1,584) | (1,584) | (1,584) | (1,584) | (1,584) | (1,584) | (1,584) | (1,584) |
| Insurance Billing Fees | (3,696) | (3,696) | (3,696) | (3,696) | (3,696) | (3,696) | (3,696) | (3,696) | (3,696) | (3,696) | (3,696) | (3,696) |
| **Net Cash In/(Out) Before Corporate Overhead: IOP** | **122,018** | **122,018** | **122,018** | **122,018** | **122,018** | **122,018** | **122,018** | **122,018** | **122,018** | **122,018** | **122,018** | **122,018** |

| | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL NET CASH IN/(OUT) BEFORE CORPORATE OVERHEAD: IP DETOX + IOP** | **239,781** | **186,172** | **239,781** | **221,912** | **239,781** | **221,912** | **239,781** | **239,781** | **221,912** | **239,781** | **221,912** | **239,781** |

Gallus Reorg
Monthly Budget

| | days in yr >> | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | days in mo >> | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 |
| | | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
| **CASH OUT: CORPORATE OVERHEAD** | | | | | | | | | | | | | |
| Total Labor | | (103,688) | (103,688) | (103,688) | (103,688) | (103,688) | (103,688) | (103,688) | (103,688) | (103,688) | (103,688) | (103,688) | (103,688) |
| | | | | | | | | | | | | | |
| Marketing (Non-Labor) | | | | | | | | | | | | | |
| Digital Marketing | | (15,914) | (15,914) | (15,914) | (15,914) | (15,914) | (15,914) | (15,914) | (15,914) | (15,914) | (15,914) | (15,914) | (15,914) |
| Business Development Expenses | | (1,591) | (1,591) | (1,591) | (1,591) | (1,591) | (1,591) | (1,591) | (1,591) | (1,591) | (1,591) | (1,591) | (1,591) |
| Total Marketing (Non-Labor) | | (17,505) | (17,505) | (17,505) | (17,505) | (17,505) | (17,505) | (17,505) | (17,505) | (17,505) | (17,505) | (17,505) | (17,505) |
| | | | | | | | | | | | | | |
| General & Administrative | | | | | | | | | | | | | |
| Accounting | | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) |
| 3rd Party IT Support | | (6,365) | (6,365) | (6,365) | (6,365) | (6,365) | (6,365) | (6,365) | (6,365) | (6,365) | (6,365) | (6,365) | (6,365) |
| Professional Services | | (2,652) | (2,652) | (2,652) | (2,652) | (2,652) | (2,652) | (2,652) | (2,652) | (2,652) | (2,652) | (2,652) | (2,652) |
| Insurance | | (16,974) | (16,974) | (16,974) | (16,974) | (16,974) | (16,974) | (16,974) | (16,974) | (16,974) | (16,974) | (16,974) | (16,974) |
| Communications & Technology | | (2,122) | (2,122) | (2,122) | (2,122) | (2,122) | (2,122) | (2,122) | (2,122) | (2,122) | (2,122) | (2,122) | (2,122) |
| Subscriptions | | (1,326) | (1,326) | (1,326) | (1,326) | (1,326) | (1,326) | (1,326) | (1,326) | (1,326) | (1,326) | (1,326) | (1,326) |
| Assumed SBA Loans | | (3,183) | (3,183) | (3,183) | (3,183) | (3,183) | (3,183) | (3,183) | (3,183) | (3,183) | (3,183) | (3,183) | (3,183) |
| Chief Medical Officer Contract | | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| Other G&A | | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) | (4,244) |
| Total General & Administrative | | (51,110) | (51,110) | (51,110) | (51,110) | (51,110) | (51,110) | (51,110) | (51,110) | (51,110) | (51,110) | (51,110) | (51,110) |
| | | | | | | | | | | | | | |
| **Total Cash Out: Corporate Overhead** | | **(172,303)** | **(172,303)** | **(172,303)** | **(172,303)** | **(172,303)** | **(172,303)** | **(172,303)** | **(172,303)** | **(172,303)** | **(172,303)** | **(172,303)** | **(172,303)** |
| | | | | | | | | | | | | | |
| **Cash Available from Ongoing Operations** | | **67,479** | **13,870** | **67,479** | **49,609** | **67,479** | **49,609** | **67,479** | **67,479** | **49,609** | **67,479** | **49,609** | **67,479** |
| | | | | | | | | | | | | | |
| Cash Out: Payments to Secured Creditors | | (30,701) | (30,701) | (30,701) | (30,701) | (30,701) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) |
| | | | | | | | | | | | | | |
| **Cash Available after payments to secured creditors** | | **36,778** | **(16,831)** | **36,778** | **18,908** | **36,778** | **40,075** | **57,945** | **57,945** | **40,075** | **57,945** | **40,075** | **57,945** |
| | | | | | | | | | | | | | |
| **CASH OUT: CASH NEEDS FOR ORDERED PAYMENTS AND CAPITAL EXPENDITURES** | | | | | | | | | | | | | |
| Catch up Rent Payments | | | | | | | | | | | | | |
| Gallus Detox Scottsdale, LLC | | | | | | | | | | | | | |
| Gallus Detox Denver, LLC | | | | | | | | | | | | | |
| Gallus Detox Dallas, PLLC | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Court Ordered Payments to F2920M Property Management (Houston landlord) | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Capital Expenditures: Ongoing Operations | | | | (12,500) | | | (12,500) | | | (12,500) | | | (12,500) |
| Capital Expenditures: Scottsdale clinic Move in 2026 | | | | | (25,000) | | | (25,000) | | | (25,000) | | |
| | | | | | | | | | | | | | |
| Chapter 11 Administrative Fees | | | | | | | | | | | | | |
| Medical Ombudsman | | | | | | | | | | | | | |
| Subchapter V Trustee | | | | | | | | | | | | | |
| Debtor's Legal Counsel | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Total Cash Out: Other** | | **-** | **-** | **(12,500)** | **(25,000)** | **-** | **(12,500)** | **(25,000)** | **-** | **(12,500)** | **(25,000)** | **-** | **(12,500)** |
| | | | | | | | | | | | | | |
| **DISPOSABLE MONTHLY INCOME** | | **36,778** | **(16,831)** | **24,278** | **(6,092)** | **36,778** | **27,575** | **32,945** | **57,945** | **27,575** | **32,945** | **40,075** | **45,445** |

Gallus Reorg
Monthly Budget

| | days in yr >> | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | days in mo >> | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 |
| | | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |

**CURRENT BUSINESS OPERATIONS: IN-PATIENT MEDICAL DETOX SERVICES ("IP Detox")**

**Gross Cash In: IP Detox**

| | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | 227,829 | 205,781 | 227,829 | 220,479 | 227,829 | 220,479 | 227,829 | 227,829 | 220,479 | 227,829 | 220,479 | 227,829 |
| Gallus Detox Denver, LLC | 207,021 | 186,986 | 207,021 | 200,342 | 207,021 | 200,342 | 207,021 | 207,021 | 200,342 | 207,021 | 200,342 | 207,021 |
| Gallus Detox Dallas, PLLC | 156,274 | 141,151 | 156,274 | 151,233 | 156,274 | 151,233 | 156,274 | 156,274 | 151,233 | 156,274 | 151,233 | 156,274 |
| **Total Gross Cash In: IP Detox** | **591,123** | **533,918** | **591,123** | **572,055** | **591,123** | **572,055** | **591,123** | **591,123** | **572,055** | **591,123** | **572,055** | **591,123** |

**Cash Out: IP Detox**

| | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cash Out - IP Detox: Gallus Detox Scottsdale, LLC | (146,049) | (146,049) | (146,049) | (146,049) | (146,049) | (146,049) | (146,049) | (146,049) | (146,049) | (146,049) | (146,049) | (146,049) |
| Total Cash Out - IP Detox: Gallus Detox Denver, LLC | (148,611) | (148,611) | (148,611) | (148,611) | (148,611) | (148,611) | (148,611) | (148,611) | (148,611) | (148,611) | (148,611) | (148,611) |
| Total Cash Out - IP Detox: Gallus Detox Dalllas, PLLC | (154,621) | (154,621) | (154,621) | (154,621) | (154,621) | (154,621) | (154,621) | (154,621) | (154,621) | (154,621) | (154,621) | (154,621) |

**Gross Cash In/(Out):  IP Detox**

| | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | 81,780 | 59,732 | 81,780 | 74,431 | 81,780 | 74,431 | 81,780 | 81,780 | 74,431 | 81,780 | 74,431 | 81,780 |
| Gallus Detox Denver, LLC | 58,410 | 38,375 | 58,410 | 51,732 | 58,410 | 51,732 | 58,410 | 58,410 | 51,732 | 58,410 | 51,732 | 58,410 |
| Gallus Detox Dallas, PLLC | 1,653 | (13,470) | 1,653 | (3,388) | 1,653 | (3,388) | 1,653 | 1,653 | (3,388) | 1,653 | (3,388) | 1,653 |
| **Total Gross Cash In/(Out): IP Detox** | **141,843** | **84,637** | **141,843** | **122,774** | **141,843** | **122,774** | **141,843** | **141,843** | **122,774** | **141,843** | **122,774** | **141,843** |

**Deductions to Gross Cash In: IP Detox**

| | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credit Card Processing Fees | (5,852) | (5,286) | (5,852) | (5,663) | (5,852) | (5,663) | (5,852) | (5,852) | (5,663) | (5,852) | (5,663) | (5,852) |
| Insurance Billing Fees | (13,655) | (12,334) | (13,655) | (13,214) | (13,655) | (13,214) | (13,655) | (13,655) | (13,214) | (13,655) | (13,214) | (13,655) |
| **Net Cash In/(Out) Before Corporate Overhead: IP Detox** | **122,336** | **67,018** | **122,336** | **103,896** | **122,336** | **103,896** | **122,336** | **122,336** | **103,896** | **122,336** | **103,896** | **122,336** |

**ADDED BUSINESS OPERATIONS: INTENSIVE OUTPATIENT SERVICES ("IOP")**

**Gross Cash In: IOP**

| | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 |
| Gallus Detox Denver, LLC | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 | 51,500 |
| Gallus Detox Dallas, PLLC | 61,800 | 61,800 | 61,800 | 61,800 | 61,800 | 61,800 | 61,800 | 61,800 | 61,800 | 61,800 | 61,800 | 61,800 |
| **Total Gross Cash In: IOP** | **164,800** | **164,800** | **164,800** | **164,800** | **164,800** | **164,800** | **164,800** | **164,800** | **164,800** | **164,800** | **164,800** | **164,800** |

**Cash Out: IOP**

| | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total IOP Cash Out: Gallus Detox Scottsdale, LLC | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) |
| Total IOP Cash Out: Gallus Detox Denver, LLC | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) | (11,935) |
| Total IOP Cash Out: Gallus Detox Dallas, PLLC | (9,813) | (9,813) | (9,813) | (9,813) | (9,813) | (9,813) | (9,813) | (9,813) | (9,813) | (9,813) | (9,813) | (9,813) |

**Gross Cash In/(Out):  IOP**

| | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gallus Detox Scottsdale, LLC | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 |
| Gallus Detox Denver, LLC | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 | 39,565 |
| Gallus Detox Dallas, PLLC | 51,987 | 51,987 | 51,987 | 51,987 | 51,987 | 51,987 | 51,987 | 51,987 | 51,987 | 51,987 | 51,987 | 51,987 |
| **Total Gross Cash In/(Out): IOP** | **131,116** | **131,116** | **131,116** | **131,116** | **131,116** | **131,116** | **131,116** | **131,116** | **131,116** | **131,116** | **131,116** | **131,116** |

**Deductions to Gross Cash In: IOP**

| | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credit Card Processing Fees | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) |
| Insurance Billing Fees | (3,807) | (3,807) | (3,807) | (3,807) | (3,807) | (3,807) | (3,807) | (3,807) | (3,807) | (3,807) | (3,807) | (3,807) |
| **Net Cash In/(Out) Before Corporate Overhead: IOP** | **125,678** | **125,678** | **125,678** | **125,678** | **125,678** | **125,678** | **125,678** | **125,678** | **125,678** | **125,678** | **125,678** | **125,678** |

| | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL NET CASH IN/(OUT) BEFORE CORPORATE OVERHEAD: IP DETOX + IOP** | **248,014** | **192,696** | **248,014** | **229,574** | **248,014** | **229,574** | **248,014** | **248,014** | **229,574** | **248,014** | **229,574** | **248,014** |

Gallus Reorg
Monthly Budget

| | days in yr >> | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 |
| | days in mo >> | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 |
| | | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
| **CASH OUT: CORPORATE OVERHEAD** | | | | | | | | | | | | | |
| Total Labor | | (110,842) | (110,842) | (110,842) | (110,842) | (110,842) | (110,842) | (110,842) | (110,842) | (110,842) | (110,842) | (110,842) | (110,842) |
| | | | | | | | | | | | | | |
| Marketing (Non-Labor) | | | | | | | | | | | | | |
| Digital Marketing | | (16,391) | (16,391) | (16,391) | (16,391) | (16,391) | (16,391) | (16,391) | (16,391) | (16,391) | (16,391) | (16,391) | (16,391) |
| Business Development Expenses | | (1,639) | (1,639) | (1,639) | (1,639) | (1,639) | (1,639) | (1,639) | (1,639) | (1,639) | (1,639) | (1,639) | (1,639) |
| Total Marketing (Non-Labor) | | (18,030) | (18,030) | (18,030) | (18,030) | (18,030) | (18,030) | (18,030) | (18,030) | (18,030) | (18,030) | (18,030) | (18,030) |
| | | | | | | | | | | | | | |
| General & Administrative | | | | | | | | | | | | | |
| Accounting | | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) |
| 3rd Party IT Support | | (6,556) | (6,556) | (6,556) | (6,556) | (6,556) | (6,556) | (6,556) | (6,556) | (6,556) | (6,556) | (6,556) | (6,556) |
| Professional Services | | (2,732) | (2,732) | (2,732) | (2,732) | (2,732) | (2,732) | (2,732) | (2,732) | (2,732) | (2,732) | (2,732) | (2,732) |
| Insurance | | (17,484) | (17,484) | (17,484) | (17,484) | (17,484) | (17,484) | (17,484) | (17,484) | (17,484) | (17,484) | (17,484) | (17,484) |
| Communications & Technology | | (2,185) | (2,185) | (2,185) | (2,185) | (2,185) | (2,185) | (2,185) | (2,185) | (2,185) | (2,185) | (2,185) | (2,185) |
| Subscriptions | | (1,366) | (1,366) | (1,366) | (1,366) | (1,366) | (1,366) | (1,366) | (1,366) | (1,366) | (1,366) | (1,366) | (1,366) |
| Assumed SBA Loans | | (3,278) | (3,278) | (3,278) | (3,278) | (3,278) | (3,278) | (3,278) | (3,278) | (3,278) | (3,278) | (3,278) | (3,278) |
| Chief Medical Officer Contract | | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| Other G&A | | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) | (4,371) |
| Total General & Administrative | | (52,343) | (52,343) | (52,343) | (52,343) | (52,343) | (52,343) | (52,343) | (52,343) | (52,343) | (52,343) | (52,343) | (52,343) |
| | | | | | | | | | | | | | |
| **Total Cash Out: Corporate Overhead** | | **(181,215)** | **(181,215)** | **(181,215)** | **(181,215)** | **(181,215)** | **(181,215)** | **(181,215)** | **(181,215)** | **(181,215)** | **(181,215)** | **(181,215)** | **(181,215)** |
| | | | | | | | | | | | | | |
| **Cash Available from Ongoing Operations** | | **66,799** | **11,481** | **66,799** | **48,359** | **66,799** | **48,359** | **66,799** | **66,799** | **48,359** | **66,799** | **48,359** | **66,799** |
| | | | | | | | | | | | | | |
| Cash Out: Payments to Secured Creditors | | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) |
| | | | | | | | | | | | | | |
| **Cash Available after payments to secured creditors** | | **57,265** | **1,947** | **57,265** | **38,825** | **57,265** | **38,825** | **57,265** | **57,265** | **38,825** | **57,265** | **38,825** | **57,265** |
| | | | | | | | | | | | | | |
| **CASH OUT: CASH NEEDS FOR ORDERED PAYMENTS AND CAPITAL EXPENDITURES** | | | | | | | | | | | | | |
| Catch up Rent Payments | | | | | | | | | | | | | |
| Gallus Detox Scottsdale, LLC | | | | | | | | | | | | | |
| Gallus Detox Denver, LLC | | | | | | | | | | | | | |
| Gallus Detox Dallas, PLLC | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Court Ordered Payments to F2920M Property Management (Houston landlord) | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Capital Expenditures: Ongoing Operations | | | | (12,500) | | | (12,500) | | | (12,500) | | | (12,500) |
| Capital Expenditures: Scottsdale clinic Move in 2026 | | (25,000) | | (25,000) | | | (25,000) | | | (25,000) | | | |
| | | | | | | | | | | | | | |
| Chapter 11 Administrative Fees | | | | | | | | | | | | | |
| Medical Ombudsman | | | | | | | | | | | | | |
| Subchapter V Trustee | | | | | | | | | | | | | |
| Debtor's Legal Counsel | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Total Cash Out: Other** | | **(25,000)** | **-** | **(37,500)** | **-** | **-** | **(37,500)** | **-** | **-** | **(37,500)** | **-** | **-** | **(12,500)** |
| | | | | | | | | | | | | | |
| **DISPOSABLE MONTHLY INCOME** | | **32,265** | **1,947** | **19,765** | **38,825** | **57,265** | **1,325** | **57,265** | **57,265** | **1,325** | **57,265** | **38,825** | **44,765** |

Gallus Reorg
Monthly Budget

| | days in yr >> | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 |
| | days in mo >> | 31 | 29 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 |
| | | Jan-28 | Feb-28 | Mar-28 | Apr-28 | May-28 | Jun-28 | Jul-28 | Aug-28 | Sep-28 | Oct-28 | Nov-28 | Dec-28 |
| **CURRENT BUSINESS OPERATIONS: IN-PATIENT MEDICAL DETOX SERVICES ("IP Detox")** | | | | | | | | | | | | | |
| **Gross Cash In: IP Detox** | | | | | | | | | | | | | |
| Gallus Detox Scottsdale, LLC | | 233,347 | 218,292 | 233,347 | 225,820 | 233,347 | 225,820 | 233,347 | 233,347 | 225,820 | 233,347 | 225,820 | 233,347 |
| Gallus Detox Denver, LLC | | 211,749 | 198,087 | 211,749 | 204,918 | 211,749 | 204,918 | 211,749 | 211,749 | 204,918 | 211,749 | 204,918 | 211,749 |
| Gallus Detox Dallas, PLLC | | 162,623 | 152,131 | 162,623 | 157,377 | 162,623 | 157,377 | 162,623 | 162,623 | 157,377 | 162,623 | 157,377 | 162,623 |
| **Total Gross Cash In: IP Detox** | | 607,719 | 568,511 | 607,719 | 588,115 | 607,719 | 588,115 | 607,719 | 607,719 | 588,115 | 607,719 | 588,115 | 607,719 |
| **Cash Out: IP Detox** | | | | | | | | | | | | | |
| Total Cash Out - IP Detox: Gallus Detox Scottsdale, LLC | | (150,430) | (150,430) | (150,430) | (150,430) | (150,430) | (150,430) | (150,430) | (150,430) | (150,430) | (150,430) | (150,430) | (150,430) |
| Total Cash Out - IP Detox: Gallus Detox Denver, LLC | | (153,069) | (153,069) | (153,069) | (153,069) | (153,069) | (153,069) | (153,069) | (153,069) | (153,069) | (153,069) | (153,069) | (153,069) |
| Total Cash Out - IP Detox: Gallus Detox Dalllas, PLLC | | (159,259) | (159,259) | (159,259) | (159,259) | (159,259) | (159,259) | (159,259) | (159,259) | (159,259) | (159,259) | (159,259) | (159,259) |
| **Gross Cash In/(Out):  IP Detox** | | | | | | | | | | | | | |
| Gallus Detox Scottsdale, LLC | | 82,917 | 67,862 | 82,917 | 75,389 | 82,917 | 75,389 | 82,917 | 82,917 | 75,389 | 82,917 | 75,389 | 82,917 |
| Gallus Detox Denver, LLC | | 58,679 | 45,018 | 58,679 | 51,849 | 58,679 | 51,849 | 58,679 | 58,679 | 51,849 | 58,679 | 51,849 | 58,679 |
| Gallus Detox Dallas, PLLC | | 3,363 | (7,128) | 3,363 | (1,882) | 3,363 | (1,882) | 3,363 | 3,363 | (1,882) | 3,363 | (1,882) | 3,363 |
| **Total Gross Cash In/(Out): IP Detox** | | 144,960 | 105,752 | 144,960 | 125,356 | 144,960 | 125,356 | 144,960 | 144,960 | 125,356 | 144,960 | 125,356 | 144,960 |
| **Deductions to Gross Cash In: IP Detox** | | | | | | | | | | | | | |
| Credit Card Processing Fees | | (6,016) | (5,628) | (6,016) | (5,822) | (6,016) | (5,822) | (6,016) | (6,016) | (5,822) | (6,016) | (5,822) | (6,016) |
| Insurance Billing Fees | | (14,038) | (13,133) | (14,038) | (13,585) | (14,038) | (13,585) | (14,038) | (14,038) | (13,585) | (14,038) | (13,585) | (14,038) |
| **Net Cash In/(Out) Before Corporate Overhead: IP Detox** | | 124,905 | 86,991 | 124,905 | 105,948 | 124,905 | 105,948 | 124,905 | 124,905 | 105,948 | 124,905 | 105,948 | 124,905 |
| **ADDED BUSINESS OPERATIONS: INTENSIVE OUTPATIENT SERVICES ("IOP")** | | | | | | | | | | | | | |
| **Gross Cash In: IOP** | | | | | | | | | | | | | |
| Gallus Detox Scottsdale, LLC | | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 |
| Gallus Detox Denver, LLC | | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 | 53,045 |
| Gallus Detox Dallas, PLLC | | 63,654 | 63,654 | 63,654 | 63,654 | 63,654 | 63,654 | 63,654 | 63,654 | 63,654 | 63,654 | 63,654 | 63,654 |
| **Total Gross Cash In: IOP** | | 169,744 | 169,744 | 169,744 | 169,744 | 169,744 | 169,744 | 169,744 | 169,744 | 169,744 | 169,744 | 169,744 | 169,744 |
| **Cash Out: IOP** | | | | | | | | | | | | | |
| Total IOP Cash Out: Gallus Detox Scottsdale, LLC | | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) |
| Total IOP Cash Out: Gallus Detox Denver, LLC | | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) | (12,293) |
| Total IOP Cash Out: Gallus Detox Dallas, PLLC | | (10,108) | (10,108) | (10,108) | (10,108) | (10,108) | (10,108) | (10,108) | (10,108) | (10,108) | (10,108) | (10,108) | (10,108) |
| **Gross Cash In/(Out): IOP** | | | | | | | | | | | | | |
| Gallus Detox Scottsdale, LLC | | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 |
| Gallus Detox Denver, LLC | | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 | 40,752 |
| Gallus Detox Dallas, PLLC | | 53,546 | 53,546 | 53,546 | 53,546 | 53,546 | 53,546 | 53,546 | 53,546 | 53,546 | 53,546 | 53,546 | 53,546 |
| **Total Gross Cash In/(Out): IOP** | | 135,050 | 135,050 | 135,050 | 135,050 | 135,050 | 135,050 | 135,050 | 135,050 | 135,050 | 135,050 | 135,050 | 135,050 |
| **Deductions to Gross Cash In: IOP** | | | | | | | | | | | | | |
| Credit Card Processing Fees | | (1,680) | (1,680) | (1,680) | (1,680) | (1,680) | (1,680) | (1,680) | (1,680) | (1,680) | (1,680) | (1,680) | (1,680) |
| Insurance Billing Fees | | (3,921) | (3,921) | (3,921) | (3,921) | (3,921) | (3,921) | (3,921) | (3,921) | (3,921) | (3,921) | (3,921) | (3,921) |
| **Net Cash In/(Out) Before Corporate Overhead: IOP** | | 129,448 | 129,448 | 129,448 | 129,448 | 129,448 | 129,448 | 129,448 | 129,448 | 129,448 | 129,448 | 129,448 | 129,448 |
| **TOTAL NET CASH IN/(OUT) BEFORE CORPORATE OVERHEAD: IP DETOX + IOP** | | 254,353 | 216,439 | 254,353 | 235,396 | 254,353 | 235,396 | 254,353 | 254,353 | 235,396 | 254,353 | 235,396 | 254,353 |

Gallus Reorg
Monthly Budget

| | | Jan-28 | Feb-28 | Mar-28 | Apr-28 | May-28 | Jun-28 | Jul-28 | Aug-28 | Sep-28 | Oct-28 | Nov-28 | Dec-28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *days in yr >>* | | *366* | *366* | *366* | *366* | *366* | *366* | *366* | *366* | *366* | *366* | *366* | *366* |
| *days in mo >>* | | *31* | *29* | *31* | *30* | *31* | *30* | *31* | *31* | *30* | *31* | *30* | *31* |
| **CASH OUT: CORPORATE OVERHEAD** | | | | | | | | | | | | | |
| Total Labor | | (113,060) | (113,060) | (113,060) | (113,060) | (113,060) | (113,060) | (113,060) | (113,060) | (113,060) | (113,060) | (113,060) | (113,060) |
| | | | | | | | | | | | | | |
| Marketing (Non-Labor) | | | | | | | | | | | | | |
|   Digital Marketing | | (16,883) | (16,883) | (16,883) | (16,883) | (16,883) | (16,883) | (16,883) | (16,883) | (16,883) | (16,883) | (16,883) | (16,883) |
|   Business Development Expenses | | (1,688) | (1,688) | (1,688) | (1,688) | (1,688) | (1,688) | (1,688) | (1,688) | (1,688) | (1,688) | (1,688) | (1,688) |
| Total Marketing (Non-Labor) | | (18,571) | (18,571) | (18,571) | (18,571) | (18,571) | (18,571) | (18,571) | (18,571) | (18,571) | (18,571) | (18,571) | (18,571) |
| | | | | | | | | | | | | | |
| General & Administrative | | | | | | | | | | | | | |
|   Accounting | | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) |
|   3rd Party IT Support | | (6,753) | (6,753) | (6,753) | (6,753) | (6,753) | (6,753) | (6,753) | (6,753) | (6,753) | (6,753) | (6,753) | (6,753) |
|   Professional Services | | (2,814) | (2,814) | (2,814) | (2,814) | (2,814) | (2,814) | (2,814) | (2,814) | (2,814) | (2,814) | (2,814) | (2,814) |
|   Insurance | | (18,008) | (18,008) | (18,008) | (18,008) | (18,008) | (18,008) | (18,008) | (18,008) | (18,008) | (18,008) | (18,008) | (18,008) |
|   Communications & Technology | | (2,251) | (2,251) | (2,251) | (2,251) | (2,251) | (2,251) | (2,251) | (2,251) | (2,251) | (2,251) | (2,251) | (2,251) |
|   Subscriptions | | (1,407) | (1,407) | (1,407) | (1,407) | (1,407) | (1,407) | (1,407) | (1,407) | (1,407) | (1,407) | (1,407) | (1,407) |
|   Assumed SBA Loans | | (3,377) | (3,377) | (3,377) | (3,377) | (3,377) | (3,377) | (3,377) | (3,377) | (3,377) | (3,377) | (3,377) | (3,377) |
|   Chief Medical Officer Contract | | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
|   Other G&A | | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) | (4,502) |
| Total General & Administrative | | (53,613) | (53,613) | (53,613) | (53,613) | (53,613) | (53,613) | (53,613) | (53,613) | (53,613) | (53,613) | (53,613) | (53,613) |
| | | | | | | | | | | | | | |
| **Total Cash Out: Corporate Overhead** | | **(185,245)** | **(185,245)** | **(185,245)** | **(185,245)** | **(185,245)** | **(185,245)** | **(185,245)** | **(185,245)** | **(185,245)** | **(185,245)** | **(185,245)** | **(185,245)** |
| | | | | | | | | | | | | | |
| **Cash Available from Ongoing Operations** | | **69,109** | **31,195** | **69,109** | **50,152** | **69,109** | **50,152** | **69,109** | **69,109** | **50,152** | **69,109** | **50,152** | **69,109** |
| | | | | | | | | | | | | | |
| Cash Out: Payments to Secured Creditors | | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) | (9,534) |
| | | | | | | | | | | | | | |
| **Cash Available after payments to secured creditors** | | **59,575** | **21,661** | **59,575** | **40,618** | **59,575** | **40,618** | **59,575** | **59,575** | **40,618** | **59,575** | **40,618** | **59,575** |
| | | | | | | | | | | | | | |
| **CASH OUT: CASH NEEDS FOR ORDERED PAYMENTS AND CAPITAL EXPENDITURES** | | | | | | | | | | | | | |
| Catch up Rent Payments | | | | | | | | | | | | | |
|   Gallus Detox Scottsdale, LLC | | | | | | | | | | | | | |
|   Gallus Detox Denver, LLC | | | | | | | | | | | | | |
|   Gallus Detox Dallas, PLLC | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Court Ordered Payments to F2920M Property Management (Houston landlord) | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Capital Expenditures: Ongoing Operations | | | | (12,500) | | | (12,500) | | | (12,500) | | | (12,500) |
| Capital Expenditures: Scottsdale clinic Move in 2026 | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Chapter 11 Administrative Fees | | | | | | | | | | | | | |
|   Medical Ombudsman | | | | | | | | | | | | | |
|   Subchapter V Trustee | | | | | | | | | | | | | |
|   Debtor's Legal Counsel | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Total Cash Out: Other** | | **-** | **-** | **(12,500)** | **-** | **-** | **(12,500)** | **-** | **-** | **(12,500)** | **-** | **-** | **(12,500)** |
| | | | | | | | | | | | | | |
| **DISPOSABLE MONTHLY INCOME** | | **59,575** | **21,661** | **47,075** | **40,618** | **59,575** | **28,118** | **59,575** | **59,575** | **28,118** | **59,575** | **40,618** | **47,075** |

Gallus Reorg
Monthly Budget

| | days in yr >> | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | days in mo >> | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 |
| | | Jan-29 | Feb-29 | Mar-29 | Apr-29 | May-29 | Jun-29 | Jul-29 | Aug-29 | Sep-29 | Oct-29 | Nov-29 | Dec-29 |
| **CURRENT BUSINESS OPERATIONS: IN-PATIENT MEDICAL DETOX SERVICES ("IP Detox")** | | | | | | | | | | | | | |
| **Gross Cash In: IP Detox** | | | | | | | | | | | | | |
| Gallus Detox Scottsdale, LLC | | 240,144 | 216,904 | 240,144 | 232,397 | 240,144 | 232,397 | 240,144 | 240,144 | 232,397 | 240,144 | 232,397 | 240,144 |
| Gallus Detox Denver, LLC | | 217,637 | 196,575 | 217,637 | 210,616 | 217,637 | 210,616 | 217,637 | 217,637 | 210,616 | 217,637 | 210,616 | 217,637 |
| Gallus Detox Dallas, PLLC | | 169,863 | 153,425 | 169,863 | 164,384 | 169,863 | 164,384 | 169,863 | 169,863 | 164,384 | 169,863 | 164,384 | 169,863 |
| **Total Gross Cash In: IP Detox** | | 627,644 | 566,904 | 627,644 | 607,397 | 627,644 | 607,397 | 627,644 | 627,644 | 607,397 | 627,644 | 607,397 | 627,644 |
| | | | | | | | | | | | | | |
| **Cash Out: IP Detox** | | | | | | | | | | | | | |
| Total Cash Out - IP Detox: Gallus Detox Scottsdale, LLC | | (154,943) | (154,943) | (154,943) | (154,943) | (154,943) | (154,943) | (154,943) | (154,943) | (154,943) | (154,943) | (154,943) | (154,943) |
| Total Cash Out - IP Detox: Gallus Detox Denver, LLC | | (157,661) | (157,661) | (157,661) | (157,661) | (157,661) | (157,661) | (157,661) | (157,661) | (157,661) | (157,661) | (157,661) | (157,661) |
| Total Cash Out - IP Detox: Gallus Detox Dalllas, PLLC | | (164,037) | (164,037) | (164,037) | (164,037) | (164,037) | (164,037) | (164,037) | (164,037) | (164,037) | (164,037) | (164,037) | (164,037) |
| | | | | | | | | | | | | | |
| **Gross Cash In/(Out):  IP Detox** | | | | | | | | | | | | | |
| Gallus Detox Scottsdale, LLC | | 85,201 | 61,961 | 85,201 | 77,454 | 85,201 | 77,454 | 85,201 | 85,201 | 77,454 | 85,201 | 77,454 | 85,201 |
| Gallus Detox Denver, LLC | | 59,976 | 38,914 | 59,976 | 52,955 | 59,976 | 52,955 | 59,976 | 59,976 | 52,955 | 59,976 | 52,955 | 59,976 |
| Gallus Detox Dallas, PLLC | | 5,826 | (10,613) | 5,826 | 346 | 5,826 | 346 | 5,826 | 5,826 | 346 | 5,826 | 346 | 5,826 |
| **Total Gross Cash In/(Out): IP Detox** | | 151,002 | 90,262 | 151,002 | 130,756 | 151,002 | 130,756 | 151,002 | 151,002 | 130,756 | 151,002 | 130,756 | 151,002 |
| | | | | | | | | | | | | | |
| **Deductions to Gross Cash In: IP Detox** | | | | | | | | | | | | | |
| Credit Card Processing Fees | | (6,214) | (5,612) | (6,214) | (6,013) | (6,214) | (6,013) | (6,214) | (6,214) | (6,013) | (6,214) | (6,013) | (6,214) |
| Insurance Billing Fees | | (14,499) | (13,095) | (14,499) | (14,031) | (14,499) | (14,031) | (14,499) | (14,499) | (14,031) | (14,499) | (14,031) | (14,499) |
| **Net Cash In/(Out) Before Corporate Overhead: IP Detox** | | 130,290 | 71,555 | 130,290 | 110,711 | 130,290 | 110,711 | 130,290 | 130,290 | 110,711 | 130,290 | 110,711 | 130,290 |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **ADDED BUSINESS OPERATIONS: INTENSIVE OUTPATIENT SERVICES ("IOP")** | | | | | | | | | | | | | |
| **Gross Cash In: IOP** | | | | | | | | | | | | | |
| Gallus Detox Scottsdale, LLC | | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 |
| Gallus Detox Denver, LLC | | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 | 54,636 |
| Gallus Detox Dallas, PLLC | | 65,564 | 65,564 | 65,564 | 65,564 | 65,564 | 65,564 | 65,564 | 65,564 | 65,564 | 65,564 | 65,564 | 65,564 |
| **Total Gross Cash In: IOP** | | 174,836 | 174,836 | 174,836 | 174,836 | 174,836 | 174,836 | 174,836 | 174,836 | 174,836 | 174,836 | 174,836 | 174,836 |
| | | | | | | | | | | | | | |
| **Cash Out: IOP** | | | | | | | | | | | | | |
| Total IOP Cash Out: Gallus Detox Scottsdale, LLC | | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) |
| Total IOP Cash Out: Gallus Detox Denver, LLC | | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) | (12,662) |
| Total IOP Cash Out: Gallus Detox Dallas, PLLC | | (10,411) | (10,411) | (10,411) | (10,411) | (10,411) | (10,411) | (10,411) | (10,411) | (10,411) | (10,411) | (10,411) | (10,411) |
| | | | | | | | | | | | | | |
| **Gross Cash In/(Out): IOP** | | | | | | | | | | | | | |
| Gallus Detox Scottsdale, LLC | | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 |
| Gallus Detox Denver, LLC | | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 | 41,974 |
| Gallus Detox Dallas, PLLC | | 55,153 | 55,153 | 55,153 | 55,153 | 55,153 | 55,153 | 55,153 | 55,153 | 55,153 | 55,153 | 55,153 | 55,153 |
| **Total Gross Cash In/(Out): IOP** | | 139,101 | 139,101 | 139,101 | 139,101 | 139,101 | 139,101 | 139,101 | 139,101 | 139,101 | 139,101 | 139,101 | 139,101 |
| | | | | | | | | | | | | | |
| **Deductions to Gross Cash In: IOP** | | | | | | | | | | | | | |
| Credit Card Processing Fees | | (1,731) | (1,731) | (1,731) | (1,731) | (1,731) | (1,731) | (1,731) | (1,731) | (1,731) | (1,731) | (1,731) | (1,731) |
| Insurance Billing Fees | | (4,039) | (4,039) | (4,039) | (4,039) | (4,039) | (4,039) | (4,039) | (4,039) | (4,039) | (4,039) | (4,039) | (4,039) |
| **Net Cash In/(Out) Before Corporate Overhead: IOP** | | 133,332 | 133,332 | 133,332 | 133,332 | 133,332 | 133,332 | 133,332 | 133,332 | 133,332 | 133,332 | 133,332 | 133,332 |
| | | | | | | | | | | | | | |
| **TOTAL NET CASH IN/(OUT) BEFORE CORPORATE OVERHEAD: IP DETOX + IOP** | | 263,622 | 204,886 | 263,622 | 244,043 | 263,622 | 244,043 | 263,622 | 263,622 | 244,043 | 263,622 | 244,043 | 263,622 |

Gallus Reorg
Monthly Budget

| | | Jan-29 | Feb-29 | Mar-29 | Apr-29 | May-29 | Jun-29 | Jul-29 | Aug-29 | Sep-29 | Oct-29 | Nov-29 | Dec-29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *days in yr >>* | | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 365 |
| *days in mo >>* | | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 |
| **CASH OUT: CORPORATE OVERHEAD** | | | | | | | | | | | | | |
| Total Labor | | (115,345) | (115,345) | (115,345) | (115,345) | (115,345) | (115,345) | (115,345) | (115,345) | (115,345) | (115,345) | (115,345) | (115,345) |
| | | | | | | | | | | | | | |
| Marketing (Non-Labor) | | | | | | | | | | | | | |
| Digital Marketing | | (17,389) | (17,389) | (17,389) | (17,389) | (17,389) | (17,389) | (17,389) | (17,389) | (17,389) | (17,389) | (17,389) | (17,389) |
| Business Development Expenses | | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) |
| Total Marketing (Non-Labor) | | (19,128) | (19,128) | (19,128) | (19,128) | (19,128) | (19,128) | (19,128) | (19,128) | (19,128) | (19,128) | (19,128) | (19,128) |
| | | | | | | | | | | | | | |
| General & Administrative | | | | | | | | | | | | | |
| Accounting | | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) |
| 3rd Party IT Support | | (6,956) | (6,956) | (6,956) | (6,956) | (6,956) | (6,956) | (6,956) | (6,956) | (6,956) | (6,956) | (6,956) | (6,956) |
| Professional Services | | (2,898) | (2,898) | (2,898) | (2,898) | (2,898) | (2,898) | (2,898) | (2,898) | (2,898) | (2,898) | (2,898) | (2,898) |
| Insurance | | (18,548) | (18,548) | (18,548) | (18,548) | (18,548) | (18,548) | (18,548) | (18,548) | (18,548) | (18,548) | (18,548) | (18,548) |
| Communications & Technology | | (2,319) | (2,319) | (2,319) | (2,319) | (2,319) | (2,319) | (2,319) | (2,319) | (2,319) | (2,319) | (2,319) | (2,319) |
| Subscriptions | | (1,449) | (1,449) | (1,449) | (1,449) | (1,449) | (1,449) | (1,449) | (1,449) | (1,449) | (1,449) | (1,449) | (1,449) |
| Assumed SBA Loans | | (3,478) | (3,478) | (3,478) | (3,478) | (3,478) | (3,478) | (3,478) | (3,478) | (3,478) | (3,478) | (3,478) | (3,478) |
| Chief Medical Officer Contract | | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| Other G&A | | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) | (4,637) |
| Total General & Administrative | | (54,922) | (54,922) | (54,922) | (54,922) | (54,922) | (54,922) | (54,922) | (54,922) | (54,922) | (54,922) | (54,922) | (54,922) |
| | | | | | | | | | | | | | |
| **Total Cash Out: Corporate Overhead** | | **(189,395)** | **(189,395)** | **(189,395)** | **(189,395)** | **(189,395)** | **(189,395)** | **(189,395)** | **(189,395)** | **(189,395)** | **(189,395)** | **(189,395)** | **(189,395)** |
| | | | | | | | | | | | | | |
| **Cash Available from Ongoing Operations** | | **74,226** | **15,491** | **74,226** | **54,648** | **74,226** | **54,648** | **74,226** | **74,226** | **54,648** | **74,226** | **54,648** | **74,226** |
| | | | | | | | | | | | | | |
| Cash Out: Payments to Secured Creditors | | (4,667) | (4,667) | (4,667) | (4,667) | (4,667) | (4,667) | (4,667) | (4,667) | (4,667) | (4,667) | (4,667) | (4,667) |
| | | | | | | | | | | | | | |
| **Cash Available after payments to secured creditors** | | **69,559** | **10,824** | **69,559** | **49,981** | **69,559** | **49,981** | **69,559** | **69,559** | **49,981** | **69,559** | **49,981** | **69,559** |
| | | | | | | | | | | | | | |
| **CASH OUT: CASH NEEDS FOR ORDERED PAYMENTS AND CAPITAL EXPENDITURES** | | | | | | | | | | | | | |
| Catch up Rent Payments | | | | | | | | | | | | | |
| Gallus Detox Scottsdale, LLC | | | | | | | | | | | | | |
| Gallus Detox Denver, LLC | | | | | | | | | | | | | |
| Gallus Detox Dallas, PLLC | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Court Ordered Payments to F2920M Property Management (Houston landlord) | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Capital Expenditures: Ongoing Operations | | | | (12,500) | | | (12,500) | | | (12,500) | | | (12,500) |
| Capital Expenditures: Scottsdale clinic Move in 2026 | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Chapter 11 Administrative Fees | | | | | | | | | | | | | |
| Medical Ombudsman | | | | | | | | | | | | | |
| Subchapter V Trustee | | | | | | | | | | | | | |
| Debtor's Legal Counsel | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Total Cash Out: Other** | | **-** | **-** | **(12,500)** | **-** | **-** | **(12,500)** | **-** | **-** | **(12,500)** | **-** | **-** | **(12,500)** |
| | | | | | | | | | | | | | |
| **DISPOSABLE MONTHLY INCOME** | | **69,559** | **10,824** | **57,059** | **49,981** | **69,559** | **37,481** | **69,559** | **69,559** | **37,481** | **69,559** | **49,981** | **57,059** |

Exhibit D

Gallus Detox
Reorganization Ownership & Waterfall

**Proposed Common Stock Ownership**

| Common Stockholder | Type | % of Common Stock Issued | Total for Type |
|---|---|---|---|
| Walter van Woudenberg | Lead DIP Investor | 10.00% | |
| Mitchell C Milias | Lead DIP Investor | 10.00% | |
| | | | 20.00% |
| | | | |
| Walter van Woudenberg | DIP Provider | 13.00% | |
| Mitchell C Milias | DIP Provider | 6.00% | |
| Potential New DIP Loan | DIP Provider | 6.00% | |
| 2 Street Investments / Ronald Sierzenski | DIP Provider | 1.50% | |
| Stanhope Reed Rigby Advisory LLC | DIP Provider | 0.45% | |
| Michael A Dixon | DIP Provider | 0.05% | |
| Allen Fata & Courtney Olsen | DIP Provider | 3.00% | |
| | | | 30.00% |
| Walter van Woudenberg | Insider/Convertible | 7.34% | |
| Warren Olsen | Insider/Convertible | 10.78% | |
| SCB Global Capital Management, LLC | Insider/Convertible | 1.71% | |
| Russell Matthews | Insider/Convertible | 1.61% | |
| Pacific Financial Association, Inc. | Insider/Convertible | 4.62% | |
| Patrick Gallus | Insider/Convertible | 2.51% | |
| Jon Maxwell Silverman | Insider/Convertible | 0.43% | |
| Yellow Lab Properties LP | Insider/Convertible | 0.37% | |
| Stanhope Reed Rigby Advisory LLC | Insider/Convertible | 0.28% | |
| Sara Montgomery | Insider/Convertible | 0.22% | |
| Whitney Knier | Insider/Convertible | 0.10% | |
| Michael A Dixon | Insider/Convertible | 0.03% | |
| | | | 30.00% |
| | | | |
| Warren Olsen | Management | 8.25% | |
| Russell Matthews | Management | 8.25% | |
| 2 Street Investments / Ronald Sierzenski | Management | 3.50% | |
| | | | 20.00% |
| | | | 100.00% |

Summary of Common Stock Ownership by Holder

| | |
|---|---|
| Walter van Woudenberg | 30.34% |
| Warren Olsen | 19.03% |
| Mitchell C Milias | 16.00% |
| Russell Matthews | 9.86% |
| Proposed new $200k DIP | 0.00% |
| 2 Street Investments / Ronald Sierzenski | 5.00% |
| Pacific Financial Association, Inc. | 4.62% |
| Allen Fata & Courtney Olsen | 3.00% |
| Patrick Gallus | 2.51% |
| SCB Global Capital Management, LLC | 1.71% |
| Stanhope Reed Rigby Advisory LLC | 0.73% |
| Jon Maxwell Silverman | 0.43% |
| Yellow Lab Properties LP | 0.37% |
| Sara Montgomery | 0.22% |
| Whitney Knier | 0.10% |
| Michael A Dixon | 0.08% |
| | 94.00% |

[assumes 100% of group converts to Preferred Equity] / 30% Common Class owenrship as a group

| | Converting to Preferred | Amt (accrued through 11/13/23) | % of Group | % of Common Class | |
|---|---|---|---|---|---|
| Insider Note | Warren J Olsen | 1,495,863.02 | 35.94% | 10.78% | |
| Insider Note | SCB Global Capital Management, LLC | 237,268.49 | 5.70% | 1.71% | |
| Insider Note | Russell Matthews | 223,261.99 | 5.36% | 1.61% | 14.10% |
| Insider Note | Walter van Woudenberg | 1,017,671.24 | 24.45% | 7.34% | |
| Insider Note + Convert | Pacific Financial Association, Inc. | 640,982.35 | 15.40% | 4.62% | |
| Insider Note | Patrick Gallus | 347,601.11 | 8.35% | 2.51% | |
| Insider Note | Jon Maxwell Silverman | 60,295.89 | 1.45% | 0.43% | |
| Convert | Yellow Lab Properties | 50,673.98 | 1.22% | 0.37% | |
| Convert | Stanhope Reed Rigby LLC | 38,986.01 | 0.94% | 0.28% | |
| Convert | Sara Montgomery | 30,880.67 | 0.74% | 0.22% | |
| Convert | Whitney Knier | 14,183.51 | 0.34% | 0.10% | |
| Convert | Michael A Dixon | 4,252.56 | 0.10% | 0.03% | |
| | | 4,161,920.81 | 100.00% | 30.00% | |

# Exhibit E

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 23-15280-JGR |
| GALLUS DETOX SERVICES, INC. | ) | Chapter 11 |
| EIN: 88-2490456 | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| GALLUS DETOX DENVER, LLC | ) | Case No. 23-15283-JGR |
| EIN: 84-3421544 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| GALLUS DETOX SCOTTSDALE, LLC | ) | Case No. 23-15284-JGR |
| EIN: 47-2515577 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| GALLUS DETOX DALLAS, PLLC, | ) | Case No. 23-15285-JGR |
| EIN: 87-2068937 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

**STIPULATION RESOLVING OBJECTIONS TO USE OF CASH COLLATERAL**

The Debtors, Gallus Detox Services, Inc. ("GDS"), Gallus Detox Denver, LLC ("Denver"), Gallus Detox Scottsdale, LLC ("Scottsdale"), and Gallus Detox Dallas, PLLC ("Dallas" and together "Debtors"), and AKF, Inc. d/b/a FundKite ("FundKite"), by and through their undersigned attorneys, state their Resolving FundKite's Objection to Use of Cash Collateral as follows:

**BACKGROUND**

1.      The Debtors filed their respective Voluntary Petitions pursuant to Chapter 11 of the Bankruptcy Code on November 14, 2023.  The cases are jointly administered under Case No. 23-15280-JGR, and the Debtors remain debtors in possession and are in operation of its business pursuant to 11 U.S.C. §§ 1107, 1108 and 1182.

2.      GDS is a Delaware corporation with its principal place of business located in Denver, Colorado.  GDS is engaged in business as the agent and manager of detoxification clinics located in Denver, Colorado, Scottsdale, Arizona, and Dallas and Houston, Texas.  Denver,

Scottsdale, and Dallas are managed by GDS in all respects, including employee management, financial management, and operational management.

3.      On August 1, 2023, Scottsdale and Dallas entered into respective "Revenue Purchase Agreements" with FundKite.  On August 2, 2023, Denver entered into a "Revenue Purchase Agreement" (collectively the "FundKite Agreements") with FundKite.

4.      On November 15, 2023, the Debtors filed their Motion for Authority to Use Cash Collateral, seeking to use funds in which FundKite and other parties asserted an interest.

5.      FundKite filed their Objection to the Debtors' Motion for Authority to Use Cash Collateral on November 20, 2023.

6.      The Court entered an Interim Order Authorizing Use of Cash Collateral on November 22, 2023, setting a final hearing on the Debtors' use of cash collateral and ordering the Debtors to escrow funds that may be subject to FundKite's interest pending a determination as to the issues between the Parties.

7.      To avoid the time, expense, and uncertainty of further litigation and resolve issues between the Parties, the Debtors and FundKite stipulate and agree as follows:

**STIPULATION**

8.      FundKite shall have an allowed secured claim in the amount of $498,000, secured by accounts and the proceeds thereof to the extent of the pre-petition FundKite Agreements and any applicable security interests granted therein and perfected by virtue of a subsequent pre-petition UCC-1 Financing Statement.

9.       The Debtors shall remit payments as follows:

a.  $120,000 from January 1, 2024 comprised of one monthly payment on January 1, 2024 in the amount of $10,000 and 48 weekly payments in the amount of $2,292 beginning on February 1, 2024 and continuing weekly thereafter.;

b.  52 weekly payments in the amount of $3,461.54 beginning on January 1, 2025;

c.  26 weekly payments in the amount of $5,000.23 beginning on January 1, 2026; and

d.  One payment due on or about July 1, 2026 in the amount of $67,993.98.

10.     If the Debtor fails to make any such payment in the amount and manner provided in Paragraph 9, FundKite shall provide written notice by mail and electronic mail to the Debtors and undersigned counsel.  The Debtors shall have a ten (10) day period in which to cure any alleged defaults and if the Debtors fail to cure the asserted default, FundKite may proceed to exercise any

applicable rights at that time, including, but not limited to seeking entry of an Order from the Bankruptcy Court revoking the use of cash collateral.

11.     The Debtors shall incorporate the terms of this Stipulation, either by reference or in their entirety, into any proposed Plan of Reorganization.

12.     Notwithstanding any rights granted to FundKite with respect to guarantors, absent any defaults under this Stipulation, FundKite shall forbear from exercising any rights against any and all guarantors under the FundKite Agreements until the conclusion of the payments under this Stipulation.

13.     Subject to incorporating this Stipulation into a Plan of Reorganization, this Stipulation resolves any and all issues between the Parties, including, without limitation, any asserted objections to any claims, objections to confirmation of any proposed Plan of Reorganization, Adversary Proceedings, declaratory judgment actions, or objections to the use of cash collateral, except to the extent the Debtors default on their obligation set forth herein.

14.     While this Stipulation intends to resolve any and all issues, FundKite reserves the right to object to the Plan of Reorganization to the extent the Plan of Reorganization does not incorporate the terms of this Stipulation or the Debtors otherwise default on the terms of this Stipulation.

15.     Nothing contained herein shall establish nor limit any parties' right to assert or argue the nature, extent, validity, or priority of any lien or interest under Section 506(a) of the Bankruptcy Code, nor shall it constitute an admission, waiver, confession or release as to any argument or legal rights the Debtors and FundKite may have regarding the nature of the FundKite Agreements.

WHEREFORE, the Debtor respectfully requests that the Court enter an Order, authorizing the Debtor's use of cash collateral in accordance with this Stipulation, and for such further and additional relief as to the Court may appear proper.

DATED: January 16, 2024                     Respectfully submitted,

By: _/s/ Keri L. Riley_____
     Keri L. Riley, #47605
     **KUTNER BRINEN DICKEY RILEY, P.C.**
     1660 Lincoln Street, Suite 1720
     Denver, CO 80264
     Telephone:  (303) 832-2400
     E-mail: klr@kutnerlaw.com

By: _/s/ Shanna M. Kaminski_____
     Shanna M Kaminski
     **KAMINSKI LAW, PLLC**
     P.O. Box 247
     Grass Lake, Michigan 49240
     Telephone: 248-462-7111
     E-mail: skaminski@kaminskilawpllc.com

## CERTIFICATE OF SERVICE

I certify that on January 16, 2024, I served a complete copy of the foregoing **STIPULATION RESOLVING OBJECTIONS TO USE OF CASH COLLATERAL** on the following parties in compliance with the Federal Rules of Bankruptcy Procedure and the Court's Local Rules:


Alison Goldenberg, Esq.
US Trustee's Office
1961 Stout Street
Suite 12-200
Denver, CO 80294
Alison.Goldenberg@usdoj.gov

Joli A. Lofstedt, Esq.
Subchapter V Trustee
P.O. Box 270561
Louisville, CO 80027
joli@jaltrustee.com

Shanna M. Kaminski, Esq.
Kaminski Law, PLLC
P.O. Box 247
Grass Lake, Michigan 49240
skaminski@kaminskilawpllc.com

Theodore J. Hartl, Esq.
Ballard Spahr, LLP
1225 17th Street
Suite 2300
Denver, CO 80202-5596
hartlt@ballardspahr.com

Christopher C. Simpson, Esq.
Osborn Maledon P.A.
2929 North Central Avenue
Suite 2000
Phoenix, AZ 85012
csimpson@omlaw.com

C. Daniel Roberts, Esq.                     **/s/Vicky Martina**
C. Daniel Roberts, P.C.                     Vicky Martina
P.O. Box 6368
Austin, TX 78762
droberts@cdrlaw.net

Exhibit F

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 23-15280-JGR |
| GALLUS DETOX SERVICES, INC. | ) | Chapter 11 |
| EIN: 88-2490456 | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| GALLUS DETOX DENVER, LLC | ) | Case No. 23-15283-JGR |
| EIN: 84-3421544 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| GALLUS DETOX SCOTTSDALE, LLC | ) | Case No. 23-15284-JGR |
| EIN: 47-2515577 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| GALLUS DETOX DALLAS, PLLC, | ) | Case No. 23-15285-JGR |
| EIN: 87-2068937 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

**STIPULATION RESOLVING OBJECTIONS TO USE OF CASH COLLATERAL**

The Debtors, Gallus Detox Services, Inc. ("GDS"), Gallus Detox Denver, LLC ("Denver"), Gallus Detox Scottsdale, LLC ("Scottsdale"), and Gallus Detox Dallas, PLLC ("Dallas" and together "Debtors"), and MYNT Advance ("MYNT"), by and through their undersigned attorneys, state their Stipulation Resolving MYNT's Objection to Use of Cash Collateral as follows:

**BACKGROUND**

1.     The Debtors filed their respective Voluntary Petitions pursuant to Chapter 11 of the Bankruptcy Code on November 14, 2023.  The cases are jointly administered under Case No. 23-15280-JGR, and the Debtors remain debtors in possession and are in operation of its business pursuant to 11 U.S.C. §§ 1107, 1108 and 1182.

2.     GDS is a Delaware corporation with its principal place of business located in Denver, Colorado.  GDS is engaged in business as the agent and manager of detoxification clinics located in Denver, Colorado, Scottsdale, Arizona, and Dallas and Houston, Texas.  Denver,

Scottsdale, and Dallas are managed by GDS in all respects, including employee management, financial management, and operational management.

3. On August 22, 2023, the Debtors entered into a "Standard Merchant Cash Advance Agreement" with MYNT ("MYNT Agreement").

4. On November 15, 2023, the Debtors filed their Motion for Authority to Use Cash Collateral, seeking to use funds in which MYNT and other parties asserted an interest.

5. MYNT filed their Objection to the Debtors' Motion for Authority to Use Cash Collateral on November 20, 2023.

6. The Court entered an Interim Order Authorizing Use of Cash Collateral on November 22, 2023, setting a final hearing on the Debtors' use of cash collateral and ordering the Debtors to escrow funds that may be subject to MYNT's interest pending a determination as to the issues between the Parties.

7. To avoid the time, expense, and uncertainty of further litigation and resolve issues between the Parties, the Debtors and MYNT stipulate and agree as follows:

## STIPULATION

8. MYNT shall have an allowed secured claim in the amount of $292,000, secured by receivables of the Debtors to the extent of the pre-petition MYNT Agreements and any applicable security interests granted therein and perfected by virtue of a subsequent UCC-1 Financing Statement.

9. As adequate protection of MYNT's interest and payment of its claim, the Debtors shall pay MYNT's claim in full over sixty months beginning on January 1, 2024 comprised of weekly payments in the amount of $1,123.08.

10. In the event of a default, MYNT shall provide written notice by mail and electronic mail to the Debtors and undersigned counsel. The Debtors shall have a ten (10) day period in which to cure any alleged defaults and if the Debtors fail to cure the asserted default, MYNT may proceed to exercise any applicable rights, including seeking entry of an Order from the Bankruptcy Court revoking the use of cash collateral.

11. The Debtors shall incorporate the terms of this Stipulation, either by reference or in their entirety, into any proposed Plan of Reorganization.

12. Notwithstanding any rights granted to MYNT with respect to guarantors, absent any defaults under this Stipulation, MYNT shall forbear from exercising any rights against any

and all guarantors under the MYNT Agreements until the conclusion of the payments under this Stipulation.

13.     Subject to incorporating this Stipulation into a Plan of Reorganization, this Stipulation resolves any and all issues between the Parties, including, without limitation, any asserted objections to any claims, objections to confirmation of any proposed Plan of Reorganization, Adversary Proceedings, declaratory judgment actions, or objections to the use of cash collateral.

14.     While this Stipulation intends to resolve any and all issues, MYNT reserves the right to object to the Plan of Reorganization to the extent the Plan of Reorganization does not incorporate the terms of this Stipulation or the Debtors otherwise default on the terms of this Stipulation.

15.     Nothing contained herein shall establish nor limit any parties' right to assert or argue the nature, extent, validity, or priority of any lien or interest under Section 506(a) of the Bankruptcy Code, nor shall it constitute an admission, waiver, confession or release as to any argument or legal rights the Debtors may have as to the nature of the MYNT Agreements.

WHEREFORE, the Debtor respectfully requests that the Court enter an Order, authorizing the Debtor's use of cash collateral in accordance with this Stipulation, and for such further and additional relief as to the Court may appear proper.

DATED: January 16, 2024                 Respectfully submitted,

By:   */s/ Keri L. Riley*
     Keri L. Riley, #47605
     **KUTNER BRINEN DICKEY RILEY, P.C.**
     1660 Lincoln Street, Suite 1720
     Denver, CO 80264
     Telephone:  (303) 832-2400
     E-mail: klr@kutnerlaw.com

By:   */s/ Shanna M. Kaminski*
     Shanna M Kaminski
     **KAMINSKI LAW, PLLC**
     P.O. Box 247
     Grass Lake, Michigan 49240
     Telephone: 248-462-7111
     E-mail: skaminski@kaminskilawpllc.com

## CERTIFICATE OF SERVICE

I certify that on January 16, 2024, I served a complete copy of the foregoing **STIPULATION RESOLVING OBJECTIONS TO USE OF CASH COLLATERAL** on the following parties in compliance with the Federal Rules of Bankruptcy Procedure and the Court's Local Rules:


Alison Goldenberg, Esq.
US Trustee's Office
1961 Stout Street
Suite 12-200
Denver, CO 80294
Alison.Goldenberg@usdoj.gov

Joli A. Lofstedt, Esq.
Subchapter V Trustee
P.O. Box 270561
Louisville, CO 80027
joli@jaltrustee.com

Shanna M. Kaminski, Esq.
Kaminski Law, PLLC
P.O. Box 247
Grass Lake, Michigan 49240
skaminski@kaminskilawpllc.com

Theodore J. Hartl, Esq.
Ballard Spahr, LLP
1225 17th Street
Suite 2300
Denver, CO 80202-5596
hartlt@ballardspahr.com

Christopher C. Simpson, Esq.
Osborn Maledon P.A.
2929 North Central Avenue
Suite 2000
Phoenix, AZ 85012
csimpson@omlaw.com

C. Daniel Roberts, Esq.                     /s/Vicky Martina
C. Daniel Roberts, P.C.                     Vicky Martina
P.O. Box 6368
Austin, TX 78762
droberts@cdrlaw.net

# Exhibit G

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 23-15280-JGR |
| GALLUS DETOX SERVICES, INC. | ) | Chapter 11 |
| EIN: 88-2490456 | ) | |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| | ) | |
| GALLUS DETOX DENVER, LLC | ) | Case No. 23-15283-JGR |
| EIN: 84-3421544 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

| | | |
|---|---|---|
| | ) | |
| GALLUS DETOX SCOTTSDALE, LLC | ) | Case No. 23-15284-JGR |
| EIN: 47-2515577 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

| | | |
|---|---|---|
| | ) | |
| GALLUS DETOX DALLAS, PLLC, | ) | Case No. 23-15285-JGR |
| EIN: 87-2068937 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

**STIPULATION RESOLVING OBJECTIONS TO USE OF CASH COLLATERAL**

The Debtors, Gallus Detox Services, Inc. ("GDS"), Gallus Detox Denver, LLC ("Denver"), Gallus Detox Scottsdale, LLC ("Scottsdale"), and Gallus Detox Dallas, PLLC ("Dallas" and together "Debtors"), and Lionheart Funding, LLC ("Lionheart"), by and through their undersigned attorneys, state their Stipulation Resolving Lionheart's Objection to Use of Cash Collateral as follows:

**BACKGROUND**

1.     The Debtors filed their respective Voluntary Petitions pursuant to Chapter 11 of the Bankruptcy Code on November 14, 2023.  The cases are jointly administered under Case No. 23-15280-JGR, and the Debtors remain debtors in possession and are in operation of its business pursuant to 11 U.S.C. §§ 1107, 1108 and 1182.

2.     GDS is a Delaware corporation with its principal place of business located in Denver, Colorado.  GDS is engaged in business as the agent and manager of detoxification clinics located in Denver, Colorado, Scottsdale, Arizona, and Dallas and Houston, Texas.  Denver,

Scottsdale, and Dallas are managed by GDS in all respects, including employee management, financial management, and operational management.

      3.      On November 1, 2023, the Debtors entered into a "Standard Merchant Cash Advance Agreement with Lionheart ("Lionheart Agreement").

      4.      On November 15, 2023, the Debtors filed their Motion for Authority to Use Cash Collateral, seeking to use funds in which Lionheart and other parties asserted an interest.

      5.      Lionheart filed its Objection to the Debtors' Motion for Authority to Use Cash Collateral on November 20, 2023.

      6.      The Court entered an Interim Order Authorizing Use of Cash Collateral on November 22, 2023, setting a final hearing on the Debtors' use of cash collateral and ordering the Debtors to escrow funds that may be subject to Lionheart's interest pending a determination as to the issues between the Parties.

      7.      To avoid the time, expense, and uncertainty of further litigation and resolve issues between the Parties, the Debtors and Lionheart stipulate and agree as follows:

**STIPULATION**

      8.      Lionheart shall have an allowed secured claim in the amount of $136,000, secured by receivables of the Debtors to the extent of the pre-petition Lionheart Agreements and any applicable security interests granted therein and perfected by virtue of a subsequent UCC-1 Financing Statement.

      9.      As adequate protection of Lionheart's interest and payment of its claim, the Debtors shall pay Lionheart's claim in full over twenty-four months beginning on January 1, 2024 comprised of weekly payments in the amount of $1,307.69.

      10.     In the event of a default, Lionheart shall provide written notice by mail and electronic mail to the Debtors and undersigned counsel. The Debtors shall have a ten (10) day period in which to cure any alleged defaults and if the Debtors fail to cure the asserted default, Lionheart may proceed to exercise any applicable rights, including seeking entry of an Order from the Bankruptcy Court revoking the use of cash collateral.

      11.     The Debtors shall incorporate the terms of this Stipulation, either by reference or in their entirety, into any proposed Plan of Reorganization.

      12.     Notwithstanding any rights granted to Lionheart with respect to guarantors, absent any defaults under this Stipulation, Lionheart shall forbear from exercising any rights against any

and all guarantors under the Lionheart Agreements until the conclusion of the payments under this Stipulation.

13.     Subject to incorporating this Stipulation into a Plan of Reorganization, this Stipulation resolves any and all issues between the Parties, including, without limitation, any asserted objections to any claims, objections to confirmation of any proposed Plan of Reorganization, Adversary Proceedings, declaratory judgment actions, or objections to the use of cash collateral.

14.     While this Stipulation intends to resolve any and all issues, Lionheart reserves the right to object to the Plan of Reorganization to the extent the Plan of Reorganization does not incorporate the terms of this Stipulation or the Debtors otherwise default on the terms of this Stipulation.

15.     Nothing contained herein shall establish nor limit any parties' right to assert or argue the nature, extent, validity, or priority of any lien or interest under Section 506(a) of the Bankruptcy Code, nor shall it constitute an admission, waiver, confession or release as to any argument or legal rights the Debtors may have as to the nature of the Lionheart Agreements.

WHEREFORE, the Debtor respectfully requests that the Court enter an Order, authorizing the Debtor's use of cash collateral in accordance with this Stipulation, and for such further and additional relief as to the Court may appear proper.

DATED: January 16, 2024                                 Respectfully submitted,


By:___ /s/ Keri L. Riley_____
Keri L. Riley, #47605
**KUTNER BRINEN DICKEY RILEY, P.C.**
1660 Lincoln Street, Suite 1720
Denver, CO 80264
Telephone:  (303) 832-2400
E-mail: klr@kutnerlaw.com


By: ____ /s/ Shanna M. Kaminski_____
Shanna M Kaminski
**KAMINSKI LAW, PLLC**
P.O. Box 247
Grass Lake, Michigan 49240
Telephone: 248-462-7111
E-mail: skaminski@kaminskilawpllc.com

## CERTIFICATE OF SERVICE

I certify that on January 16, 2024, I served a complete copy of the foregoing **STIPULATION RESOLVING OBJECTIONS TO USE OF CASH COLLATERAL** on the following parties in compliance with the Federal Rules of Bankruptcy Procedure and the Court's Local Rules:

Alison Goldenberg, Esq.
US Trustee's Office
1961 Stout Street
Suite 12-200
Denver, CO 80294
Alison.Goldenberg@usdoj.gov

Joli A. Lofstedt, Esq.
Subchapter V Trustee
P.O. Box 270561
Louisville, CO 80027
joli@jaltrustee.com

Shanna M. Kaminski, Esq.
Kaminski Law, PLLC
P.O. Box 247
Grass Lake, Michigan 49240
skaminski@kaminskilawpllc.com

Theodore J. Hartl, Esq.
Ballard Spahr, LLP
1225 17th Street
Suite 2300
Denver, CO 80202-5596
hartlt@ballardspahr.com

Christopher C. Simpson, Esq.
Osborn Maledon P.A.
2929 North Central Avenue
Suite 2000
Phoenix, AZ 85012
csimpson@omlaw.com

C. Daniel Roberts, Esq.                    **/s/Vicky Martina**
C. Daniel Roberts, P.C.                    Vicky Martina
P.O. Box 6368
Austin, TX 78762
droberts@cdrlaw.net

# Exhibit H

**Gallus - Liquidation Analysis**

| SERVICES | Book Value | Liquidation Value | Cost of Sale/Recovery | Value to Estate Before Liens |
|---|---|---|---|---|
| Prepaid Expenses | $ 75,777.86 | | | |
| Cash in DIP account at 12/31/23 | $ 175,050.14 | $ 175,050.14 | | $ - |
| Other Cash | $ 34,144.00 | $ 34,144.00 | | $ - |
| Management Contracts with Scottsd | unknown | | | |
| www.gallusdetox.com | unknown | | | |
| | | | | |
| Fixed Assets | | | | |
| Furniture & Fixtures | $ 163,224.80 | $ 4,000.00 | $ 400.00 | $ - |
| Office Artwork | $ 50,592.31 | $ 7,000.00 | $ 700.00 | $ - |
| Technology Equipment | $ 52,528.98 | $ 5,000.00 | $ 500.00 | $ - |
| Software/Intangible | $ 11,250.00 | $ - | $ - | |
| Other Equipment | $ 2,084.78 | $ - | $ - | |
| Lease Deposits | $ 354,733.44 | | $ - | |
| Tenant Improvements | $ 140,129.24 | $ - | $ - | |
| Accumulated Depreciation | $ (114,965.54) | | $ - | |
| Book Value of Fixed Assets | $ 659,578.01 | | $ - | |
| | | | $ - | |
| **Total Liquidation Value of Assets GDS** | | $ 225,194.14 | | $ - |
| | | | | |
| **DENVER** | Book Value | Liquidation Value | | |
| Bank of America (as of 12/31/23) | $ 6,013.14 | $ 6,013.14 | | $ 6,013.14 |
| Accounts Receivable (as of 12/31/23 | $ 165,923.00 | $ 165,923.00 | $ 33,184.60 | $ 132,738.40 |
| | | | | |
| Fixed Assets | | | | |
| Tenant Improvements | $ 165,307.02 | $ - | $ - | $ - |
| Medical Equipment | $ 42,987.75 | $ 10,000.00 | $ 1,000.00 | $ 9,000.00 |
| Technology Equipment | $ 29,553.99 | $ 5,000.00 | $ 500.00 | $ 4,500.00 |
| Other Equipment | $ 14,771.32 | $ 2,000.00 | $ 200.00 | $ 1,800.00 |
| Furniture and Fixtures | $ 37,612.77 | $ 3,000.00 | $ 300.00 | $ 2,700.00 |
| Software/Intangible Assets | $ 9,000.00 | $ - | $ - | $ - |
| Accumulated Depreciation | $ (76,451.06) | | $ - | $ - |
| Book Value of Fixed Assets | $ 222,781.79 | | $ - | $ - |
| | | | $ - | $ - |
| **Total Liquidation Value - Denver** | | $ 191,936.14 | | |

| | Book Value | Liquidation Value | | |
|---|---|---|---|---|
| **SCOTTSDALE** | Book Value | Liquidation Value | | |
| Bank of America (as of 12/31/23) | $ 9,260.15 | $ 9,260.15 | $ - | $ 9,260.12 |
| Accounts Receivable (as of 12/31/23 | $ 239,900.00 | $ 239,900.00 | $ 47,980.00 | $ 191,920.00 |
| | | | | |
| Fixed Assets | | | | |
| Tenant Improvements | $ 305,201.09 | $ - | $ - | $ - |
| Medical Equipment | $ 66,761.20 | $ 10,000.00 | $ 1,000.00 | $ 9,000.00 |
| Technology Equipment | $ 11,503.45 | $ 1,000.00 | $ 100.00 | $ 900.00 |
| Furniture and Fixtures | $ 25,023.23 | $ 2,000.00 | $ 200.00 | $ 1,800.00 |
| Software/Intangible Assets | $ 5,143.20 | $ - | $ - | |
| Accumulated Depreciation | $ (59,201.03) | | | |
| Book Value of Fixed Assets | $ 354,431.14 | | | |
| | | | | |
| | | | | |
| **Total Liquidation Value - Scottsdale** | | $ 262,160.15 | | |
| **DALLAS** | Book Value | Liquidation Value | | |
| Bank of America (as of 12/31/23) | $ 10,634.36 | $ 10,634.36 | $ - | $ 10,634.36 |
| Accounts Receivable (as of 12/31/23 | $ 111,293.00 | $ 111,293.00 | $ 22,258.60 | $ 89,034.40 |
| | | | | |
| Fixed Assets | | | | |
| Tenant Improvements | $ 201,778.69 | $ - | | |
| Medical Equipment | $ 57,349.30 | $ 10,000.00 | $ 1,000.00 | $ 9,000.00 |
| Technology Equipment | $ 61,530.74 | $ 5,000.00 | $ 500.00 | $ 4,500.00 |
| Other Equipment | $ 13,489.00 | $ 1,000.00 | $ 100.00 | $ 900.00 |
| Furniture and Fixtures | $ 117,575.89 | $ 8,000.00 | $ 800.00 | $ 7,200.00 |
| Software/Intangible Assets | $ 5,416.64 | $ - | | $ - |
| Accumulated Depreciation | $ (82,735.30) | | | |
| Book Value of Fixed Assets | $ 374,404.96 | | | |
| | | | | |
| **Total Liquidation Value - Dallas** | | $ 145,927.36 | | $ 490,900.42 |
| | | | MCA Liens | $ (926,000.00) |
| | | | Other Liens | $ (800,000.00) |
| | | | Value for the Estate | $ - |